**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. 26-CR-14 (JDB)** |
| | **:** | |
| | **:** | |
| **TONG LI,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**DEFENDANT TONG LI'S MOTION FOR REDETERMINATION OF DETENTION ORDER**

Defendant Tong Li, by and through his attorneys, respectfully moves this Court to set conditions for his release, pursuant to the Bail Reform Act ("BRA"), 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). Redetermination of Mr. Li's detention order is appropriate for two reasons.

First, Mr. Li has new information to present, including two crucial sources that this Court lacked at the time it issued its order of detention: the Pretrial Services report and the transcript from Mr. Li's prior bond hearing in the Central District of California, where the Magistrate Judge ordered Mr. Li's release secured by a deposit of $10,000.[1]  Further, the following factual errors underlie the order of detention:

- Mr. Li does in fact have substantial ties to the community in Los Angeles;

- Mr. Li can present significant collateral in the form of two real properties belonging to his parents and a $100,000 cash deposit;

- This Court misunderstood the record regarding Mr. Li's alleged role in the offense and whether he was involved in drug trafficking after the search of his home in January 2026; and

---

[1] Both documents have been included as exhibits to this motion. Exhibit A is the transcript of the bond hearing in the Central District of California before Magistrate Judge Richlin. Exhibit B is the Pretrial Services report from the Central District of California, which will be filed under seal.

- This Court failed to consider all the facts surrounding Mr. Li's alleged flight risk.

Second, this Court erred in its application of the legal standard. First, based on the U.S. Supreme Court's recent decision in *Wolford v. Lopez*, 609 U.S., ---, 2026 WL 1825723 (2026), the presumption of detention is unconstitutional.[2] Second, assuming that the presumption of detention was constitutional, this Court incorrectly gave excessive weight to the presumption in its analysis.

Mr. Li has rebutted the presumption of detention by demonstrating that he has extensive ties to his community, lacks any history of violence or serious criminal history, has demonstrated a willingness and commitment to comply with whatever release conditions are imposed, and can present sureties with significant and secured collateral to guarantee his appearance. Further, the United States failed to meet its burden of establishing that Mr. Li poses either a flight risk or a danger to the community. Thus, conditions can in fact be set to reasonably assure Mr. Li's appearance and public safety. Indeed, the Magistrate Judge in the Central District of California set release conditions in the amount of a $10,000 secured personal appearance bond. Given all this, this Court should order that Mr. Li be released, with his appearance secured by the collateral of two real properties (valued at approximately $1.5 million) owned by his parents and a $100,000 cash deposit.

## I.    Procedural History

On January 28, 2026, Mr. Li was detained while law enforcement executed a search warrant for his house in Los Angeles leading to the seizure of multiple items. An indictment was filed on May 19, 2026 in the United States District Court for the District of Columbia, charging Mr. Li with one count of conspiracy to distribute and possess to distribute controlled substances (specifically, methamphetamine, cocaine, marijuana, and psilocybin mushrooms) in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(vii), (b)(1)(C), and 846;  one count of

---

[2] *Wolford* was decided after this Court's order of detention in this case. Thus, based solely on the issues raised by this new precedent, there is a basis for reconsideration of the order.

conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h); and forfeiture allegations pursuant to 18 U.S.C. § 982(a)(1). (ECF No. 29).

Approximately four months after the initial detention, search and seizure, Mr. Li was arrested on June 3, 2026, based on the indictment from the District of Columbia. Between January and June of 2026, Mr. Li retained two separate attorneys. Both attorneys contacted the Assistant United States Attorney assigned to the case in D.C. His first counsel contacted them in February of 2026. Then, Mr. Li's second counsel emailed in both April and May of 2026, attempting to schedule a self-surrender date for Mr. Li. The Assistant United States Attorney in D.C. never responded to Mr. Li's query regarding self-surrender.

Instead, Mr. Li was arrested in the same place he was detained months before: at his home in Los Angeles. At the time of both the search in January and the arrest in June, the government knew exactly where Mr. Li was. As the government has pointed out, Mr. Li has an international passport and access to sufficient funds to travel. After he was detained during the search of his home, Mr. Li knew he was under investigation. But at no point during the four months between his detention and his arrest, did Mr. Li ever try to flee. (Ex. A at 22 ("my understanding is he has remained at home and he's remained within the jurisdiction")). Instead, he retained counsel in order to handle the matter properly and lawfully through the justice system. Mr. Li's actions are consistent with his desire to be cooperative and have open communication with the Assistant United States Attorney through his counsel.

On June 4, 2026, the U.S. District Court for the Central District of California held an initial appearance. Mr. Li waived arrival of process and an identity hearing, (ECF No. 60 at 13). Pretrial Services prepared a report in which it recommended a personal appearance bond in the amount of $20,000. (Ex. B at 6). A detention hearing was held, and the district court set a secured appearance bond of $10,000. (*Id.* at 4–10). After the detention hearing, Mr. Li's family surrendered Mr. Li's passport and issued a $10,000 cashier's check to the clerk of the U.S. District Court. Exhibit C is confirmation that Mr. Li's passport was surrendered and a $10,000 cashier's check was deposited in the Central District of California.

The district court in the Central District of California agreed to stay the bond to allow the United States to seek review and appeal of the release order with this Court. This Court reviewed the briefing of the parties. (ECF Nos. 45, 52, 58, and 61). It then issued a Memorandum Opinion and Order granting the government's motion and ordered that Mr. Li be held without bond. (ECF No. 62). This Motion for Redetermination follows.

## II.      The Legal Standard

"In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Salerno*, 481 U.S. at 755. Because Mr. Li has been charged with a Controlled Substances Act offense with a statutory maximum sentence of 10 years imprisonment or more, the BRA creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(e)(3). "[C]ase law emphasizes two checks that the BRA and the Constitution impose on the presumption."[3] First, a defendant can easily rebut the presumption, and the prosecution always bears the burden of persuasion. *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). Second, the presumption alone does not warrant detention; a court must always consider the factors laid out in § 3142(g) of the BRA. *See*, *e.g.*¸ *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017). Specifically, those factors are: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence," (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The BRA allows for a district court to redetermine bond "at any time before trial" if "finds that information exists that was not known to the movant at the time of the hearing and

---

[3] Alison Siegler, *Freedom Denied: How the Culture of Detention Created a Federal Jailing Crisis* 151 (2022), https://freedomdenied.law.uchicago.edu/; *see also Bail*, 51 GEO. L.J. ANN. REV. CRIM. PROC. 396, 171 (2022), https://www.westlaw.com/Document/I43b1e73f204811ed9f24ec7b211d8087/View/FullText.html ?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0.

that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B); *see also United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014). Reconsideration of a bond order may be warranted "as justice requires." *United States v. Hong Vo*, 978 F. Supp. 2d 41, 47 (D.D.C. 2013). A court should consider "whether [it] patently misunderstood the parties, made a decision beyond the adversarial issues presented, or made an error in failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred." *See id.* (quoting *Arias v. DynCorp*, 856 F. Supp. 2d 46, 51 (D.D.C. 2012)).

### III.    Factual Errors

The detention of Mr. Li was based on misapprehensions of fact and deficiencies in the record. This Court did not have complete information related to Mr. Li's community ties and the nature of the proposed security. Further, this Court failed to fully consider multiple facts related to Mr. Li's potential risk of flight and incorrectly interpreted the government's assertions regarding ongoing criminal activity. Significantly, this Court lacked several crucial pieces of information that Mr. Li now presents: (1) the transcript from the detention hearing in the Central District of California; (2) the Pretrial Services report; and (3) the full details of Mr. Li's proposed conditions for release. This motion now presents additional evidence and corrects errors on the record. For these reasons, the Court should redetermine Mr. Li's bond and find that he is neither a flight risk nor a danger to the community, therefore conditions of release may be set.

### A.  Mr. Li's Community Ties

There is extensive evidence regarding Mr. Li's history and characteristics that this Court did not consider at the time of its detention order.  This Court noted that Mr. Li "does not assert any community ties [] in . . . Los Angeles." (ECF No. 62 at 6). This is an incorrect statement of fact, likely due to the Court not having the Pretrial Services report or transcript from the prior bond hearing. Thus, at the time of making its original bond determination, this Court only had knowledge of Mr. Li's ties to China and foreign travel. *Id.*

In fact, Mr. Li has extensive lifelong ties to his home community in the Los Angeles area. Mr. Li is a 37-year-old U.S. citizen. Although he was born in China, he moved to the U.S. when he was approximately 2 years old. (Ex. B at 2). Mr. Li became a naturalized U.S. citizen when he was a teenager. (*Id.*). He has lived exclusively in the Central District of California since immigrating to this country in 1992. (*Id.*). Mr. Li arrived to the United States with his mother; his father had arrived by himself the prior year. In 1997, his parents purchased a house in the city of Walnut, which is in Los Angeles County. Mr. Li lived there with his parents until his mid-twenties. That address was listed on his naturalization documents and is the address still listed on his current driver's license.

After graduating from Walnut High School in Los Angeles, Mr. Li attended California Polytechnic State University, a nearby college, for four years (2007–2011). He majored in Finance, Real Estate, and Law, but did not graduate with a diploma.

In April of 2020, Mr. Li got married in Los Angeles. Later that year, Mr. Li and his wife moved into the home where his wife had grown up; it was passed down to her by her mother. In February of 2021, Mr. Li's first son was born. In February of 2023, Mr. Li's second son was born. The family still lives at the same home in Los Angeles County; his children are now three and five years old. Mr. Li's parents and in-laws both still reside in Walnut, California. Mr. Li's family has always been supportive, and they remain by his side even after his arrest. During the detention hearing in the Central District of California, Mr. Li's parents, wife, and brother-in-law were all present in court. (Ex. A at 9).

Mr. Li's employment history also has occurred exclusively in Los Angeles County. He worked at Samsung for approximately one year. Thereafter, he opened his own business selling cell phone accessories on eBay and Amazon in his parents' garage for approximately three years. After selling his business, he went on to partner with others in opening three companies over the course of ten years. First, ten years ago, Mr. Li started an e-commerce business (Hydroponic City). Then seven years ago, he opened a business where he sold products on Amazon (Buddy Bags). Five years ago, Mr. Li started a healthcare management business (Brian Leonard Tong

Management Service Organization or "BLT MSO"). In short, for more than a decade, Mr. Li has been a self-employed business owner.

Although the United States alleges that two of Mr. Li's businesses were related to drug trafficking, it has not been asserted that Mr. Li's healthcare management business, BLT MSO, has any involvement with or relation to criminal activity. Exhibit D is a letter from one of Mr. Li's partners at BLT MSO, who is also one of his partners at Hydroponic City. Mr. Li thus has an undisputed legitimate form of income and will be able to work during the pendency of the case. *See* Ex. D ("Should the Court grant his release, Tong Li has a clear and ongoing responsibility waiting for him within our company. He will resume his role working on our Amazon business . . .".) Even if he did not have employment, which he does, Mr. Li would continue to be the primary caretaker of his two minor children being responsible for transportation to/from school and extracurricular activities on the weekends.

Mr. Li's strong ties to the community were obvious to the court in the Central District of California at his original detention hearing where bond was set. The Magistrate Judge there summed it up succinctly: "He lives here. He's lived here since he's a kid. He has family here. He's got little kids. Is he going to flee the country? I don't think so." (Ex. A at 34-35). In response, the Assistant United States Attorney in the Central District of California conceded, "I don't think so either." Id. at 35. Thus, with all the information regarding Mr. Li's community ties available to them, both the judge and the prosecutor at the first detention hearing agreed that Mr. Li was not a flight risk.

Mr. Li's ties to Los Angeles should be given the same weight as if he had ties to Washington, D.C. This Court erred in stating that ties to D.C. would be more important than ties to Los Angeles. (ECF No. 62 at 6). But under the law, "ties to the community" does not necessarily require that Mr. Li have ties to the district in which he has been prosecuted. The BRA itself does not define what it means by "ties to the community," but it certainly does not require that those ties connect to the district in which the prosecution takes place. Nor does it state that a district court should weigh ties to the prosecuting district higher than ties to a defendant's

7

residential district. Although the D.C. Circuit has not explicitly ruled on the issue, the Ninth

Circuit has held that ties to another district suffice under the BRA, while providing the logical

rationale for such a rule:

> Among additional characteristics that must be considered are their ties to 'the community.' What 'community' is meant? If it were only the community in which the indictment was brought, a defendant who has deep roots in Boston, for example, might be denied bail if indicted in New Haven. If the defendant is a United States resident, the community to be considered must be at least as broad as in the United States. Accordingly, we hold that "community" in this section of the statute embraces both the community in which the charges are brought and also a community in the United States to which the defendant has ties.

*United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (citing *Truong Dinh Hung v. United States*, 439 U.S. 1326 (1978) (Brennan, J., in chambers) (ordering bail pending appeal because defendant "resided continuously in this country . . . [for 13 years], and has extensive ties in the community")); *Himler*, 797 F.2d at 162 (reversing order of pretrial detention because of defendant's "family ties to the area")).

Thus, this Court should not have determined that ties to Los Angeles are not as important as ties to Washington, D.C. Indeed, it appears that all of Mr. Li's alleged criminal acts occurred in Los Angeles, not Washington, D.C., and thus it is not surprising that his ties are to that city. Favoring the district of prosecution over the district where a defendant lives and allegedly committed a crime would allow the government to intentionally abuse the system by charging drug conspiracies in another relevant district to prevent certain defendants from being able to demonstrate community ties. Thus, as the Ninth Circuit has noted, ties to another American city still should be considered a positive factor favoring release. *See also United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (setting conditions of release for two defendants based in part on their family and employment connections in Florida and Nevada despite the drug conspiracy being prosecuted in Indiana). Mr. Li's ties to Los Angeles constitute the type of community ties envisioned by Congress when passing the BRA.

**B.  Mr. Li's Proposed Collateral**

Mr. Li also has additional knowledge at this juncture regarding potential securities for his bond, which would allow this Court to create even stronger conditions to secure his appearance. The Central District of California set a $10,000 bond in this case. Mr. Li then presented documents related to a real property valued at approximately $960,000. This Court conveyed three concerns about this property serving as collateral. First, it did not know how Mr. Li was "related to the owners of the property." (ECF No. 62 at 7). Second, it expressed concern that, given the alleged quantity of drug proceeds in this case, "the risk of losing a substantial bond may be 'a mere cost of doing business'" for Mr. Li. *Id.* Finally, this Court expressed "doubt on the source of funds used to finance this property." *Id.* Mr. Li now provides additional information regarding collateral to assuage this Court's concerns, as well as presenting additional potential collateral to make the bond even stronger.

Mr. Li now proposes that the bond be secured by *two* separate houses, with a combined valuation of approximately $1.5 million. The first house is the one referred to in the original bond order. The house is in Walnut, California and is owned by Mr. Li's parents, to whom he is very close. Mr. Li has no siblings and is the only child. His parents, ages 65 and 69, are both retired, and the home is their current residence. As the oldest and only child, his parents are his responsibility as is customary in Asian culture. This is the same house that Mr. Li lived in from childhood until his mid-twenties. His parents paid off the house in approximately 2009; it is currently valued at approximately $960,000. Exhibit E is the title and appraisal report. The second house is also owned by Mr. Li's parents. This is their rental property in Jurupa Valley in Riverside County. Mr. Li's parents purchased this home in 2017, and it currently has approximately $600,000 in equity. Exhibit F is the title and appraisal report. Together, the two houses are valued at approximately $1.5 million. Mr. Li's parents are willing to post both of their homes as collateral for bond. Additionally, Mr. Li's wife is willing to deposit an additional $100,000 as additional security. Mr. Li's wife is a real estate agent.

Thus, this Court need not worry about "the source of funds used to finance this property." This is not property from a co-conspirator; nor does it consist of proceeds from illegal activity

9

allegedly undertaken by Mr. Li. These houses were purchased independently by Mr. Li's parents, one when Mr. Li was a mere child. Crucially, the United States has not made allegations of drug trafficking involvement on the part of Mr. Li's wife, parents, or healthcare management business. Thus, there is a legitimate source for all the collateral, both real property and cash, that would potentially secure this bond.

This additional information further shows that Mr. Li could not simply write off the collateral as "the cost of doing business." Even in the context of a multimillion-dollar business, this amount of money is far from negligible—and it creates even more motivation to appear given that both real properties belong to Mr. Li's beloved parents. After Mr. Li's parents immigrated to the United States approximately 30 years ago, they have each worked hard to be able to afford not just one but two homes. It takes tremendous confidence on their part to both be willing to risk everything they have worked for their entire lives. Moreover, the $100,000 cash deposit would be made by his wife and mother of his two minor children. A failure to appear in this case would lead to significant financial ruin for his entire family, potentially leaving his parents homeless and his wife without resources to support their minor children.

The Court's concerns about setting a bond in the context of an "extremely lucrative" drug business are not grounded in sufficient fact but rather based primarily on speculation and generalizations about the drug trafficking business. The United States has alleged that Mr. Li had $40,000 in cash in his home and transferred $186,000 in cryptocurrency. These are considerable sums that demonstrate financial resources, but they are far from the type of true "kingpin" wealth that Congress was concerned about. For example, according to Encyclopedia Britannica, Pablo Escobar had a net worth of $25 billion,[4] and a DEA agent who investigated Nemesio "El Mencho" Oseguera has told news outlets he believed the kingpin was worth between $500 million to $1 billion.[5]

---

[4] Encyclopedia Britannica, *How Rich Was Pablo Escobar?*, https://www.britannica.com/topic/How-Rich-Was-Pablo-Escobar.
[5] John Hyatt, *Why Drug Kingpin El Mencho's Billion Dollar Fortune Will Likely Remain Untouched By Authorities*, FORBES (Feb. 27, 2026),

Regardless, the BRA does not foreclose pretrial release for affluent defendants. Rather, a district court must simply craft conditions that are severe in proportion to the resources of a defendant. In this case, it is understandable why this Court did not believe $10,000 was sufficient. But two real properties, valued at approximately $1.5 million, along with $100,000 in cash, do indeed create a financial (and personal) threat that is tailored to Mr. Li's actual assets and income. Indeed, Mr. Li reported his annual income to Pretrial Services was approximately $100,000. (Ex. B at 3). And despite the broad generalizations it makes about DTOs overall, the United States has failed to create a record supporting any finding that Mr. Li himself is so wealthy that no bond amount could ever reasonably assure his appearance. In fact, the Assistant United States Attorney in the Central District ultimately agreed that bond was appropriate and stated it would feel more comfortable with a bond where Mr. Li's parents' house was used as collateral. (Ex. A at 33–34). Now, two separate homes are being proposed as collateral in addition to $100,000 (compared to $10,000).

### C. Alleged Role in the Offense

This Court made several factual errors in its analysis that Mr. Li can clarify regarding his role in the offense. Mr. Li does not deny that he is accused of two serious offenses, conspiracy to distribute controlled substances and money laundering. He does note, however, that this Court incorrectly stated that the government accused him of being "*the* leader" of a drug trafficking organization ("DTO") based out of Los Angeles as well as "*the* alleged ringleader of the conspiracy." (ECF No. 62 at 3 (citing Govt. Mot. 2–4)) (emphasis added). The briefing of the United States, however, alleges that Mr. Li is "*a* leader" of the DTO. (ECF No. 45 at 1, 4). It never refers to him as "the ringleader." While this may seem like a distinction without a difference, whether Mr. Li is *the* top person in a DTO is relevant to whether he constitutes the type of "drug kingpin" that Congress had particular concerns about in terms of detention. *See* S. REP. NO. 98-225, at 7.

---

https://www.forbes.com/sites/johnhyatt/2026/02/27/why-drug-kingpin-el-menchos-billion-dollar-fortune-will-likely-remain-untouched-by-authorities/.

Importantly, it is clear under the law that Mr. Li is not automatically rendered ineligible for bond simply due to the serious nature of his charges or his alleged leadership role. Congress did not place a blanket prohibition on bond for all drug traffickers, just a rebuttable presumption. Similarly, while Congress can and does intentionally exclude leaders/managers/etc. from certain provisions (e.g., Safety Valve), it did not specifically prohibit defendants with alleged leadership roles from eligibility for pretrial release. Thus, the nature and circumstances of the offense alone cannot suffice as a basis to find that Mr. Li is a flight risk. Under that interpretation, there would essentially be no pretrial release for anyone charged with a serious drug trafficking crime. Understanding that, the Assistant United States Attorney in the Central District went straight to the point: "I'll just get straight to it. Really, the driving force here for why detention is warranted is the instant allegation." (Ex. A at 18).

### D.  Alleged Criminal Activity After January 28, 2026

The order detaining Mr. Li was also based on misapprehensions and incorrect facts surrounding alleged ongoing criminal activity.[6] This Court found that Mr. Li was a danger to the community because he allegedly "continued to deal lethal drugs even after having his home searched, stash house raided, and associates arrested earlier this year." (ECF No. 62 at 8). Mr. Li now presents evidence refuting those allegations as well as directing this Court to its errors in interpretation of the record.

This Court expressed substantial concern at the risk that Mr. Li would "continue to engage in drug trafficking." ECF No. 62 at 7 (quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 71 (D.D.C. 2018)). Mr. Li does not contest that drug trafficking can constitute a danger to the community under the BRA and that he is accused of distributing methamphetamine, which is a

---

[6] It is important to note that possibility of ongoing drug trafficking was the sole rationale for a finding that Mr. Li was a danger to the community. Neither the United States nor this Court have raised any suggestion that Mr. Li might pose any risk of engaging in physically violent behavior. There is absolutely zero indication of any prior violence in his life, nor was there any evidence of his connection to firearms or any type of weapon. There is no allegation of violence or firearms. (Ex. A at 19).

deadly substance.[7] He does, however, dispute whether the government has met its high burden of proof as to this assertion. Mr. Li also vehemently denies any involvement with drugs since his detention, search, and seizure on January 28, 2026. Mr. Li encourages the government to present any evidence in support of this allegation, especially if it is being used to support Mr. Li's detention.

In fact, the United States itself has not even clearly asserted that Mr. Li was trafficking drugs since that date. This Court determined that the government established a risk to public safety based on its claim that there is "evidence of continued criminal activity even after Li was on notice that he was under investigation." (ECF No. 62 at 5). That statement, however, does not accurately reflect what the United States proffered in its motion. The government *never* directly stated that Mr. Li *himself* engaged in drug trafficking after the enforcement operation in January. Instead, it stated that:

> [T]he DTO *led by the Defendant* continued to operate. *Members of the Defendant's DTO* continued to advertise online—using the same promotional photographs for drugs that had been found on the Defendant's phones. *Members of the DTO* again sold drugs to an FBI UC. In fact, law enforcement was able to trace the cryptocurrency the UC sent for those post-January purchases to an account operated by the Defendant. Additionally, immediately after the enforcement operation, more than $186,000 worth of drug proceeds in the form of cryptocurrency that had been in the custody and control of the Defendant was transferred out of reach of law enforcement through a complex series of transactions.

(ECF No. 45 at 6) (emphasis added).

Thus, a closer evaluation of the government's allegations shows that there is no evidence of Mr. Li's direct involvement in the conspiracy between the raid in January and his arrest in June. Instead, the allegations are about other members of the alleged DTO. Even if someone sent

---

[7] To add context, however, the government's own statistics show that opioids far outweigh methamphetamine in terms of deadliness. Their CDC figures show that fewer than 10% of overdose deaths during the cited period involved *only* methamphetamine; the remaining 21.5% of overdose deaths involving methamphetamine *also* involved opioids. (ECF No. 45 at 12). Mr. Li is not accused of trafficking any opioids, which are involved in the vast majority of overdose deaths.

cryptocurrency to an account allegedly operated by Mr. Li, nothing here establishes that it was Mr. Li directly who transferred the currency. There is no proof that Mr. Li was the only person with the ability to transfer funds to the account. Further, the government's language appears to show that the DTO continued operating *without* any involvement from one of its alleged leaders, which again suggests that the implication that Mr. Li is a "kingpin" is misplaced.

Therefore, none of this definitively demonstrates that Mr. Li had knowledge of or participated in any drug trafficking activity during that period. All of this is far too speculative to meet the high "clear and convincing evidence" standard. It further fails to properly give the benefit of the doubt to the Defendant, as required under D.C. Circuit precedent. *See United States v. Munchel*, 991 F.3d 1273, 1289 (D.C. Cir. 2021).

### E.  Mr. Li's Alleged Flight Risk

This Court also erred by failed to sufficiently consider all the facts related to potential risk of flight. First, it gave undue credence to Mr. Li's alleged ties to foreign countries. This Court found that the government had proven that Mr. Li was a flight risk due in part to his "alleged international ties—including to drug traffickers in Mexico." (ECF No. 62 at 8). But, in addition to being false, the government's statement alleging Mr. Li's "international ties" was far too vague to meet the evidentiary standard.

The government claimed that based on the communications in Mr. Li's phone, he "had suppliers in Mexico." (ECF No. 45 at 11). First and foremost, Mr. Li denies this fact. Mr. Li has never been to Mexico. Mr. Li does not speak Spanish. He maintains that he does not know anyone in Mexico. Most notably, he vehemently denies having any ties, let alone drug sources, from Mexico as alleged by the government.

The government does not provide any details regarding these alleged communications, rendering them minimally useful as evidence. The exact nature of the basis for the government's assertion is unknown to Mr. Li. It is unclear whether the United States is claiming that Mr. Li himself ever had personal contact with anybody in Mexico—let alone asserting that he has ties strong enough to incentivize him to flee to a foreign country where he lacks family, residence, or

14

language fluency. Many questions are raised: who did Mr. Li communicate with, when did they communicate, by what means did they communicate, and how extensive or frequent the communication was? So much additional information is necessary to assess whether these alleged communications support a finding of flight risk. Without those clarifying facts, it is error to rely on this fact to establish risk of flight.

Similarly, there is little support for the proposition that Mr. Li has "international ties." Although Mr. Li does have a passport, which has already been surrendered to Pretrial Services in the Central District of California (Ex. C), the Pretrial Services report notes he has not left the country in two years, and he did not report *any* prior travel to Mexico (as confirmed by his wife). (Ex. B at 3). Taken with the fact that he has not actually lived in any foreign country for 35 years (and he was a child when he did live there), Mr. Li does not have any significant ties outside of the U.S. that pose an unmitigable threat of fleeing the U.S.

Additionally, it bears repeating that when law enforcement looked for Mr. Li on January 28, 2026, they knew exactly where to find him. Months later, in June of 2026, when they went to arrest Mr. Li, again they knew exactly where to find him and that was exactly where he was on January 28, 2026. If Mr. Li wanted to flee, he would have done so after he was detained and his house was searched, and items were seized. Mr. Li did not flee. He remained at home because that is where his entire family is.

Moreover, this Court did not properly weigh Mr. Li's offer to self-surrender in assessing his risk of flight, possibly due to a misunderstanding of the circumstances. Mr. Li tried to confront this case head on as evidenced by his desire to request both of his prior attorneys to reach out to the Assistant U.S. Attorney in D.C. This Court stated that "an attorney's statement that a client would voluntarily surrender carries less weight than a voluntary surrender itself." (ECF No. 62 at 6). This implies, however, that Mr. Li either took no action toward self-surrender or willingly failed to follow through on his intentions. But this was more than simply a hollow statement. Mr. Li, through each of his counsel, contacted the Assistant U.S. Attorney in the District of Columbia about the case. That counsel proactively attempted to set up Mr. Li's self-

surrender. The sole reason that Mr. Li did not self-surrender[8] is that the Assistant U.S. Attorney did not respond to counsel's email seeking to make arrangements. Instead, it elected to have him arrested, thus denying him the chance to surrender. This is, of course, the government's prerogative—but the government's choice should not diminish the significance of Mr. Li's desire to cooperate with his prosecution. Even the Assistant U.S. Attorney in the Central District of California agreed that he was not a flight risk and that he did not think he would flee the country. (Ex. A at 35).

## IV.    Legal Errors

Detaining Mr. Li was also incorrect under the BRA and the United States Constitution. First, as a matter of first impression, this Court should find that the presumption of detention is unconstitutional under *Wolford* because it places a "new and significant burden" on Mr. Li's exercise of the right to liberty. *See Wolford*, 609 U.S. at ---, 2026 WL 1825723 at *9. Second, even if the presumption was constitutional, this Court applied the incorrect standard when weighing it with the § 3142(g) factors. No binding authority requires a court to give "substantial weight" to the presumption of detention after it is rebutted. In fact, the use of that standard among D.C. district courts is based on an entirely incorrect citation.

### 1.    The Presumption of Detention Under the BRA Is Unconstitutional

This Court should reconsider the detention of Mr. Li because new Supreme Court precedent establishes that no defendants should be subjected to a "presumption of detention" as laid out in the BRA. *See Wolford*, 609 U.S. ---, 2026 WL 1825723. *Wolford v. Lopez* demonstrates that the presumption of detention does not comport with the U.S. Constitution.  Mr. Li is not aware of any court that has considered this issue, due to the recency of the precedent. But this Court should now redetermine whether conditions of release can be set for Mr. Li *without* considering any presumption of detention.

---

[8] As a father and primary caregiver of two minor children, as difficult as it would have been to self-surrender, Mr. Li was open to it if presented with the opportunity.

Under *Wolford*, Congress cannot pass a law that places a "new and significant burden" on a traditional common-law right. *See id.* at *6. In *Wolford*, the Court held that Hawaii violated the Second Amendment when it created a presumption that gun owners could not take their guns onto private property open to the public. *Id.* at *14. The property owner had to expressly consent to the gun's presence. *Id.* at 8. The court reached that conclusion because the presumption reversed the "common-law rule" and in doing so, placed a "new and significant burden on the exercise" of the right to bear arms. *See id.* at 9.

Here, just as the Hawaiian law infringed on the traditional right to bear arms, the BRA infringes on the traditional common-law right to liberty. The right to liberty is a common-law right that existed prior to the U.S. Constitution or BRA. *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 723–24 (2015). As was noted by the Fifth Circuit Court of Appeals,

> The Fifth and Fourteenth Amendments did not create any new rights to life, liberty, or due process of law. These rights had existed for Englishmen since Magna Charta. The Declaration of Independence and the Revolution of 1776 merely declared and established these rights for the American Colonies. The Tenth Amendment reserved them to the people of the newly created states; the Fifth Amendment protected them from molestation by the newly created states; the Fifth Amendment protected them from molestation by the newly created federal government; and the Fourteenth Amendment safe-guarded them from violation by the several states of the re-welded union. These were common-law rights, which the people of this nation have sought by three federal constitutional amendments to preserve inviolate to themselves.

*Screven County v. Brier Creek Hunting & Fishing Club, Inc.*, 202 F.2d 369, 371 (5th Cir. 1953).

Until the Bail Reform Act of 1984, "federal law . . . unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail." *Stack v. Boyle*, 342 U.S. 1, 4 (1951). That is, there is a historical "traditional right to freedom before conviction[.]" *Id.* Thus, the BRA's presumption regime flipped this long-standing default, thereby placing a "new and significant burden" on this traditional right.

This conclusion finds support in *Salerno*, even though the Court there upheld the preventive detention provisions of the BRA. *See* 481 U.S. at 750−51. In finding that the statute comported with due process, the Court discussed all the procedural protections a defendant has.

17

However, the presumption regime necessarily loosens the government's burden, especially when it is coupled with substantial weight given to the presumption.

Although *Wolford* involved the historical right to bear arms, its reasoning is still applicable to common-law liberty rights. The Supreme Court has frequently utilized historical analysis when evaluating the constitutionality of a statute, and its jurisprudence has been increasingly relying upon our nation's traditions. For example, it has emphasized historical evidence in the context of the Fourteenth Amendment right to due process, *see, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Sixth Amendment guarantee of a unanimous jury trial, *see, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83 (2020), and in the First Amendment rights of free speech and exercise, *see, e.g.*, *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507 (2022). In particular, *Kennedy* is instructive in terms of the Supreme Court's methodology, as it rejected a long-standing judicially created doctrine in favor of resolving the constitutional question by reference to "historical practices and understandings." *See id.* at 534–36.

In keeping with *Wolford* and the Supreme Court's approach regarding traditional rights, the presumption of detention can no longer stand. In this case, the Court determined whether Mr. Li should be released on bail while giving "substantial weight" to the BRA's presumption of detention. (ECF No. 62 at 3). For this reason, this Court should redetermine bond without applying the presumption. Without that presumption, it is even more clear that the § 3142(g) factors support setting conditions of release.

### 2. This Court Erred in Giving the Presumption of Detention "Substantial Weight."

Even if the presumption of detention were constitutional, this Court erred by giving it excessive importance in its analysis. This Court's opinion quotes *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), for the proposition that the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." (ECF No. 62 at 3). The district court in *Ali*, however, does not

18

provide the correct standard for analysis in a presumption case. Instead, this Court should not have given weight to the presumption of detention after it was rebutted by Mr. Li. Therefore, this Court should reanalyze the § 3142(g) factors without giving any weight–let alone substantial weight–to the presumption of detention. Under the proper analysis, Mr. Li should be released on bail.

### i. *Precedent does not support the use of the "substantial weight" standard.*

There is no binding case law requiring a court to give "substantial weight" to the presumption of detention after rebuttal. The district court in *Ali* appears to have inadvertently relied on an unsupported citation when it applied that standard. Therefore, it was legal error for this Court to give the presumption such heavy consideration.

Courts throughout the country have commonly used a two-step analysis in presumption cases under the BRA. Step one allows a defendant to rebut the presumption of detention with producing some evidence that he will not flee or endanger the community if released." *United States v. Garcia*, 312 F. Supp. 3d 36, 40 (D.D.C. 2018) (quoting *Dominguez*, 783 F.2d at 707). At step two, after the presumption is rebutted, the court considers the § 3142(g) factors. *Id.* at 41. According to *Ali*, that presumption is still given "substantial weight" after it is rebutted. *Ali*, 793 F. Supp. 2d at 391.

A review of the relevant precedent, however, shows there is no basis for a "substantial weight" standard. In stating that the presumption of detention "is given substantial weight," the *Ali* court cited to *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988). In turn, *Bess* supports the proposition by citing two appellate decisions (only one of which is binding on this Court): *Alatishe*, 768 F.2d at 371, and *United States v. Jessup*, 757 F.2d 378, 389 (1st Cir. 1985). But an examination of these two cases shows that they do not support the proposition that *Bess* cites them for.

Neither *Alatishe* nor *Jessup* use the phrase "substantial weight" at any point. *Alatishe*, in fact, does not even discuss the "step two" presumption analysis. Rather, in *Alatishe*, the D.C. Circuit found that the defendant had not rebutted the presumption of detention because the

defendant had not presented any evidence against it, "relying exclusively on the argument that the Government had waived its right to seek pretrial detention." 768 F.2d at 371. Thus, *Alatishe* is completely irrelevant to the amount of weight the presumption of detention should receive after it is rebutted. *Alatishe* does not actually assert that a district court must give *any* weight to a rebutted presumption of detention. It should not have been cited by *Bess*, and in turn, *Bess* should not have been cited by *Ali*.

Turning to *Jessup*, it also fails to support the use of a "substantial weight" standard. *Jessup*, however, does address the second step of the presumption analysis, after a defendant has met his burden of production and rebutted the presumption of detention. In *Jessup*, the defendant relied on the "bursting bubble" theory to argue that the presumption of detention disappeared completely upon rebuttal. 757 F.2d at 382. Under the "bursting bubble" theory, "the presumption requires the 'presumed against' party to introduce evidence, but, once he does so, the presumption 'bursts' and totally disappears, allowing the judge . . . to decide the question without reference to the presumption." *Id.* The First Circuit acknowledged that the "bursting bubble" theory was "the prevailing judicial view" on burdens of production. *Id.* Still, it determined that the theory should not apply to the presumption of detention under the BRA. *Id.* at 383. Instead, it held that after a defendant rebuts the presumption of detention, "the magistrate should incorporate [the presumption] among the other special factors that Congress has told him to weigh when making his bail decision." *Id.* at 384.

*Jessup* did not at any point state that a court must give "substantial weight" to the presumption after rebuttal. It recognized that Congress "did not precisely describe just how a magistrate will weigh the presumption, along with (or against) the other § 3142(g) factors." *Id.* In fact, the *Jessup* court indicated that the weight of the presumption might be quite low. It referred to it as "but one factor among many" and noted that considering the presumption "might not make much difference" for some judges. *Id.* Thus, *Bess* was also incorrect in citing *Jessup* for the proposition that the presumption should be given "substantial weight."

This improper citation in *Bess* has led to a cascade of error. An entire line of cases from district courts in D.C. have used the "substantial weight" standard, usually citing to *Ali* and/or *Bess*. *See*, *e.g.*, *United States v. Tarrio*, 605 F. Supp. 3d 73, 76 (D.D.C. 2022). But when one follows the chain of citations, there is no actual legal support for this standard. All these cases are based on the flawed reasoning of *Bess* (and then *Ali* in turn). For this reason, they are equally erroneous and not persuasive.

This Court thus should reconsider its standard for step two of the presumption analysis.[9] The D.C. Circuit has never held that it must be given "substantial weight." Rather, it has not explicitly decided what weight to give the presumption after it is rebutted. Other circuit courts of appeal, however, have been like *Jessup* in determining it is simply "one factor among many." *See*, *e.g.*, *United States v. Stone*, 608 F.3d 939, 945−46 (6th Cir. 2010) (stating that the "presumption remains as a factor," even when rebutted); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (calling the presumption a "factor to be considered"); *Dominguez*, 783 F.2d at 707 (holding that the presumption should "be weighed along with other evidence relevant to factors listed in § 3142(g)").

### ii. This Court should find that the presumption is a "bursting" bubble, or at worst, simply a factor to consider.

The presumption of detention should not be given any weight after it is rebutted. First, the *Jessup* court should have applied the "prevailing judicial view" that a burden of production is a "bursting bubble." 757 F.2d 378. As the First Circuit noted in that case, the "bursting bubble theory" is "the most widely followed theory of presumptions in American law." *Id.* (quoting C. McCormick, Evidence § 345 at 821 (2d ed. 1972)). The D.C. Circuit has endorsed that theory in other contexts. *See, e.g.*, *Legille v. Dann*, 544 F.2d 1, 6 (D.C. Cir. 1976).

---

[9] This Court further erred by failing to make a determination about whether Mr. Li had rebutted the presumption of detention. Given that the Court did appear to be conducting the "step two" analysis, for the sake of this motion, it will be assumed that the presumption was rebutted. This finding would have been appropriate given that Mr. Li did "offer some credible evidence contrary to the statutory presumption." *See Alatishe*, 768 F.2d at 371

If, however, this Court decides that the presumption should be given weight, it should follow the precedent of other circuits and not give it more consideration than the other § 3142(g) factors. *See, e.g., Stone*, 608 F.3d at 945−46 (6th Cir. 2010); *Mercedes*, 254 F.3d at 436; *Dominguez*, 783 F.2d at 707; *Jessup*, 757 F.2d at 384. Giving little weight to the presumption makes sense, given that it imposes such a light burden of production on a defendant. *See, e.g., United States v. Hunt*, 240 F. Supp. 3d 128, 131 (D.D.C. 2017) (citing *United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991); *United States v. Taylor*, 289 F. Supp. 3d 55, 63–64 (D.D.C. 2018) (referring to it as a "modest burden" to "proffer at least some evidence or basis to conclude that the case falls outside the congressional paradigm giving rise to the presumption") (internal quotations and citations omitted).

Courts have found that the presumption of detention is rebutted by "*[a]ny evidence* favorable to a defendant that comes within a category listed in § 3142(g) . . . including evidence of their marital, family and employment status, ties to and role in the community . . . and other types of evidence encompassed in § 3142(g)(3)." *Dominguez*, 783 F.2d at 707 (emphasis added). This includes any "evidence of economic and social stability," *id.*, or evidence of ties to the community, *see United States v. Jackson*, 845 F.2d 1262, 1266 (5th Cir. 1988). *See also Taylor*, 289 F. Supp. 3d at 64 (finding defendant rebutted presumption by presenting evidence of a residence, a possible job offer, a lack of violent history, and possibly exculpatory evidence).

It must be noted that to rebut the presumption of dangerousness, a defendant need not "demonstrate that narcotics trafficking [or another serious crime] is not dangerous to the community." *See Dominguez*, 783 F.2d at 706. Instead, a court must analyze the defendant's individual characteristics under § 3142(g). Also, a court may not rely solely on the weight of the evidence of guilt to detain a defendant in a presumption case. A defendant is not required to "'rebut' the government's showing of probable cause to believe that he is guilty of the crimes charged." *Id.* This makes sense—a person's likelihood of guilt is analytically distinct from whether there are conditions of release that will reasonably assure the person's appearance or the safety of the community.

Given both the precedent from other circuits and the light burden put on the defendant to rebut the presumption, it should not be given "substantial weight" by a district court. Because the presumption is *rebuttable*, it should burst like a bubble and disappear. But even if it is considered, it should just be one of many factors. Here, this Court gave it "substantial weight" such that it essentially made the presumption the controlling factor. This was error, and this Court should redetermine its order of detention accordingly.

### iii. Giving excessive weight to the presumption has led to high rates of detention of low-risk defendants in violation of the BRA and their rights to liberty

A recent national study by the University of Chicago Law School's Federal Criminal Justice Clinic (FCJC) found that judges are not adhering to these two legal requirements and are giving the presumption greater weight than the law allows. Through court watching and qualitative interviews with stakeholders, this study found that the presumption is often treated as a de facto detention order, even though the law makes the presumption easily rebuttable and requires the government to always bear the "burden of proving that detention is genuinely necessary." First, at Step 1, judges are not applying the correct rebuttal standard: "in 95% of presumption cases that held a Detention Hearing in our study, judges either concluded that the arrestee had failed to rebut the presumption or did not mention whether the presumption was rebutted."[10] Second, "data also suggest that judges often disregard Step 2 of the legal test, where they are supposed to weigh the rebutted or unrebutted presumption along with all of the other pretrial release factors in reaching the ultimate release or detention determination."[11]

"In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *Salerno*, 481 U.S. at 755. "However, the 'limited exception' has now swallowed the rule." *United States v. McLean*, 749 F. Supp. 3d 167, 169 (D.D.C. 2024). Since the enactment of

---

[10] *Id.* at 161.
[11] *Id.* at 161–62.

23

the BRA, federal pretrial incarceration rates have skyrocketed from less than 24% to 75%, and the average length of pretrial detention has increased from less than two months to a year.[12]

The high rates of pretrial detention are contrary to the BRA's mandate that a district court "shall order" pretrial release except in certain narrow circumstances. *See* 18 U.S.C. § 3142(b). Even if a court determines under § 3142(c) that an unsecured bond is not sufficient, it "shall order" release subject to "the least restrictive further condition[s]" that will "*reasonably assure*" the defendant's appearance in court and the safety of the community. § 3142(c)(1) (emphasis added). Under this statutory scheme, inquiries take place "against the backdrop of a strong presumption against detention." *United States v. Gloster*, 969 F. Supp. 92, 96 (D.D.C. 1997). Pretrial detention is only contemplated for "a small but identifiable group of particularly dangerous defendants." *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) (quoted in *Gloster*, 969 F. Supp. at 97).

Congress enacted the statutory presumption of detention in the BRA to detain "a small but identifiable group of particularly dangerous defendants."[13] Indeed, Congress intended the presumptions to operate primarily on "*major* drug traffickers."[14] Congress emphasized that detention should be presumed only for these major drug traffickers, essentially drug kingpins.[15] "Congress considered at length arrestees' pretrial liberty interests, and concluded that the constitutional concerns with pretrial detention required a narrowly tailored statute to secure community safety and appearance in court."[16]

But the presumption of detention has not worked as intended, and federal pretrial

---

[12] Siegler, *supra* note 1, at 20–22.
[13] S. REP. NO. 98-225, at 6.
[14] S. REP. NO. 98-225, at 20 (emphasis added).
[15] S. REP. NO. 98-225, at 7 (emphasizing that it was only for this "limited group of offenders that the courts [needed the] . . . power to deny release pending trial").
[16] Siegler, *supra* note 1, at 73 (citing S. REP. NO. 98-225, at 8–10).

detention rates have skyrocketed since the BRA was enacted, rising from 19% in 1985 to 75% in 2019.[17] A recent study by the Administrative Office of the Courts (AO) attributed this "massive increase"[18] in detention rates to the presumption of detention, especially as it is applied to low-risk defendants.[19] The study concludes that the statutory presumption in drug and firearm cases applies to nearly half of all federal cases and to 93% of drug cases.[20] The 2022 FCJC study demonstrated that the detention rate for defendants facing a presumption of detention is nearly 20 percentage points higher than that for defendants not facing a presumption, even though today "there is no evidence that people in presumption cases pose any greater risk than those in nonpresumption cases."[21]

The AO study confirms that the presumption increases the detention rate without advancing community safety. Rather than jailing the worst of the worst, the presumption overincarcerates the lowest-risk offenders in the system, people who are stable, employed, educated, and have minimal to no criminal history.[22] When a low-risk individual is not facing a presumption, they're released 94% of the time.[23] Yet an identically low-risk individual in a

---

[17] *Pretrial Release and Detention: The Bail Reform Act of 1984*, BUREAU OF JUST. STAT. SPECIAL REP., at 2 (Feb. 1988), https://www.bjs.gov/content/pub/pdf/prd-bra84.pdf (Table 1) (18.8% of defendants detained pretrial in 1985); *Judicial Business: Federal Pretrial Services Tables*, ADMIN. OFF. U.S. COURTS ("AO Table"), Table H-14 (Sept. 30, 2019) https://www.uscourts.gov/sites/default/files/data_tables/jb_h14_0930.2019.pdf (74.8% of defendants detained pretrial in 2019); see also AO Table H-14A (Sept. 30, 2019), https://www.uscourts.gov/sites/default/files/data_tables/jb_h14a_0930.2019.pdf (61% detention rate *excluding* immigration cases).

[18] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81 FED. PROB. 52, 61 (2017) (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).

[19] *Id.* at 57.

[20] *Id.* at 55 (the drug presumption "applied to between 42 and 45 percent of [all federal] cases every year").

[21] Siegler, *supra* note 1, at 158, 160 & fig.19, 153.

[22] *Id.* at 57.

[23] *Id.*

presumption case is released just 68% of the time.[24] Recent testimony before Congress relied on this government study to call for reform: "These presumptions must be changed because they've had far-reaching and devastating consequences that were unforeseen and unintended by Congress."[25]

Relying on the groundbreaking findings of the AO study, the Judicial Conference's Committee on Criminal Law recently determined "that the § 3142(e) presumption was unnecessarily increasing detention rates of low-risk defendants, particularly in drug trafficking cases."[26] To address this problem, the Judicial Conference proposed significant legislative reform that would amend the presumption of detention in drug cases "to limit its application to defendants described therein whose criminal history suggests that they are at a higher risk of failing to appear or posing a danger to the community or another person."[27] In the wake of the Judicial Conference's recommendation, Judiciary Committee Chair Dick Durbin introduced a bipartisan bill in the Senate that would eliminate the presumption in all drug cases.[28]

The problems with the statutory presumption of detention are important to Mr. Li's motion because, as the AO study confirms, high federal pretrial detention rates come with

---

[24] *Id.*

[25] *See The Administration of Bail by State and Federal Courts: A Call for Reform*: *Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 115th Cong. (2019), https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2256; *Testimony of Alison Siegler* at PDF 6–7 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-20191114.pdf; *see also Written Statement of Alison Siegler* at 13–17 (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-Wstate-SieglerA-20191114.pdf (calling for the complete elimination of the presumptions in drug and gun cases).

[26] *Report of the Proceedings of the Judicial Conference of the United States* 10 (Sept. 12, 2017), archived at https://perma.cc/B7RG-5J78; *see also* Siegler, *supra* note 1, at 152 ("The Judicial Conference relied on a study finding that the presumption increased detention orders by 26% for people in the lowest Pretrial Risk Assessment (PTRA) category. The same study found that detention rates in gun presumption cases climbed from 66% in 1995 to 86% in 2010. These findings strongly suggest that judges place undue weight on the presumption of detention.").

[27] *Judicial Conference*, *supra* note 17, at 10.

[28] *Judicial Conference*, *supra* note 21, at 10.

significant and wide-ranging "social and economic costs."[29] For example, the study explains that "[e]very day that a defendant remains in custody, he or she may lose employment which in turn may lead to a loss of housing. These financial pressures may create a loss of community ties, and ultimately push a defendant towards relapse and/or new criminal activity."[30] Indeed, the economic harms stemming from being detained pretrial persist for years: even three to four years after their Detention Hearing, people released pretrial were still 24.9% more likely to be employed than those who were detained.[31] And the repercussions of pretrial detention overwhelmingly fall on people of color. Nationally, 81% of people charged with federal crimes are people of color.[32] These harms are not just limited to the detained person—once someone is incarcerated, the odds that his children become homeless increase by 95%, and the odds that his partner becomes homeless increase by 49%.[33] The other emotional and psychological harms visited upon the children of incarcerated parents are well-documented.[34]

---

[29] Austin, *supra* note 8, at 61; *see also* Siegler, *supra* note 1, at 22 n.5, 61–72 (discussing the devastating consequences of high jailing rates on individuals, their families, their communities, and society, and citing studies in support).

[30] *Id.* at 53; *see also* Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) FED. PROB. 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83 (finding that for people detained pretrial for at least three days, 76.1% had a negative job-related consequence and 37.2% had an increase in residential instability).

[31] Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108(2) AMER. ECON. REV. 201, 204 (2018), archived at https://perma.cc/X77W-DAWV.

[32] Siegler, *supra* note 1, at 24.

[33] *For* children, Christopher Wildeman, *Parental Incarceration, Child Homelessness, and the Invisible Consequences of Mass Imprisonment*, 651 THE ANNALS OF THE AMERICAN ACADEMY OF POLITICAL AND SOCIAL SCIENCE 74, 88 (2014); *for* partners, *see* Amanda Geller & Allyson Walker Franklin, *Paternal Incarceration and the Housing Security of Urban Mothers*, 76 J. FAM. & MARRIAGE 411, 420 (2014).

[34] *See, e.g.,* Joseph Murray et al., *Children's Antisocial Behavior, Mental Health, Drug Use, and Educational Performance After Parental Incarceration: A Systematic Review and Meta-Analysis*, 138(2) PSYCHOLOGICAL BULLETIN 175, 186 (2012).

Pretrial jailing imposes tremendous human suffering: more than 153,000 human beings are currently incarcerated in the federal justice system,[35] spending an average of 1 year in jail.[36] While in jail, people suffer major personal losses—their job, home, custody of their children.[37] These harms also impact the loved ones and communities of those detained.[38] "The brutal reality is that people detained pretrial in federal jails are deprived of necessary medical care, live in dangerously overcrowded conditions, are subjected to violence, and suffer high rates of COVID-19 infection."[39] Moreover, the high federal detention rates fall overwhelmingly on people of color.[40] The first few days of detention can also be dangerous. According to the Bureau of Justice Statistics, between 38% and 45% of all jailhouse rapes perpetrated on a male victim happen within three days of admission.[41] Over 40% of people who die in jail die within their first week.[42] Despite the trauma and danger inherent in the first few days of a jail stay, jails' physical and mental health screenings and treatment offerings are often inadequate.[43]

Data prove that pretrial detention does not make our communities safer or ensure appearance in court: "The harmful effects of pretrial detention cannot be justified as permissible consequences of protecting the community, since research shows that pretrial detention—for any amount of time—is correlated with an *increase* in recidivism."[44] The AO cites a famous study

---

[35] Federal Bureau of Prisons, *Population Statistics* (last updated June 25, 2026), https://www.bop.gov/about/statistics/population_statistics.jsp.

[36] AO Table H-15 (June 30, 2022) (117,978); AO Table H-9A (June 30, 2022) (361 days).

[37] *See* Siegler, *supra* note 1, at 62 (citing studies).

[38] *Id.* at 62.

[39] *Id.* at 63.

[40] *Id.* at 24.

[41] Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09*, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK.

[42] Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[43] *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics, at 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman, et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 J. SUBSTANCE ABUSE TREATMENT 239, 247–49 (2007), archived at https://perma.cc/G55Z-4KQH.

[44] Siegler, *supra* note 1, at 62 & n.102.

that found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[45] More recent studies have confirmed that pretrial detention is criminogenic[46] and cautioned that "lower crime rates should not be tallied as a benefit of pretrial detention."[47] In addition, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[48]

These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[49] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place. The presumption of detention also falls hardest on people of color, intensifying racial disparities in the federal system.[50] Conversely, releasing more people prior to

---

[45] Austin, *supra* note 8, at 54.

[46] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 STAN. L. REV. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a 30% increase in new felony charges and a 20% increase in new misdemeanor charges, a finding consistent with other research suggesting that even short-term detention has criminogenic effects."); Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEGAL STUD. 471, 496 (2016) ("[O]ur results suggest that the assessment of money bail yields substantial negative externalities
in terms of additional crime.").

[47] Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments*, 60 J.L. & ECON. 529, 555 (2017).

[48] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 CRIME & DELINQUENCY 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.

[49] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) FED. PROB. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

[50] Siegler, supra note 1, at 165–66 ("[M]ost arrestees facing a presumption are people of color, since they make up 75% of those convicted of qualify drug offenses nationwide. . . . Our data support the idea that the presumption may fall even more heavily on arrestees of color. . . . Of the cases in which prosecutors invoked the presumption during the Detention Hearing, 97% of the arrestees were people of color, and 3% were white."); Stephanie Holmes Didwania, *Discretion and Disparity in Federal Detention*, 115 NW. U. L. REV. 1261, 1265 (2021), https://scholarlycommons.law.northwestern.edu/nulr/vol115/iss5/1/ [https://perma.cc/3E3R-N4VN].

trial does not correlate with increased rates of failure to appear or rearrest for new crimes.[51] In fact, the rates at which people on federal pretrial release either fail to appear in court or are rearrested for a new crime are extraordinarily low, "with both sitting at approximately 1–2%."[52] "Strikingly, rates of nonappearance and rearrest are just as low in the federal courts with the *highest* pretrial release rates as they are in the districts with the *lowest* release rates."[53]

Given these substantial consequences, it is imperative that this Court follow the letter of the law by giving the presumption of detention "the low weight to which it is assigned by case law."[54]

V.      **Upon redetermination in light of the new evidence and proper legal standard, this Court should set a bond for Mr. Li.**

Upon reconsideration, this Court should find that Mr. Li rebutted the presumption and the positive § 3142(g) factors outweigh any presumption (if it is considered at all) and support release. As noted above there is more than "some evidence" that Mr. Li "will not flee or endanger the community if released." *Garcia*, 312 F. Supp. 3d at 40.

**A. There are conditions that can secure Mr. Li's appearance and public safety.**

Mr. Li has presented extensive new information regarding his community ties to Los Angeles. In addition to having those positive ties, Mr. Li also lacks the type of negative attributes that are commonly found in federal defendants. He has no prior convictions, only a 2008 deferred judgment for drug possession. (Ex. B at 5). Given that the case is nearly two decades old, it should be viewed as of limited utility in terms of predicting any flight risk on the part of Mr. Li. Indeed, the Magistrate Judge in the Central District of California opined that his criminal history was negligible. (Ex. A at 32). But notably, the report shows no allegations of a failure to appear or noncompliance with pretrial/drug court conditions. The Pretrial Services report

---

[51] Siegler, *supra* note 1, at 24.
[52] *Id.*
[53] *Id.* at 25 fig.4.
[54] Siegler, *supra* note 1, at 146.

clarifies that Mr. Li has no mental or physical health issues[55], and his only drug use is marijuana (something that is legal in California). (Ex. B at 3). Although Mr. Li advised Pretrial Services that he will have no difficulty in ceasing marijuana use, (*id.*), this Court can impose drug testing and treatment conditions to reduce any related concerns.

Other specialized conditions are available that would ensure Mr. Li's appearance and the safety of the community. "[T]he mandate and intent of Congress require use of the wide variety of techniques available to provide reasonable assurance that the accused will present himself when required." *United States v. Alston*, 420 F.2d 176, 180 (D.C. Cir. 1969). When it drafted the BRA, Congress refused to require mandatory pretrial detention even for alleged leaders of DTOs facing mandatory minimum sentences and high Guidelines ranges—and this was far before the development of so much technology that increases the government's ability to a defendant's movements. Fleeing the country was far easier in 1984 than it is in 2026, and yet Congress still believed that district courts could craft conditions that would reasonably assure the appearance of individuals accused of serious and even violent crimes.

As the Central District of California noted, there are many phone- and electronics-specific conditions that allow Pretrial Services to monitor Mr. Li's activities. (Ex. A at 45). Based on the United States' allegations, the DTO in this indictment was conducted primarily via the internet. Thus, conducting online drug trafficking business would be severely curtailed by conditions such as: (1) requiring Mr. Li to disclose all screen names, passwords, and accounts to Pretrial Services; (2) allowing for searches of all digital devices; (3) imposing restrictions on Mr. Li's ability to possess more than one virtual currency wallet account; and (4) allowing Pretrial Services to install monitoring software on all digital devices. Perhaps most importantly in this case, this Court could require Mr. Li to submit to electronic/GPS monitoring such that the

---

[55] Mr. Li had an appointment scheduled on July 1, 2026 for a testicular cancer screening where he would undergo an ultrasound procedure at a hospital in Los Angeles. In January of 2026, Mr. Li first noticed some lumps and received an ultrasound then. He was advised to undergo a second ultrasound six months later, which would have been the July 1, 2026 appointment.

government would know where he is at all times. Along with setting his wife or mother as a third-party custodian, this would create substantial assurances for this Court.

This Court expressed concerns about the sufficiency of these types of conditions, stating, "If the mere imposition of such conditions was by itself enough to prevent flight and protect the community, then that would obviate the need for any detention ever." (ECF No. 62 at 5). But while this Court is correct that "some individuals charged with crimes do flee or harm the community during pretrial release," *id.*, this Court is not expected or required to establish conditions that 100% guarantee Mr. Li's total compliance with conditions of release. This Court is rather obligated under the BRA to set the least restrictive conditions that *reasonably assure* Mr. Li's appearance and public safety.

Additionally, this Court cited favorably to *Taylor* in making its determination that Mr. Li poses a danger to public safety. It should be noted, however, that the district court in *Taylor* determined that the defendant *should* be released under conditions. 289 F. Supp. 3d at 72 (italics added). The defendant in *Taylor* had prior convictions for both drug trafficking and being a felon in possession of a firearm, and yet the evidence demonstrated that he had again become involved in distributing controlled substances (PCP) and possessed three firearms plus scores of rounds of ammunition in his apartment, connected to the drug trafficking. *Id.* at 70–72. Thus, in many ways, he posed a far more substantial threat to public safety than Mr. Li. The *Taylor* Court did find that, in considering the "nature and seriousness of the danger to any person or the community that would be posed by the defendant's release" pursuant to § 3142(g), that factor did indeed "weigh[] in favor of pretrial detention." *Id.* The court then concluded that in the end it was "a close question," given that "two of the four factors weigh in favor of continued detention, one factor weighs in favor of release, and third factor does not tip decidedly in either direction." *Id.* at 72. Overall, however, when weighing everything together along with the presumption of detention, the *Taylor* court found that the United States did not meet its burden and pretrial release was appropriate because "use of the high intensity supervision program and other

32

conditions should mitigate any risk that Taylor's pretrial release might otherwise present." *Id.* at 72.

**B. Mr. Li's Circumstances Are Distinguishable from His Detained Co-Defendant with an Allegedly Smaller Role**

This Court also asserted that because it found that Mr. Li's co-defendant Chang Hoon Lee aka Daniel Lee posed a flight risk and a danger to the community, it must now do the same for Mr. Li. (ECF No. 62 at 5) (citing *United States v. Lee*, Civ. A. No. 26-14-2, 2026 WL 292427 (D.D.C. Feb. 4, 2026)). It stated that because Lee allegedly reported to Mr. Li, "[a] fortiori," Mr. Li must also be a flight risk and danger. There are, however, many distinguishing facts between the two defendants.

First, in terms of a flight risk, Lee had greater ties to a foreign country, given that his parents reside in South Korea and he had no wife or children in the United States. Mr. Li, on the other hand, has all his family in Los Angeles, California. None of his immediate family lives abroad. Lee also lacked any employment or property, and he was found to have lied to Probation. Mr. Li, however, has not been accused of making any false statements to Pretrial, and he has a steady work history and co-owns a commercial building in Montebello, California. (Ex. B at 4).

Mr. Li is again distinguishable from his co-defendant Lee when assessing dangerous to the community. Lee does not appear to have any source of income besides alleged drug smuggling, whereas Mr. Li owns at least one legitimate business not alleged to have any relation to illegal activity. This means he will have less financial distress that could motivate recidivism. Further, Lee was found to have concealed an unregistered handgun, whereas Mr. Li has no connection to any firearms.

Therefore, this Court need not make the same rulings for Mr. Li simply because he allegedly is a higher-level participant in the DTO than Lee. There is no precedent suggesting that where a lower-level DTO member is detained without bond, all individuals higher up the ladder in the DTO must similarly be detained. This would in fact be contrary to the logic of the BRA, which requires for an individualized assessment.

### C. Research on Federal Bail Demonstrates that the Risk of Flight or Criminal Activity Is Low.

Finally, statistics show that it is extraordinarily rare for defendants on bond to flee or recidivate. This further supports Mr. Li's position that setting conditions of release will ensure appearance and safety. AO statistics show that nearly everyone released pending trial in the federal system appears in court and does not reoffend. In fact, in 2021, 99% of released federal defendants nationwide appeared for court as required and 99% were not arrested for new crimes on bond.[56] Significantly, this near-perfect compliance rate is seen equally in federal districts with very high release rates and those with very low release rates.[57] Even in districts that release two-thirds of all federal defendants on bond, just 1% fail to appear in court and 1% are rearrested

---

[56] *See, e.g.*, Mot. for Bond, *United States v. Rodriguez,* No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide appearance rate of 99% and non-rearrest rate of 98%).

[57] Siegler*, supra* note 1, at 25 fig.4. The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending September 30, 2021. *See* App. 2, AO Table H-14A (Sept. 30, 2021), https://perma.cc/CYV5-3TZ6. The failure-to-appear and rearrest rates for these districts were calculated using App. 1, AO Table H-15. With regard to flight, the ten federal districts with the lowest release rates (average 20.00%) have an average failure-to-appear rate of 1.6%, while the ten districts with the highest release rates (average 64%) have an *even lower* failure-to-appear rate of 1.1%.
*See* App. 1; App. 2. With regard to recidivism, the ten districts with the lowest release rates have an average rearrest rate on bond of 0.8%, while the ten districts with the highest release rates have an average rearrest rate of 1.1%. *See* App. 1; App. 2.

while released.[58] The below chart reflects the same vanishingly low failure to appear and rearrest rates based on AO data spanning 2007 to 2021.[59]

**Figure 4:** Even When Release Rates Increase, Arrestees Almost Never Flee or Recidivate.

In addition, as the federal Probation and Pretrial Services Office recently highlighted, release rates rose slightly during the pandemic but failure-to-appear and rearrest rates did not increase.[60] Release rates increased from 25% in 2019 to 36% in 2021 but "the rates at which people on pretrial release failed to appear in court or were rearrested remained extremely low."[61]

This date suggests, in fact, that the presumption in favor of detention for drug trafficking cases was not even based on accurate assumptions. The legislative history demonstrates that there was a concern about high rates of recidivism and flight for those charged with major drug trafficking crimes. *See Alatishe*, 768 F.2d at 370 (citing S.Rep. No. 225, 98th Cong., 1st Sess. 20 (1983); U.S. Code Cong. & Admin. News 1984, p. 3203)). But the AO statistics show that both recidivism and risk of flight are extremely uncommon, across all offenses. Thus, while this Court

---

[58] *See* App. 1; App 2.
[59] Siegler, *supra* note 1, at 25 fig.4.
[60] *Id.* at 246 n.42.
[61] *Id.*

must consider the presumption, it should recognize that it is based on flawed theories about defendant behavior.

Mr. Li should be released because the government has not established that he would be among the approximately 1% of defendants who fail to appear in court or are rearrested on bond. The specific history and characteristics of Mr. Li demonstrating his community ties and lack of criminal and violent behavior should be considered far more predictive than any generic or stereotypical ideas about what alleged drug traffickers will do on pretrial release. Detaining Mr. Li without clear and convincing evidence of his posing a danger to the community, as well as without a preponderance of the evidence demonstrating a serious risk of flight, violates his constitutionally protected liberty interest.

## VI.    Conclusion

For these reasons, Mr. Li respectfully requests that this Court grant his Motion for Redetermination of Detention Order. Mr. Li further respectfully requests that this Court order that Mr. Li be released, subject to the following conditions: (1) his appearance secured by two real properties (valued at approximately $1.5 million) and a $100,000 cash deposit; (2) his wife and/or parents serve as his custodian; and (3) any other conditions that this Court deems necessary.

Respectfully submitted this 2nd day of July 2026.

Respectfully submitted,

TOMMY VU

_____/s/ *Tommy Vu*_____

TOMMY VU
Stitt Vu Trial Lawyers 501
W. Broadway Suite 730
San Diego, CA 92101
Telephone: (619) 255-0553
tvu@stittvu.com

36

# Exhibit A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


UNITED STATES OF AMERICA,  )  Case No. 2:26-mj-3328
                           )
     Plaintiff,            )  Los Angeles, California
                           )  Thursday, June 4, 2026
          v.               )  3:14 P.M. to 3:21 P.M.
                           )  4:40 P.M. to 5:33 P.M.
TONG LI,                   )
                           )
     Defendant.            )
_____)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE


Appearances:              See Page 2

Deputy Clerk:             Ashley Silva

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


For the Plaintiff:        United States Attorney's Office
                          Central District of California
                          Criminal Division
                          By:  BARR BENYAMIN
                          312 North Spring Street, 12th Floor
                          Los Angeles, California  90012
                          (213) 894-2400
                          USACAC.Criminal@usdoj.gov


For the Defendant:        Law Offices of David M. Dudley
                          By:  DAVID M. DUDLEY
                          3415 South Sepulveda Boulevard
                          Suite 1100
                          Los Angeles, California  90034
                          (310) 772-8400
                          fedcrimlaw@hotmail.com

                          Federal Public Defender's Office
                          Central District of California
                          By:  DREW HAVENS, Specially Appearing
                          321 East Second Street
                          Los Angeles, California  90012-4206
                          (213) 894-2854

LOS ANGELES, CALIFORNIA, THURSDAY, JUNE 4, 2026, 3:14 P.M.

THE CLERK:  Attorney Dudley, will you please start your video camera.

(Pause.)

THE COURT:  There we go.

THE CLERK:  Hi, Counsel.  Thank you.

(Court speaks with clerk.)

THE CLERK:  Hi, Counsel.  Will you please start your video.

DAVID M. DUDLEY:  Yes.  It's not working right now.  I turned it on.

THE CLERK:  It's working now.  Thank you very much.

THE COURT:  We can see you.

MR. DUDLEY:  Can you hear me also, Your Honor?

THE COURT:  Yep.  Can you hear us?

MR. DUDLEY:  Thank you so much.  I can.

THE COURT:  Can or cannot?  Can you hear me?

MR. DUDLEY:  I can hear you.  I can -- yes.

THE COURT:  Okay.

MR. DUDLEY:  I can hear you right now.  Yes.

THE CLERK:  Calling Case No. LA 26-mj-3328, *United States of America v. Tong Li.*

Beginning with plaintiff, counsel, please state your appearance.

BARR BENYAMIN:  Good afternoon, Your Honor.

Barr Benyamin on behalf of the United States.

THE COURT:  Good afternoon.

MR. DUDLEY:  Good afternoon, Your Honor. David Dudley on behalf of my client Mr. Tong Li, who should be present in the courtroom right now.

THE COURT:  He is.  Good afternoon, Mr. Dudley.

And good afternoon to you, Mr. Li.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  Okay.  So, Mr. Li, as you heard me saying before we started this hearing, this is a little bit of an unusual experience, but I'm going to go with it and -- because my goal is to give defendants the opportunity to know about the charges and contest their detention as soon as possible.  So that's my goal.

And we'll see what we're able to do, Mr. Dudley, with you on Zoom.

So let me tell you a couple things and then talk about how we're going to go through this process, Mr. Li.

You're here today, number one, because you've been charged by the United States with a felony through an indictment out of the District of Columbia.  So that's what we're going to talk about today.  There are some sort of background things that I typically need to cover.

So, Mr. Dudley, some of the forms -- there are a couple forms we need to cover, basically advisements and

waivers and that sort of thing, that are very important.  So, for example, we have a form "Advisement of Defendant's Statutory and Constitutional Rights."  It describes the criminal defendant's rights under federal law and the United States Constitution.  It's a simple two-page form, I have a copy here, and typically counsel goes over the form and the rights with the defendant in advance and signs the form, and then we move forward.

I'm hesitant to do too much in the hearing until that advisement has taken place because one of the most important rights in there, for your sake, Mr. Li, is you have the right under the Fifth Amendment to remain silent.  So you don't have to say anything if you don't want to.  Now, if you refuse to talk to me, that could impact your ability to get bond, but to be clear, you don't have to say anything, and it cannot be used to infer your guilt or punish you other -- in any way other than, again, if you refuse to talk me, it could actually impact your ability to get bond.

But other than that, I -- you know, it's important that defendants understand their rights, and I don't want the defendant to say something incriminating or something they don't want to say; right, Mr. Dudley?  So that's one thing I've got here.

This is also an out-of-district case, and so we have a form for the waiver of the right to an identity

hearing and the waiver to the right to arrival of process. Those are kind of complicated rights to go through with a defendant, and so counsel typically does that one-on-one in the holding cell.  And then I've got a designation and appearance of counsel form.  So Mr. Li would sign basically designating you, Mr. Dudley, as his counsel.  Now, that one's pretty simple.

So, Mr. Li, it sounds like you have previously retained Mr. Dudley; is that right?/

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  Do you want him to represent you here today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  So I'm satisfied with that, but then there's a form as well, Mr. Dudley.

So, Mr. Dudley, we are very fortunate that we have folks from the Federal Public Defender's Office here representing other defendants on other matters.  You can't see him, but Mr. Havens is a very experienced public defender who's here in the office.  I was chatting with him.  He is willing to go over the advisement forms with Mr. Li if that would be acceptable to you.  We could take a break, and they could go back in the holding cell, and essentially what Mr. Havens would go over with Mr. Li is the advisement of rights to make sure he knows what his rights are and that he

would sign, and Mr. Havens would have to sign that he's satisfied that Mr. Li understands his rights. He would go through the designation of counsel form just designating you, Mr. Dudley; and then he would go through the waiver of the out-of-district rights, which is arrival of process and an identity hearing.

What are your thoughts on that, Mr. Dudley? And then of course I'm going to ask Mr. Li. Does that --

MR. DUDLEY: That's very kind of the deputy public federal defender to do that, and I find it acceptable. Yes, it would be great for him to make sure that my client understands his rights from that form. I'm familiar, personally, with these forms, Your Honor. I've practiced in --

THE COURT: Right.

MR. DUDLEY: -- this district for almost exactly 41 years this month --

THE COURT: Oh, good.

MR. DUDLEY: -- and so those are acceptable. We will be waiving arrival of process and a removal proceeding. Obviously, we'll want to be heard as to detention and --

THE COURT: Great.

MR. DUDLEY: -- that's our position.

THE COURT: Okay.

Mr. Li, what are your thoughts? And again, to

explain this to you, my -- the reason I suggest this is because, if we take a break and you do all this and then you're -- then I'm satisfied and you're satisfied that you know your rights, then I'd be happy to go forward with a detention hearing today, but if we can't get this done, then the other option would be to not have the hearing today, and Mr. Dudley could set up a legal call with you at MDC, but that may or may not happen today; that might happen tomorrow. My concern is that would delay your ability to have a detention hearing.  So what are your thoughts?

THE DEFENDANT:  I'm fine with it, Your Honor.

THE COURT:  Okay.  All right.  Well, then great. Then Mr. Havens is here, and I appreciate his help.  Then what I'm going to do is let's recess this hearing.  We'll go on to other matters, Mr. Dudley.  That will give Mr. Havens a chance to go over the forms with your client, and then once that's done, we can reconvene the hearing, and we should be able to move forward.  Does that work?

MR. DUDLEY:  Thank you very much, Your Honor.  I'll be on standby.

THE COURT:  Great.

(Recess from 3:21 p.m. to 4:40 p.m.)

AFTER RECESS

THE CLERK:  Recalling Case No. LA 26-mj-3328, *United States of America v. Tong Li.*

Beginning with plaintiff, counsel, please restate your appearance.

MR. BENYAMIN:  Good afternoon, Your Honor. Barr Benyamin on behalf of the United States.

THE COURT:  Good afternoon.

MR. DUDLEY:  Good afternoon, again, Your Honor. David Dudley on behalf of Mr. Li.

THE COURT:  Good afternoon.  Thank you for your patience, Mr. Dudley.

Good afternoon, Mr. Li.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  And we have here sitting with you Mr. Havens of the Federal Public Defender's Office, who's just been helping out.

And so thank you so much for that.

DREW HAVENS:  Thank you.  Yes.  Drew Havens from the Federal Public Defender's Office.

And I would just also note that Mr. Li's family is present -- his parents, his wife, and his brother-in-law. They may be blocked by the screen, but they're back there.

THE COURT:  Okay.  Wonderful.  Welcome, all. You're also welcome to move over if you can't see.  Thank you for your patience as well.

Okay.  So we have a bunch of paperwork that's been filled out, Mr. Li.  So this is great.  Let's see if we can't

move forward now.  I've received from you your designation and appearance of counsel, where you have Mr. Dudley on the screen that you've retained.  He's counsel of record.  That is great.

Now what I want to do is I want to go over with you your "Advisement of Defendant's Statutory and Constitutional Rights."  I'm holding up my copy of this form.  This form describes your rights as a criminal defendant under federal law and the United States Constitution, and it looks like you signed on the second page, Mr. Li; is that correct?

THE DEFENDANT:  That's correct, Your Honor.

THE COURT:  Before signing this form, did you read it or have it read to you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And I know Mr. Havens was helping you out with this.  Did you have an opportunity to talk with Mr. Havens about what your rights are?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you have any questions for me about what your rights are?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Do you feel like you understand your rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

And, Mr. Havens, I'm going to ask you since you talked to Mr. Li. Do you feel like he understands his rights?

MR. HAVENS: Yes, Your Honor. Certainly.

THE COURT: Okay.

MR. HAVENS: And he also has a copy of the charging document, the Indictment.

THE COURT: Wonderful. Great. And we'll get to that shortly.

And, Mr. Havens, you did sign this form, I see; correct?

MR. HAVENS: Yes.

THE COURT: Okay.

MR. HAVENS: Just that I went over it with him.

THE COURT: Great. Thank you for that.

Okay. So let's talk about why you're here. I think you have my copy of the charging document, which is fine. It is -- I think it's an Indictment out of the District of Columbia? Was that right?

MR. HAVENS: Yes, Your Honor.

THE COURT: Okay.

MR. DUDLEY: Yes.

THE COURT: Okay. Good. I'm recalling because I handed my printed copy to Mr. Li.

MR. HAVENS: Okay. I --

THE COURT:  But that's fine.  It's more important that you have it.

So you have a copy of the charging document, Mr. Li.  Did you have an opportunity to review that with Mr. Havens?

THE DEFENDANT:  Yes I did, Your Honor.

THE COURT:  Okay.  Having reviewed the charging document -- and you're holding it now, you have a printed copy -- do you feel like you understand what the Government is accusing you of?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  Do you have any questions for me about what the allegations against you are?

THE DEFENDANT:  Not at the moment, Your Honor.

THE COURT:  Okay.

And, Mr. Havens, since you were able to talk with Mr. Li, are you satisfied that he understands the nature of the allegations against him?

MR. HAVENS:  Yes, Your Honor.

THE COURT:  Okay.  All right.  Now, this is an out-of-district case, meaning that you're being charged in the District of Columbia, not in the Central District of California, where we are.  So you have two rights that I need to talk to you about, Mr. Li.  You have the right to something called an "identity hearing" and you have the right

to something called "arrival of process."

An identity hearing is a hearing at which the Government would have to prove you are who they say you are, in other words, that you are the Tong Li named in the Indictment that you're holding a copy of.

And you also have the right to arrival of process. Arrival of process is to insist that I, as the Court, receive a sufficiently certified copy of the charging document from the District of Columbia so that I know you really are charged in the District of Columbia and it's not basically fake.

I have here signed by you a waiver of your right to an identity hearing and arrival of process. Did you sign this form?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Before signing this form, did you read it or have it read to you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did you have an opportunity to talk with Mr. Havens about the benefits and consequences of waiving your rights to an identity hearing and arrival of process?

THE DEFENDANT: Yes, I did, Your Honor.

THE COURT: Having done that, is that your desire? Would you like to waive your rights to arrival of process and

an identity hearing?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.

And, Mr. Havens, you also signed this form; correct?

MR. HAVENS:  Yes, I did.  And Mr. Dudley previously indicated that he joined in the waivers, and I also informed Mr. Li, per the form, that he does not have a right to a preliminary hearing given the Indictment.

THE COURT:  Okay.

Mr. Dudley, I apologize for neglecting you.  Is there anything you want to add?

MR. DUDLEY:  No.  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Well, then I will find a knowing and voluntary waiver of your right to an identity hearing and arrival of process, and I will sign off on the waiver form, Mr. Li.  So I'm not going to schedule an identity hearing.

I will also find, in the alternative, that arrival of process is satisfied because I received copies of the indictment through the court's electronic filing system, which I find to be sufficiently reliable.

Okay.  What I'm going to do now is, since this is your first appearance in this court on these charges, even though it's an out-of-district case, I'm going to instruct

the Government, pursuant to a law called the "Due Process Protections Act," which is a law designed to protect criminal defendants such as yourself, Mr. Li.

So, Mr. Benyamin, pursuant to the Due Process Protections Act and Central District General Order 21-02, the Court will order the Government to comply with the disclosure obligations under *Brady v. Maryland* and its progeny, and the Court reminds the Government of the possible consequences of not doing so. Those include the exclusion of evidence, adverse jury instructions, dismissal of charges, contempt, referral to a disciplinary authority, and sanctions.

Does the Government understand its obligations and agree to comply?

MR. BENYAMIN: Yes, it does, Your Honor.

THE COURT: Okay. All right. Since this is an out-of-district case, I think that's all the preliminary items other than a bond hearing.

Am I missing anything, Mr. Benyamin?

MR. BENYAMIN: That's it.

THE COURT: Okay. Yeah. No dates to set. Okay.

MR. HAVENS: And then just Mr. Li had signed the form that he would like Mr. Dudley designated as his counsel --

THE COURT: Oh. Yes.

MR. HAVENS: -- and I'm just specially appearing

for the limited purpose of getting the paperwork done.

THE COURT:  You are correct.  I appreciate it, and I do not intend to hold you on the hook for anything.  So thanks again.

I think that covers everything other than a bond hearing.

So, Mr. Benyamin, the Court is in receipt of the Government's notice of request for detention.  Is the Government still seeking detention in this matter?

MR. BENYAMIN:  Yes, we are, Your Honor.  My understanding in speaking with AUSA --

THE COURT:  Mr. Dudley?

MR. BENYAMIN:  -- Belm (phonetic) --

THE COURT:  Oh.

MR. BENYAMIN:  -- was that it -- the hearing -- he had, had some discussions with Mr. Dudley that the detention hearing might be continued over to another day.  I don't know if that's Mr. Dudley's plan --

THE COURT:  Okay.  Let me ask Mr. Dudley.

MR. BENYAMIN:  Yeah.

THE COURT:  Mr. Dudley, what do you want to do?  Do you want to proceed with a detention hearing today?

MR. DUDLEY:  I would.  There was some consternation on my part yesterday because I was not certain I would be allowed to appear remotely for this proceeding this

afternoon, and so I was somewhat reluctant to go forward, but once I learned earlier today that I could appear fully remotely with the Court, my preference -- in consultation, I should add, with my client's family, who's in the courtroom right now.

THE COURT:  Uh-huh.

MR. DUDLEY:  In consultation with them, I would request that we do proceed forward.

THE COURT:  Can we do that, Mr. Benyamin?  Any reason not to?

MR. BENYAMIN:  No objection at all, Your Honor.

THE COURT:  Okay.  Great.  And obviously Pretrial Services has recommended some conditions of bond; so I appreciate being able to move forward and have a hearing today.  So why don't you go ahead, Mr. Benyamin, and present your motion.

MR. BENYAMIN:  Sure.  Thank you, Your Honor.

I'll just start by saying that this is a presumption case given that it is a drug charge with a certain quantity.

I'll just get straight to it.  Really, the driving force here for why detention is warranted is the instant allegation.  Now, my understanding is that the out-of-district AUSA that's handling the case or the case agent had presented some information to Pretrial Services that didn't

make it into the report, and I'm hoping to be able to proffer that to the Court as an officer of the court.

And so Mr. Li is, if not the leader, at least a very, very prominent player in this drug conspiracy and in this drug scheme. He ran an extensive online drug business called "Fungi's Player's Club" (phonetic). They used encrypted applications, where he sold wholesale quantities of meth, fake Adderall pills that contained methamphetamine, cocaine, and other drugs. And this was a scheme where you couldn't just access this business, Fungi's Player's Club, and order these hard drugs. You first had to start by buying from one of his other businesses, where you would have to buy marijuana or psilocybin products, cannabis products. He utilized bitcoin in order to conceal all of these transactions, along with these encrypted apps, and he fulfilled, as far as the Government knows, at least hundreds of orders of these wholesale quantities of drugs.

And that wasn't it. He also had people working for him and reporting to him. He was really, as I said earlier, if not "the" head honcho, at least a very, very heavy, prominent player in this scheme. Another individual Chang Hoon Li (phonetic), supplied him with drugs and helped him run the operation. Ricky Cho (phonetic) was his assistant. He ran a stash house, and he counted bulk amounts of cash that the defendants received. And then there is another

individual, Valley Chung (phonetic), who moved money and drugs between stash houses at the instruction of Mr. Li.

So a very serious drug offense, and again, he's not just a courier.  He's not just a foot solider.  Based on what we know, he really is one of the head honchos, one of the masterminds behind all of it, and on those grounds we do believe that detention is warranted here, especially given that it is a presumption case, Your Honor.

THE COURT:  Okay.  Let me just confirm.  I'm not seeing -- just to make sure I'm not missing anything. There's no allegation of violence or firearms; is that right?

MR. BENYAMIN:  As far as I know, there isn't, Your Honor.

THE COURT:  Okay.  No criminal history, law enforcement contact -- anything like that?

MR. BENYAMIN:  I believe there are some law enforcement contacts, but they are  --

THE COURT:  No, no.  Right.  Violence or firearms?

MR. BENYAMIN:  Yeah.  Yes.  That's right, Your Honor.

THE COURT:  Okay.  Can I -- one second.

Can you print me a copy of the Indictment?  Oh, is this from --

MR. HAVENS:  Your Honor, we could -- we could give you this copy, and then we could -- I could later get him a

copy of -- separate copy of the Indictment.

THE COURT:  Okay.

(Clerk speaks with the Court.)

THE COURT:  Just give us one sec.

(Pause.)

THE COURT:  Okay.  Mr. Dudley, thank you for your patience.  I was just trying to get another copy of the indictment, but I'm -- I borrowed back my copy from your client so -- but you have a copy of this; correct, Mr. Dudley?

MR. DUDLEY:  I do.  I received one last night.  Yes, Your Honor.

THE COURT:  Okay.  All right.  So go ahead, and I'll let you respond to Mr. Benyamin.

MR. DUDLEY:  Well, starting with the presumption, as the Court knows, it's a rebuttable presumption.  If the presumption is rebutted, once the defense produces some evidence -- and I emphasize "some evidence" -- that there are conditions or combination of conditions of release that can assure the appearance of the defendant and the safety of the community if in fact the defendant is released on conditions.

Here, we would say two things with respect to our burden of production, which is not a burden of persuasion, a burden of production.  We would, first of all, proffer the Pretrial Services Report, which sets forth lots of evidence

to indicate that there are conditions and they recommend conditions of release that would assure his appearance in court, if there was any question about it, and additionally would assure the safety of the community.

I would also now proffer as an officer of the court some evidence that's not included in the Pretrial Services Report.  Namely, in April of this year, my client was aware that he might be potentially indicted -- due to the execution of some search warrants earlier in the year, he might be indicted in a criminal case in Washington, D.C.  As a result of that, he retained me as his lawyer in April.  I then began a series of some communications with AUSA Michael Barkley, who's one of the two principal federal prosecutors in D.C. handling the matter.  Those began on April 30th via email and voice mail.

Most importantly, on May 12th of this year -- and I can read the email to the Court if it wants me to -- I sent an email, in conjunction with my consultations with my client, to Mr. Barkley indicating that if he was to be indicted -- Mr. Li was to be indicted in the District of Columbia -- or anywhere else -- that he would be willing to surrender voluntarily.  In fact, I indicated that Mr. Li and I would travel to D.C. and he would be surrendered there -- no guarantee of bond whatsoever, but he would actually travel voluntarily to the charging district and surrender himself

there.

There was no response to that May 12th email.  The -- no verbal response.  We got an action response yesterday when my client was arrested not anywhere outside of the jurisdiction.  He was arrested at his home yesterday.  So he -- during the entire course of time I've represented him, my understanding is he has remained at home and he's remained within the jurisdiction.

So, when we combine that information with what's in the Pretrial Report, it appears clear that this is a defendant who -- there's clear evidence that we've produced that's sufficient to rebut the presumption.  Once that presumption is rebutted, it's now the Government's burden of proof, as the Court knows, to show by a preponderance of the evidence that Mr. Li would be a flight risk even if appropriate conditions were set and/or he would be a danger to the community, but that's by clear-and-convincing evidence if appropriate conditions were set.

We would submit that we have evidence through the Pretrial Report of strong family ties.  He's -- grew up at San Gabriel Valley.  He's lived there his whole life.  His wife lives there.  Their two minor children live there.  His elderly parents live close by.  They, in fact, are willing to post their house as collateral, surety justification for any bond that this Court might set.  The -- additionally, there

are conditions -- such as surrendering the passport, travel restrictions -- that would further -- that would further assure the appearance of my client and show that the Government cannot meet its burden of preponderance on the appearance issue.

As concern danger to the community, the burden, as the Court knows, is much higher, clear-and-convincing evidence, and what I can say is I do understand that these charges are very serious.  There is just absolutely no doubt about it, and we're not going to downplay that whatsoever. But he has no history of violence, he has no criminal convictions that I could find or that the Pretrial Report could -- I think he's got a clean criminal history, no history of engaging over the long term the kind of behavior alleged in the Indictment, and therefore even the threat that he would return to the same kind of activity alleged in the Indictment is minimal based on his lack of record but, more importantly, because Pretrial Services recommend conditions that could assure the safety of the community from any further alleged drug trafficking if Mr. Li was released on bond.

He -- also, I would ask the Court to impose any other additional restrictive conditions it believes necessary, if a bond was to be set, including, but not limited to, electronic monitoring on an ankle bracelet,

(indecipherable) custodians to monitor his activities and make sure he's in compliance with the Court's orders.  All of those things combined would, in my mind, assure the safety of the community and assure his appearance in D.C.

He could have run, Your Honor.  He was aware for many months that this could happen.  He chose not to do that. He could have just "poo-pooed" the whole thing, so to speak, and -- but he hired counsel.  He hired a lawyer two months ago -- almost two months ago.  He has been ready to contest these charges since he became aware that they might occur. He's been ready to surrender himself voluntarily, and I'm ready to represent him in Washington, D.C., and I've spoken already about discovery with the two federal prosecutors assigned to that case.  We spoke last night, and they're going to want me -- excuse me -- to present a fairly large hard drive for them to put the discovery on so that, when I'm here with my client, whether he's in custody or out of custody -- at that point of time I will be given the discovery.

The being said, I think the Government has fallen far short of meeting its twin burdens of proof here, and the Court should set what it believes to be appropriate conditions of release in line with what Pretrial Services has recommended.

THE COURT:  Okay.  Thank you, Mr. Dudley.  Can --

Mr. Dudley, can you -- I know we've been emailing with you because we emailed you a link to join today.  Can you forward your email to the Government offering the surrender that you referenced?  Can you forward that to that same email, and we'll print it out for the prosecutor here and so I can see?

MR. DUDLEY:  Yes.  Yes.  Let me try to -- see if I can do this.  My -- I got a brand new phone, and I think I can do it.  I think I can do it  --

THE COURT:  Okay.

MR. DUDLEY:  -- if could you give me just one second, Your Honor.

THE COURT:  Yeah.  Be careful.  We don't --

MR. DUDLEY:  I think I could maybe do it very quickly.

THE COURT:  We don't want to --

MR. DUDLEY:  Uh.

THE COURT:  We don't want to read the wrong thing. So take a minute, and send us only the right thing.

THE DEFENDANT:  Yes.  I understand.  Let me see if I -- I pull up the email that I sent.

THE COURT:  Take a minute, and I'll -- we'll be -- I'll be reviewing.

MR. DUDLEY:  Okay.  Thank you.

(Pause.)

MR. DUDLEY:  This is "ajrchambers"; correct,

Your Honor?

THE COURT:  Correct.

MR. DUDLEY:  Okay.  All right.  I have it.
Subject: Tong Li.  There's a string of emails that I can
point out exactly which email stated May 12th, and it's being
sent as I speak.

(Pause.)

MR. DUDLEY:  It might be at top of the string.
(Indecipherable) looking at my phone to tell, but I have it
right in front of me, and it's dated May 12th, starting with
Mr. Barkley.

THE COURT:  Right.

(Pause.)

THE COURT:  Okay.  Mr. Benyamin, why don't I go
back to you in case you -- Mr. Dudley made some proffers and
provided this email, and so just, in fairness if there's
anything you want to respond to or add, I'll let you do that.

MR. BENYAMIN:  Sure thing, Your Honor.

I'll just say, again, I think, from the start, my
representations here have been that it's really more the
danger to the community rather than the risk of flight that
is concerning and that warrants the detention in this case.
You know, hiring an attorney is not in and of itself a
mitigating factor relating to risk and danger to the
community.  And I heard a lot from Mr. Dudley about how the

risk of flight might be mitigated by the fact that he, you know, offered to self-surrender, by the fact that he has extremely close-knit ties to the community, that he's not going -- that he hasn't fled even while being aware of the fact that there was an investigation into him.  That being said, the danger to the community here still is very real, very large.  This is a high tech --

THE COURT:  Yeah.  Can I make sure I understand?  Am I getting the right picture?  This is, like, an online business that -- the allegation is that poses as legitimate medications of some kind?

MR. BENYAMIN:  I don't know about that, Your Honor.

THE COURT:  Okay.

MR. BENYAMIN:  What I --

THE COURT:  But it's online --

MR. BENYAMIN:  It is online.  They're using --

THE COURT:  -- purchasing --

MR. BENYAMIN:  -- technology meant to conceal their activities and to hide their activities.  They're using encrypted messaging apps.  They're using cryptocurrency.  They -- my understanding is that Mr. Li was transacting exclusively in bitcoin, which is hard to trace, and the purpose of it, as we know -- I mean, is that it's often used in illegal transactions.  So, again, this is a high --

THE COURT:  And the reason I -- I guess the reason

I was asking is because in the Pretrial Report it talks about Mr. Li runs this health-care management business and he's a product seller of hydroponic -- this e-commerce business.  So I was wondering if this -- if it, like, appears to be -- do you know -- if you know, if it appears to be a --

MR. BENYAMIN:  So --

THE COURT:  -- legitimate business, and you're just saying it's not?

MR. BENYAMIN:  So, like, I don't know if those are covers for these businesses.

THE COURT:  Okay.

MR. BENYAMIN:  What I do know, in speaking with the out-of-district AUSA, is that this drug business was marketed as "Fungi's Player's Club," and that was accessible through an encrypted messaging application, and to get access to that one, you first had to be a customer of Mr. Li's in one of his other businesses that also had a similar type of name and that --

THE COURT:  Okay.

MR. BENYAMIN:  -- that business was selling cannabis and psilocybin products.  So --

THE COURT:  Right.  Okay.

MR. BENYAMIN:  -- once you bought those, you could then get access to the harder drugs as -- let's just call it those.  Yes.  So --

THE COURT:  Okay.  But the cannabis -- was that legal or an illegal -- is that alleged to be illegal at all?

MR. BENYAMIN:  I don't know, Your Honor.  Yeah.

THE COURT:  Okay.  It's not alleged either way.

MR. BENYAMIN:  Yeah.

THE COURT:  Is the psilocybin business charged in here at all?

MR. BENYAMIN:  I don't know, Your Honor.

THE COURT:  Okay.

MR. BENYAMIN:  I wish I had the --

THE COURT:  Okay.

MR. BENYAMIN:  -- the case agent with me here, but I don't, unfortunately.

THE COURT:  Okay.  But it's not in the Indictment, then?

MR. BENYAMIN:  I don't believe it is.  I believe the Indictment focuses on the methamphetamine --

THE COURT:  Okay.

MR. BENYAMIN:  -- and then, I believe, at least a hundred kilograms of marijuana as well.

THE COURT:  Okay.  Well, and look.  I guess what I -- what I wanted to -- I wanted to drill down and make sure I understood the nature of the alleged scheme.  So the -- so I guess the follow-up question is why can't I impose conditions that could ensure the safety of the community -- at least

reasonably ensure the safety of the community given the nature of the scheme in the sense that this is a sophisticated online retail business, can't -- isn't -- can't we shut that down now with conditions in supervision, and wouldn't it be really hard for Mr. Li to run that business -- compared to -- you know, this isn't alleged street dealing where --

MR. BENYAMIN:  Sure.

THE COURT:  -- where he can go out -- you know, this is sophisticated enterprise, it appears you've taken all of his money, and we know -- you know what he was doing, and you could easily -- he'd be more amenable to supervision, I guess, is what I'm wondering.

MR. BENYAMIN:  The fact that it is an online enterprise, I think, makes it harder to police, Your Honor. If it was street dealing, right, there are all kinds of different conditions -- location monitoring --

THE COURT:  Well, there are conditions, as opposed to access to computers and the internet and that sort of thing.

MR. BENYAMIN:  Sure.  But I think, really, all he needs here is just an internet connection and a phone.  So unless we're, you know, willing to take away his ability to access the internet entirely or to use a smart device of any kind -- whether it be a phone, a tablet, a computer -- this

scheme could go back into business, you know, at the snap of a finger.  And not only that.  I -- my understanding is that several of the charged coconspirators were released on bond yesterday.  So it's not like they were detained and they couldn't communicate with one another, right, if they were -- if they were detained and then being held --

THE COURT:  Well, I hazard to use that as a negative inference.  That could also be used as a positive inference -- that his coconspirators were also eligible for bond.

MR. BENYAMIN:  I --

THE COURT:  So could go either way.

MR. BENYAMIN:  Understood, Your Honor.  My point is that because they're out, even if conditions were imposed that would prevent them from communicating with one another, which I'm sure Your Honor --

THE COURT:  Box 7.

MR. BENYAMIN:  There we go.  I -- it's still -- again, if we're talking about having access to a phone, having access to an internet connection, with these encrypted apps, with usernames and monikers and aliases and avatars, we really -- it would be incredibly difficult to monitor this scheme and ensure that the parties are not engaging in further drug trafficking and sales of drugs.

THE COURT:  Okay.  I mean, I -- anything you want

to say about -- you know, I think the biggest hurdle for you here is Mr. Li doesn't have any convictions so -- you know, he has -- and his criminal history, frankly, is -- his law enforcement contacts are, frankly, negligible.  Because the 2026 is this, I assume.

MR. BENYAMIN:  I believe that's right, Your Honor.

THE COURT:  So he's got a 2008 law enforcement contact and a 2010 law enforcement contact.

MR. BENYAMIN:  Yeah.

THE COURT:  Both of which are basically misdemeanor -- I mean, they're negligible so -- okay.  And look.  He's got longstanding ties to the community, he's got a family with little kids, I don't think he's going to flee, and so I'm inclined to talk about conditions that make it really difficult for him to do this and make it really likely that, if he does, he'll be promptly caught and taken into custody.

So let's look at the conditions and see what you think.  Is there anything -- take a look, Mr. Benyamin, and let's see what -- if you think we need to enhance anything.  As I was -- you know, as we were talking, of course there is Condition 7, where he has to avoid all contact directly or indirectly with any known codefendants.  So that's there.  There are the typical drug conditions you would expect.

There is the issue of appearance bond.  What are your thoughts about that given my statement that I'm inclined

to set conditions of release?  He does have available sureties.  He has resources and -- so what are your thoughts about the appearance bond?

MR. BENYAMIN:  In terms of the amount, Your Honor?

THE COURT:  Yeah.

MR. BENYAMIN:  Yeah.

THE COURT:  Or whether it's secured.

MR. BENYAMIN:  I think we'd prefer a secured bond, if possible, in this --

THE COURT:  Well, what should that look like?

MR. BENYAMIN:  In terms of amount or the assets that would be --

THE COURT:  Yeah.  Either or.

MR. BENYAMIN:  I mean, I think that there was a -- if I read the PSA correctly, I believe his parents said that they'd be willing to put up the house, potentially.  I think that would give us some more comfort.

THE COURT:  Uh-huh.

MR. BENYAMIN:  But before we go down that road, Your Honor, and --

THE COURT:  Yeah.

MR. BENYAMIN:  -- just very respectfully, I was asked by the out-of-district to -- if Your Honor was inclined to grant bond that we would seek a 24-hour stay to get the district court's opinion on this.  So I just -- I wanted to

just put that out there --

THE COURT:  Okay.

MR. BENYAMIN:  -- and flag that for you.

THE COURT:  All right.  Well, and let me think about that, and I'll let you raise it again.

MR. BENYAMIN:  Sure.

THE COURT:  Let's figure out what the bond might be.

MR. BENYAMIN:  Yeah.  So I think the house as collateral would probably give us more comfort.  And then in terms of conditions, the, I guess, monitoring -- so location monitoring, I think, would be necessary and then in --

THE COURT:  Well, let's talk about that.  How does location monitoring help with the danger to the community?  Because I feel like location monitoring helps with flight risk.

MR. BENYAMIN:  Yeah.

THE COURT:  I'm not really sure there's a flight risk here.  Why is there a flight risk?

MR. BENYAMIN:  I think location monitoring -- so it wouldn't necessarily be for flight risk, Your Honor, because, again, I think we agree that in terms of flight risk that's less of a concern but --

THE COURT:  He lives here.  He's lived here since he's a kid.  He has family here.  He's got little kids.

MR. BENYAMIN:  Absolutely.

THE COURT:  Is he going to flee the country?  I don't think so.

MR. BENYAMIN:  I don't think so either, Your Honor. I think the location monitoring would be more in terms of mitigation of risk to the community or danger to the community.  It's to make sure that he's not meeting with his coconspirators, not engaging in activity where he's potentially meeting with them, discussing things with them, and such.  So I guess that would be the best reason for it.

THE COURT:  Okay.  And any other conditions that you think would be appropriate?

MR. BENYAMIN:  If I could just quickly take a look, Your Honor?

THE COURT:  Sure.

MR. BENYAMIN:  Oh.  My computer actually just died.

Do you have an iPad, by any chance, that I could take a look?

(Pause.)

THE COURT:  And then, Mr. Dudley, after Mr. Benyamin gets a chance to finish weighing in, I'll ask for your response to conditions.  Okay?

MR. DUDLEY:  Yes, Your Honor.

(Pause.)

MR. BENYAMIN:  I think in addition to those

conditions, Your Honor, 21, 22, and 23, which relate to digital devices and cryptocurrency wallets, would also be appropriate here just given the nature of the scheme. And agreeing to -- submitting to search, as well, on those conditions, so on 21 and 23.

THE COURT: Okay. Okay.

Mr. Dudley, what are your thoughts about conditions, specifically there's the pretrial conditions. I think the main -- the first thing you -- if you want to address, is the bond amount -- whether it's secured, et cetera -- and then the Government has proposed location monitoring, as well as conditions 21, 22, and 23, which are supervision of electronic devices and restrictions on virtual currency usage.

MR. DUDLEY: As to the Government's recommendations on 21 and 23, we have no problem with that -- with those additional conditions. I agree with the Court that I don't think an electronic monitor is necessarily helpful in this particular instance. I think the other pretrial conditions recommended by Pretrial Services are appropriate.

In terms of the amount of bond, I think 20,000 is sufficient. If the Court deems it should be somewhat higher than that, that's fine.

The only -- I have no issue with it also being secured by the property of his parents, but the problem is, is that, as the Court is aware, sometimes it takes a while

for the paperwork to be done sufficient to post, and so I would ask -- and I understand the Court may or may not grant a 24-hour stay at the end of this proceeding, but if the stay does not extend beyond that, it may take several days, even a week, for the property to be posted, and there are situations I've been part of in this district where a person has been released pending and given a very strict deadline as to when the paperwork for the property is supposed to be posted, and they've had to sign for the bond, and in the interim the sureties have had to sign for the bond.  It's just a delay that sometimes occurs with the filing of the appropriate paperwork.  So I'll leave that to the Court's discretion, but I wanted to bring that concern up.

THE COURT:  Okay.  And just to confirm, you said 21 and 23 -- you don't have an objection to 21, 22, or 23?  21 is possess and use only those digital devices, screen names, email accounts, social media accounts, et cetera, as well as any passwords that you've disclosed to supervising agency.  So basically telling them about your digital devices and screen names, emails, et cetera.  22 is that digital devices are subject to monitoring so that they can actually monitor and -- you know, they use their discretion, but they can -- you know, they can put software on the digital devices.  And 23 is do not use or possess more than one virtual currency wallet.  It relates to cryptocurrency.  Do

you have --

MR. DUDLEY:  No objection with one exception, attorney-client communications that I would not want to be --

THE COURT:  Okay.

MR. DUDLEY:  -- subject to monitoring.  Other than that, everything else --

THE COURT:  I'm sure there's some way that we can address that, and I'll ask Pretrial.

Okay.  All right.  So here are the -- Mr. Tanayo (phonetic), does -- I'm sure you have a solution for that. How do you handle that?

JARRYD FERNAND:  Yes, Your Honor.  When it comes to, you know, working with the information that we get from monitoring devices, they only work upon things that are more actionable towards the violation.  Of course, if it comes to, like, you know, communication with him and Mr. Dudley, it wouldn't be brought up or it wouldn't be collected in that fashion or way to be used against the defendant if that's the concern of counsel.

THE COURT:  Okay.  Well, I'll let you, Mr. Dudley, follow up if we get to that point.  Pretrial Services can work with you and walk you through how they handle it.

Okay.  So here are the conditions that I'm going to set is I'd like to see a $10,000 in secured bond.  So you can do that a number of ways.  You can work with a bail bondsman,

I presume, and get a secured bond of some kind, but that means -- the difference between that and an affidavit of surety without justification -- an affidavit of surety without justification is just a signature; you're not actually backing it up with actual cash.  I want an actual cash placement of $10,000.  Again, I think you can work with a bondsman so you don't actually have to have $10,000, but the court will have $10,000.

Did I say that right, Mr. Havens?  Is that -- am I misunderstanding?  Is that correct?

MR. HAVENS:  That's correct.  Or the family could just post the $10,000 cash deposit.  I'm sure Mr. Dudley --

THE COURT:  Yeah.  Okay.  So obviously, if you have $10,000, you can do it with -- my only point was you can also work with a bonding company, where you don't have to have the full 10,000.  And you obviously have collateral.  You have the house.  I agree with Mr. Dudley's point that securing the home as collateral often takes a really long time so that's why I just wanted to give you the option.  You can secure it however you want, but I want $10,000 in security.  If you want to secure it with your home, I'm happy with that.  If you have cash, then you're done.  If you want to work with a bonding company, you can do that too.  So you have lots of options, but it needs to be $10,000 in secured collateral.  That, I think, is a very meaningful security to ensure

Mr. Li's performance on these conditions of bond.

I'm going to set:

Box 1, supervision by the -- Pretrial Services.

No. 2, surrender all passports.

When can that be done, Mr. Dudley?  Does he have -- he has passports to surrender?  Does he have them here?

MR. DUDLEY:  I do not believe he has them there, but I believe his wife has access --

THE COURT:  Okay.

MR. DUDLEY:  -- to them and I am in communication with her.

THE COURT:  Let me ask since she's --

MR. DUDLEY:  I will be in further communication.

THE COURT:  -- since she's in the audience.

Does the family have the passports?

MR. DUDLEY:  She's in the audience right now.  She may be able to answer that question directly.

MRS. LI:  Yeah.  It's at home.  I can bring (inaudible).

THE COURT:  Okay.  You can bring it immediately. Okay. Great.  So then I'm just going to require that those passports are surrendered before release happens.  So, if you could do that tomorrow, great, and then that that will also -- you know, you can work on the bond issue, however you want to satisfy the $10,000, and then once you do that, you'll

have satisfied the bond.

Yeah, you can ask a question.

MRS. LI:  (Inaudible.)

THE COURT:  Do you want -- do you mind coming to the microphone because then everyone -- Mr. Dudley can hear you.

MRS. LI:  Just one question --

THE COURT:  And can you just identify yourself. Are you Mr. Li's wife?

MRS. LI:  Hi.  Yeah.  Tong Li's wife. (Indecipherable.)

THE COURT:  Okay.  Welcome.

MRS. LI:  Just wondering if it's a possibility that I bring the passport in sometime today is release -- can that happen today or -- just because --

THE COURT:  You bring it as soon as you want to. I'm still going to talk about whether --

MRS. LI:  Okay.

THE COURT:  -- I might stay my decision for a day.

MRS. LI:  Okay.

THE COURT:  But you can bring it as soon as possible.  What -- basically what I'm saying is I'm not going to release Mr. Li until I have the passport.

MRS. LI:  Okay.  Sounds good.

THE COURT:  And I'm also not going to release

Mr. Li until I have $10,000 in secured bond, whether that's cash or through a bonding company or through collateral on the home.  Okay?

MRS. LI:  We can bring check?

MR. DUDLEY:  If it's cash, Your Honor, can it be made out to the Clerk of the Court of the Central District?

THE COURT:  Mr. Havens can tell me.

MR. DUDLEY:  -- deposited with him.

THE COURT:  How does that work, Mr. Havens?

MR. HAVENS:  That -- I believe it is made out -- I believe that's accurate, that it's made out to the Clerk of the Court.  I think the Clerk's Office may be closed. Otherwise, I would have -- I could have walked down and asked someone.

But with respect to the passport issue, I know from experience once you leave the building right now, you will not be allowed back in.

THE COURT:  Yeah.  Yeah.

MR. HAVENS:  So that would not have been --

MRS. LI:  I see.  All right.

MR. HAVENS:  It wouldn't have been possible today.

MRS. LI:  I'll be back tomorrow.

MR. HAVENS:  So it'll have to be in the morning.

THE COURT:  Okay.  Box No. 3, so travel will be restricted to the Central District of California and the

District of Columbia, which you can travel to for court.

Box No. 4, Mr. Li, you'll have to reside as approved by supervising agency.

So I just want to emphasize, if you're ultimately released on my order, you're going to be under heavy conditions of release.  You're going to have a supervising agent from Pretrial Services.  You're going to have to talk to them about things.  The point here is they need to know where you are, and so you're going to be required to live at your house because they can show up and check on you unannounced.  And I know that sounds silly, but you can't, like, go on a weekend vacation because they need to be able to show up and know where you are.  You can't, like, stay over at friend's house overnight because, again, you need to be sleeping at the address where you're supposed to be because they may show up and check on you, and you better be there.  Does that make sense?

THE DEFENDANT:  Yes, it makes sense, Your Honor.

THE COURT:  Okay.  No. 5, you have to maintain or actively seek employment unless excused by the supervising agency, and your employment has to be approved by the supervising agency.

No. 7 -- this is important.  You have to avoid all contact all contact directly or indirectly with any known codefendant except in the presence of counsel.  That gets to

the Government's concern about further activity with your codefendants who have been released.

No. 11, you cannot sell, transfer, or give away any asset valued at $5,000 or more except to pay your lawyer without notifying and obtaining Court permission.

And you're going to get a copy of all of this in writing so just to be clear.

No. 14, you cannot use or possess illegal drugs or state-authorized marijuana, and you'll be subject to drug testing.  Also, in order to determine compliance, you agree to submit a search of your person and property.  So they can show up at your home, and they can search your home, unfortunately, because that's where you're living, and they're going to search for drugs.  They're going to search for any unlawful contraband.  They can drug test you.  Okay?

15, do not use for purposes of intoxication any controlled substance analog as defined by federal law.

I -- Mr. Benyamin, in light of the security that I'm requiring, the $10,000 of secured bond, I do not think it's appropriate to require location monitoring.  I don't think that sufficiently helps protect the safety of the community.  I do think that helps with a flight risk, but I don't think that the defendant here is a flight risk.  However, I will impose all of your requested conditions related to the use of electronics, which I do think helps

protect the safety of the community, and I think these are robust conditions that will make it incredibly difficult for Mr. Li to try to engage in illicit activity online.

So I will impose Condition 21 with the search, and so, Mr. Li, you will only be able to possess and use digital devices, screen names, email accounts, social media accounts, messaging applications that you have disclosed to Pretrial Services so they are aware of what you are doing online, and in order to determine compliance, they can search your person and property. So they can show up, and they can ask for your computer, and they can ask for your digital devices, and they can look around and make sure that you're not doing any of this stuff.

22, all digital devices are subject to monitoring by the supervising agency. So they can install software to monitor your activities.

No. 23, you cannot or possess more than one virtual currency wallet account. So it's a more lengthy condition, but it imposes restrictions on your ability to use cryptocurrency, and so in order to determine compliance, you agree to submit to a search of your person and property. Again, they can show up, and they can search your digital devices.

Mr. Tanayo, any questions about the conditions? Did I miss anything?

MR. FERNAND:  Nothing further, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  So those are the conditions of release I am going to set.

The Government has requested 24 hours?

MR. HAVENS:  That's right, Your Honor.  24 hours.

THE COURT:  Okay.

Mr. Dudley, do you have any thoughts on that?

MR. DUDLEY:  Well, we would object, for the record.  Certainly, anything beyond 24 hours we would -- for the record, we would object to the stay.

THE COURT:  Okay.  I'm going to grant the stay, Mr. Benyamin, of 24 hours, but after that, after the end of day tomorrow, if all the conditions are satisfied and if some other judge hasn't reversed my decision, Mr. Li can be released on my conditions of release.  Okay?

MR. BENYAMIN:  Understood, Your Honor.  Thank you.

THE COURT:  Okay.

So, Mr. Li, you and your attorney will get a copy of these conditions.  I will encourage you strongly to review them with Mr. Dudley.  There really is a lot there.  I went through it very quickly, but I do want to impress upon you the seriousness of these conditions and how onerous they are, and I don't want you to be in a situation where you mistakenly violate one of the conditions, because I am not

sympathetic to defendants who make mistakes like that, because I warn them in advance.  Talk to your lawyer, ask, and make sure you know exactly what you can and can't do.  I do not want you to put your family at financial risk, because I am making them put a $10,000 secured deposit, and if you violate any of these conditions even a little bit, they will not get their $10,000 back.

Understood?

THE DEFENDANT:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.

MR. HAVENS:  Your Honor, I'm invested in this case at this point.  Does the Court want me to go over the paperwork with him given that there's a chance he could be released on Friday, and if the paperwork isn't done by Friday, he may stay in on the weekend?

THE COURT:  Is that okay with you, Mr. Dudley?

MR. DUDLEY:  That's fine with me.  I appreciate Mr. Havens volunteering to do that.

THE COURT:  Is that okay with you, Mr. Li?

THE DEFENDANT:  Yes, it is, Your Honor.

THE COURT:  Okay.

MR. HAVENS:  It'll just be the CR --

THE COURT:  I appreciate it.

MR. HAVENS:  -- CR-1 and the affidavit with respect to the passport?

THE COURT:  Yeah.  And I appreciate your assistance.  You can talk with the family and let them know what they need to do because, frankly, I don't know how to do it so you --

MR. HAVENS:  I believe it's a money order, and it can't just be a check, and then there's a notation where you put the magistrate case number.  But I'm going to tell the family and Mr. Dudley to call the Clerk's Office and verify before getting the money order -- or whatever -- cashier's check -- they need.

THE COURT:  Great.

And then, Mr. Dudley, obviously the U.S. Attorney's Office may go into court tomorrow and seek a stay.  So I'll leave that up to you to coordinate with your counterparts so you're aware of what they may do.  They may decide not to, but we'll have to see.  So I'll leave that up to you.

MR. DUDLEY:  Thank you, Your Honor.

THE COURT:  Do I need to set a date -- do we have a date to set -- do we have any date in the other district?

MR. BENYAMIN:  Not that I'm aware of, Your Honor.

THE COURT:  Okay.

MR. DUDLEY:  We do not at this point, Your Honor.

THE COURT:  Okay.  All right.  Then anything else from the parties?  Did I -- did we cover everything?

MR. BENYAMIN:  Nothing from the Government,

Your Honor.

MR. DUDLEY:  Nothing further from the defense, Your Honor.

THE COURT:  Okay.  All right.  Well, thank you, everybody, for your patience and assistance, and Mr. Havens in particular.

Good luck to you, Mr. Li.

THE DEFENDANT:  Thank you, Your Honor.

MR. DUDLEY:  Thank you, Your Honor.

(Proceedings adjourned at 5:33 p.m.)

///

///

50

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/ Julie Messa            June 17, 2026
Julie Messa, CET**D-403      Date
Transcriber

# Exhibit B (Under Seal)

# Exhibit C

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER |
|---|---|
| PLAINTIFF | 2:26 - mj - 03328 - DUTY |
| v. | **AFFIDAVIT RE APPEARANCE BOND (CASH SECURITY)** |
| DEFENDANT(S) | Tong Li |

### AFFIDAVIT BY OWNER OF CASH SECURITY

I, Zhou Qing Tong , on oath say that I reside at 163 N. Dommer Ave, Walnut, CA 9↑↑65 91789 and that the $ 10,000 cash deposited as security on foregoing bond is owned by me and is to be returned to me at the above address upon exoneration of this bond.

I hereby subject said fund to the provisions of Local Civil Rule 65 and consent and agree that in case of default or contumacy on the part of the principal, the Court may, upon notice to me of not less than ten days, proceed summarily and render judgment against said cash security in accordance with my obligation herein and award execution thereon.

Sworn to before me, and subscribed in my presence on 6 / 5 / 2026. , by

_____ , Deputy Clerk.

_Zhou Qing Tong_

Signature of Owner of Cash Security

### AFFIDAVIT BY ATTORNEY OR AUTHORIZED AGENT OF THE OWNER OF CASH SECURITY

I, Helen Lin , on oath say that I am the attorney or authorized agent of the owner of the $ 10,000 cash deposited as security on the foregoing bond; that the owner of said cash is Zhou Qing Tong and his/her address is 163 N. Dommer Ave, Walnut, CA 91789 and that said cash is to be returned to said owner at the above address upon exoneration of this bond.

On behalf of said owner, I hereby subject said fund to the provisions of Local Civil Rule 65 and consent and agree that in case of default or contumacy on the part of the principal, the Court may, upon notice to said owner of not less than ten days, proceed summarily and render judgment against said cash security in accordance with my obligation herein and award execution thereon.

Sworn to before me, and subscribed in my presence on 6 / 5 / 2026 , by

_____ , Deputy Clerk.

_Helen Lin_

Signature of Attorney or Authorized Agent

CR-07 (08/19)                AFFIDAVIT RE APPEARANCE BOND (CASH SECURITY)

Generated: Jun 5, 2026 3:18PM



# U.S. District Court

## California Central - Los Angeles

Receipt Date: Jun 5, 2026 3:18PM

Helen Lin

| Rcpt. No: 44897 | Trans. Date: Jun 5, 2026 3:18PM | Cashier ID: #AP (7319) |
|---|---|---|

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|---|---|---|---|---|---|
| 701 | Treasury Registry | DCAC2:26MJ03328 /001<br>Tong Li<br>**FBO**: Helen Lin | 1 | 10000.00 | 10000.00 |

| CD | Tender | | | Amt |
|---|---|---|---|---|
| CH | Check | #5382 | 06/5/2026 | $10,000.00 |
| | | | Total Due Prior to Payment: | $10,000.00 |
| | | | Total Tendered: | $10,000.00 |
| | | | Total Cash Received: | $0.00 |

**Comments**: Tong Li $10,000 3507 S Spring Medow Court Diamond Bar, ca 91765

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

# *United States Probation & Pretrial Services*

## United States District Court
### Central District of California



| | |
|---|---|
| **Brian D. Karth**<br>District Court Executive / Clerk of Court | **Natasha Alexander-Mingo**<br>Chief Probation & Pretrial Services Officer |

PACTS No:  11142203

### Passport Receipt

Defendant Name:  Tong Li

Name on passport, if different:  enter text.

Country of Origin:  USA

Ordered by court in the Central District of California

Docket Number:  2:26-03328M-1

U.S. Probation & Pretrial Services
Headquarter

Edward R. Roybal Federal Building
and U.S. Courthouse
255 East Temple Street, Suite 1410
Los Angeles, CA 90012-3332
Phone 213-894-4726 / Fax 213-894-0231

Surrendered By   *Helen Lin*

Susana Marrujo

Received By

Returned To

Surrendered By

Purpose Returned

Address (if mailed)

Date   6/5/2026

Date   06/5/2026

Date

Date

Date

Edward R. Roybal Federal Building & U.S. Courthouse, 255 East Temple Street, Suite 1410, Los Angeles, CA 90012 / 213-894-4726 phone, 213-894-0231 fax

# Exhibit D

# THE HYDROPONIC CITY
Amazon Retail Operations

June 30, 2026

**RE: Letter of Support for Tong Li**

The Honorable John D. Bates

Dear Judge Bates,

My name is Leonard Wang, and I am writing to the Court on behalf of Tong Li, my Amazon business partner of over ten years. I respectfully ask that this letter be considered as part of the Court's assessment of his character.

I have worked closely with Tong Li since 2015, when we co-founded an Amazon-based retail business together, now operating as The Hydroponic City. Over the course of our partnership, I have had the opportunity to observe him not only as a businessman, but as a person of integrity, discipline, and commitment.

Under Tong Li's operational leadership and deep expertise in the Amazon marketplace, our company sustained a 95% customer satisfaction rating over a decade — a metric that reflects thousands of interactions handled with consistency and care. To date, our business has accumulated over 19,000 customer reviews, a testament to the trust we built with our customer base under his guidance.

One of our most significant accomplishments was securing an exclusivity agreement with one of the largest brands in the gardening industry — a deal that required demonstrating operational credibility, reliability, and business acumen. That agreement would not have been possible without Tong Li's knowledge, work ethic, and reputation in the space.

I will be direct with the Court: our business recently lost a key client, and it has had a real impact on our operations. I say this not to minimize the challenges we face, but to make clear that if anyone has the knowledge, experience, and capability to restore this company to where it once stood, it is Tong Li. His understanding of how the Amazon platform operates — its algorithms, logistics, compliance requirements, and customer dynamics — is genuinely rare and difficult to replace.

Should the Court grant his release, Tong Li has a clear and ongoing responsibility waiting for him within our company. He will resume his role working on our Amazon business, helping identify new products to sell and working to secure deals with brands to assist them in

managing their Amazon sales — the same work that helped build this company, and that we now need to get it back on track. This is not a hypothetical placement — it is the same work he has performed for over a decade, and the business depends on his continued involvement to move forward.

The man I have worked alongside for over a decade is someone who takes his responsibilities seriously, both professionally and personally. I believe his record speaks to who he is, and I am confident that given the opportunity, he will continue to demonstrate that character going forward.

Respectfully submitted,

**Leonard Wang**

The Hydroponic City

# Exhibit E


WFG National Title

# PROPERTY PROFILE

PREPARED FOR:
DEE BARBA
RE/MAX DYNASTY
15820 Whittier Blvd Ste B
WHITTIER, CA 90603

Customer Service 800.300.0775          cs@wfgtitleco.com



# PROPERTY PROFILE

## Property Information

|  |  |
|---|---|
| Primary Owner : | QIN FEN LI & ZHOU QING TONG |
| Secondary Owner : | N/A |
| Site Address : | 163 N DOMMER AVE |
|  | WALNUT, CA 91789-2312 |
| Mailing Address : | 163 N DOMMER AVE |
|  | WALNUT, CA 91789-2312 |
| Assessor Parcel Number : | 8720-002-023 |
| CountyName : | Los Angeles |
| Tax Account ID : |  |
| Phone : | 909-979-0182 |
| Census Tract : | 4034.02 |
| Housing Tract Number : | 27883 |
| Lot Number : | 23 |
| Page Grid : | - |
| Legal Description : | Lot: 23    ; Tract No: 27883    ; Abbreviated Description: LOT:23 |
|  | TR#:27883    TRACT NO 27883 LOT 23 |

## Property Characteristics

| Bedrooms : | 3 | Year Built : | 1964 | Square Feet : | 1780 |
|---|---|---|---|---|---|
| Bathrooms : | 2.0 | Garage : | N/A | Lot size : | 7991 SF |
| Partial Bath : | 0 | Fireplace : | N/A | Number of Units : | 0 |
| Total Rooms : | 0 | Pool/Spa : | N | Use Code : | Single Family Residential |
| Zoning : | WAR17200* |  |  |  |  |

## Sale/Loan Information

| Transfer Date : | 09/18/1997 | Document # : | 97-1444724 |
|---|---|---|---|
| Transfer Value : | N/A | Cost/Sq Feet : | N/A |
| First Loan Amt : | N/A | Lender : |  |

## Assessment/Tax Information

| Assessed Value : | $276,524 | Tax Amount : | $3,978.68 |
|---|---|---|---|
| Land Value : | $125,721 | Tax Status : | Current |
| Improvement Value : | $150,803 | Tax Rate Area : | 9-315 |
| Percent Improvement : | 54 % | Homeowner Exemption : | Y |

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

06/03/2026 12:41:40 PM                                                      Customer Service Rep:Denise Vasquez

# SUBJECT PROPERTY HISTORY

## Mortgage Release

| | |
|---|---|
| Recording Date: 03/25/2026 | Document #: 26-0208998 |
| Loan Amount: | Document Description: Release of Mortgage |
| Current Lender: FIRST AMERICAN TITLE INSURANCE COMPANY AS TRUSTEE OR SUCCESSOR TRUSTEE OR SUBSTITUTE TRUSTEE | Origination Mortgage Recording Date: 11/07/2016 |
| Borrower Name: ZHOU QING TONG QIN FEN LI | Origination Mortgage Document #: 16-1387029 |
| Original Lender: BANK OF AMERICA NA | |

## Mortgage Release

| | |
|---|---|
| Recording Date: 11/08/2016 | Document #: 16-1395043 |
| Loan Amount: $100,000 | Document Description: Substitution of Trustee and Full Reconveyance |
| Current Lender: BANK OF AMERICA, N.A. | Origination Mortgage Recording Date: 01/29/2007 |
| Borrower Name: LI,QIN F;LI,QIN FEN;TONG,ZHOU Q;TONG,ZHOU QING | Origination Mortgage Document #: 07-0181080 |
| Original Lender: BANK OF AMERICA NA | |

## Mortgage Record

| | |
|---|---|
| Recording Date: 11/07/2016 | Document #: 16-1387029 |
| Loan Amount: $150,000 | Loan Type: Credit Line (Revolving) |
| TD Due Date: | Type of Financing: VAR |
| Lender Name: BANK OF AMERICA NA | |
| Lender Type: Bank | |
| Buyer Vesting: TONG,ZHOU QING; LI,QIN PEN | |
| Vesting: | |

## Mortgage Release

| | |
|---|---|
| Recording Date: 07/22/2009 | Document #: 09-1112775 |
| Loan Amount: $119,300 | Document Description: Substitution of Trustee and Full Reconveyance |
| Current Lender: MERS, INC. | Origination Mortgage Recording Date: 11/09/2001 |
| Borrower Name: QIN FEN LI | Origination Mortgage Document #: 01-2148021 |
| Original Lender: CAPITOL COMMERCE MTG CO | |

## Mortgage Record

| | |
|---|---|
| Recording Date: 01/29/2007 | Document #: 07-0181080 |
| Loan Amount: $100,000 | Loan Type: Credit Line (Revolving) |
| TD Due Date: | Type of Financing: VAR |
| Lender Name: BANK OF AMERICA NA | |
| Lender Type: Bank | |
| Buyer Vesting: LI,QIN F; TONG,ZHOU Q | |
| Vesting: | |

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

06/03/2026 12:41:42 PM                                                                                          Customer Service Rep:  Denise Vasquez

## Mortgage Record

| | | | |
|---|---|---|---|
| Recording Date: | 11/09/2001 | Document #: | 01-2148021 |
| Loan Amount: | $119,300 | Loan Type: | Unknown |
| TD Due Date: | 11/01/2016 | Type of Financing: | |
| Lender Name: | CAPITOL COMMERCE MTG CO | | |
| Lender Type: | Mortgage company | | |
| Buyer Vesting: | LI,QIN FEN; TONG,ZHOU QING | | |
| Vesting: | | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date: | 09/18/1997 | Document #: | 97-1444724 |
| Price: | | Document Type: | Grant Deed |
| First TD: | | Type of Sale: | |
| Lender Name: | | | |
| Buyer Name: | LI, QIN FEN; TONG, ZHOU QING | | |
| Buyer Vesting: | Joint Tenancy | | |
| Sell Name: | CHEUNG, C F | | |
| City/Muni/Twp: | WALNUT | | |
| Legal: | CITY:WALNUT TRACT NO 27883 LOT 23 | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date: | 06/25/1997 | Document #: | 97-0946485 |
| Price: | $170,000 | Document Type: | Grant Deed |
| First TD: | $134,800 | Type of Sale: | Full-Computed from Transfer Tax |
| Lender Name: | REPUBLIC CONSUMER LENDING GROUP | | |
| Buyer Name: | LI, QI FEN; TONG, ZHOU QING | | |
| Buyer Vesting: | Joint Tenancy | | |
| Sell Name: | CHEUNG, C F | | |
| City/Muni/Twp: | WALNUT | | |
| Legal: | CITY:WALNUT TRACT NO 27883 LOT 23 | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date: | 04/01/1997 | Document #: | 97-0490841 |
| Price: | $125,000 | Document Type: | Individual Deed |
| First TD: | $87,500 | Type of Sale: | Full-Computed from Transfer Tax |
| Lender Name: | AMERICAN SVG BANK | | |
| Buyer Name: | CHEUNG, C F | | |
| Buyer Vesting: | Married Woman as her sole and separate property | | |
| Sell Name: | WONG, WAI LIN K; KWAN, WAI LIN | | |
| City/Muni/Twp: | WALNUT | | |
| Legal: | CITY:WALNUT TRACT NO 27883 LOT 23 | | |

## Prior Transfer

| | | | |
|---|---|---|---|
| Recording Date: | 04/01/1997 | Document #: | 97-0490840 |
| Price: | | Document Type: | Intrafamily Transfer & Dissolution |
| First TD: | | Type of Sale: | |
| Lender Name: | | | |
| Buyer Name: | CHEUNG, C F | | |
| Buyer Vesting: | Married Woman as her sole and separate property | | |
| Sell Name: | CHEUNG, S Y | | |
| City/Muni/Twp: | LA VERNE | | |
| Legal: | CITY:WALNUT TRACT NO 27883 LOT 23 | | |

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

163 N DOMMER AVE
WALNUT, CA 91789-2312



| Address | Date | Price | SqFt | BR/Bth | Year Built | Lot Size |
|---|---|---|---|---|---|---|
| 1. 20607 Fuerte Dr | 12/12/2025 | $1,000,000 | 1790 | 3/2 | 1958 | 25641 |
| 2. 602 Lone Eagle Rd | 04/21/2026 | $1,200,000 | 1786 | 4/2 | 1975 | 12064 |
| 3. 244 Maryville Dr | 02/10/2026 | $1,100,000 | 1384 | 3/2 | 1973 | 10266 |
| 4. 3332 La Puente Rd | 02/12/2026 | $815,000 | 1425 | 4/2 | 1964 | 6215 |
| 5. 3316 S Gauntlet Dr | 01/02/2026 | $830,000 | 1425 | 4/2 | 1965 | 6298 |
| 6. 3404 E Hilltonia Dr | 03/24/2026 | $1,020,000 | 1690 | 3/3 | 1964 | 7257 |
| 7. 19601 Mackel Ter | 03/25/2026 | $890,000 | 1736 | 3/2 | 1975 | 7635 |
| 8. 19619 El Camino Esplanade | 02/24/2026 | $840,000 | 1550 | 3/2 | 1975 | 7769 |
| 9. 516 Vista Rambla | 02/24/2026 | $818,000 | 1736 | 3/2 | 1975 | 7434 |
| 10. 578 Vista Rambla | 04/16/2026 | $925,000 | 1736 | 3/2 | 1975 | 7811 |

| Address | Date | Price | SqFt | BR/Bth | Year Built | Lot Size |
|---|---|---|---|---|---|---|
| 11. 3512 S Flemington Dr | 02/13/2026 | $850,000 | 1400 | 4/2 | 1964 | 7552 |
| 12. 3328 S Flemington Dr | 02/27/2026 | $958,000 | 1658 | 3/2 | 1964 | 7141 |
| 13. 3022 E Quinnell Dr | 12/26/2025 | $804,000 | 1414 | 3/2 | 1963 | 6509 |
| 14. 3632 S Morganfield Ave | 04/08/2026 | $930,000 | 1621 | 3/2 | 1963 | 7571 |
| 15. 3845 S Forecastle Ave | 03/05/2026 | $785,000 | 1414 | 3/2 | 1963 | 7431 |
| 16. 244 Calle Luna | 02/11/2026 | $900,000 | 1600 | 4/2 | 1975 | 8069 |
| 17. 19819 Camino Arroyo | 05/04/2026 | $1,200,000 | 1859 | 4/3 | 1977 | 9780 |
| 18. 19873 Calle Granada | 12/22/2025 | $1,180,000 | 2015 | 4/3 | 1976 | 9274 |

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

Customer Service Rep:  Denise Vasquez



# SALES COMPARABLES

## Criteria Selected:

Searched by Radius: 1 miles
Minimum Area: 1,335 SqFt.          Maximum Area: 2,225 SqFt.
Maximum Bathrooms: 4              Minimum Bathrooms: 0
Maximum Bedrooms: 5              Minimum Bedrooms: 1
Pool: All
Land Use: Same as Subject
Date Range: 12/05/2025 to 06/03/2026

## Area Sales Analysis

|                      | Low       | Median    | High        |
|----------------------|-----------|-----------|-------------|
| Bedrooms:            | 3         | 3         | 4           |
| Baths:               | 2         | 2         | 3           |
| Lot Size:            | 6,215     | 7,603     | 25,641      |
| Living Area (SqFt):  | 1,384     | 1,639     | 2,015       |
| Sale Price:          | $785,000  | $912,500  | $1,200,000  |
| Year Built:          | 1958      | 1969      | 1977        |
| Age:                 | 49        | 57        | 68          |

## Subject Property

Sale Date:  09/18/1997    Year Built:    1964    Price:  N/A              Pool:    N
Lot Size:    7,991 SF      Square Feet:  1,780   $/SF:  N/A              BR/Bth: 3/2.0

## Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|------------|----------|------|
| 1 | 20607 FUERTE DR WALNUT, CA 91789 | 12/12/2025 | $1,000,000 | $500,000 | $558 | 1,790 | 3/2 | 1958 | 25,641 SF | P |

Owner:      CHRISTIAN D GARCIA, KAYLI M BROWN          Seller:      JAMES E HILL REVOCABLE TRUST, LORI C
APN:        8709-012-031                               Document #: 25-0903985
Legal:      Lot:1 Subdivision:PARCEL MAP 15424 Map Ref:MB 161 PG 99City/Muni/Twp:WALNUT
Land Use:   Single Family Residential                  Located approximately 1.00 miles from subject property.

| 2 | 602 LONE EAGLE RD WALNUT, CA 91789 | 04/21/2026 | $1,200,000 | $960,000 | $671 | 1,786 | 4/2 | 1975 | 12,064 SF | N/A |

Owner:      NEIMA C TANARA                             Seller:      SHEILA LOUISE WRIGHT, CHARLES ROLAND
APN:        8709-031-039                               Document #: 26-0277783
Legal:      Lot:3 Tract No:31338 Map Ref:MB 847 PG 10-12City/Muni/Twp:WALNUT
Land Use:   Single Family Residential                  Located approximately 0.54 miles from subject property.

| 3 | 244 MARYVILLE DR WALNUT, CA 91789 | 02/10/2026 | $1,100,000 | $990,000 | $794 | 1,384 | 3/2 | 1973 | 10,266 SF | N/A |

Owner:      THIPPHAPHONE BOUNYING, EDHOWELL S          Seller:      LY MY PHAM, THU THAO THI NGUYEN
APN:        8720-027-036                               Document #: 26-0096241
Legal:      Lot:35 Tract No:28908 Map Ref:MB 822 PG 98-100City/Muni/Twp:WALNUT
Land Use:   Single Family Residential                  Located approximately 0.39 miles from subject property.

| 4 | 3332 LA PUENTE RD WEST COVINA, CA 91792 | 02/12/2026 | $815,000 | $0 | $571 | 1,425 | 4/2 | 1964 | 6,215 SF | N/A |

Owner:      LARRIGIN LLC                               Seller:      THE BEATRIZ C LUCHA LIVING TRUST,
APN:        8722-001-037                               Document #: 26-0103577
Legal:      Lot:301 Tract No:27416 Map Ref:MB 710 PG 88-94City/Muni/Twp:WEST COVINA
Land Use:   Single Family Residential                  Located approximately 0.49 miles from subject property.

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

Customer Service Rep:  Denise Vasquez

Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 5 | 3316 S GAUNTLET DR WEST COVINA, CA 91792 | 01/02/2026 | $830,000 | $622,500 | $582 | 1,425 | 4/2 | 1965 | 6,298 SF | N/A |

Owner: STEVEN SI YU WU, PENNY PAK YAN LAI    Seller: CORTADO HOME INC, REVIVE REALTY LLC
APN: 8722-002-010    Document #: 26-0002178
Legal: Lot:148 Tract No:27416 Map Ref:MB 710 PG 88-94City/Muni/Twp:WEST COVINA
Land Use: Single Family Residential    Located approximately 0.52 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 6 | 3404 E HILLTONIA DR WEST COVINA, CA 91792 | 03/24/2026 | $1,020,000 | $714,000 | $603 | 1,690 | 3/3 | 1964 | 7,257 SF | N/A |

Owner: YANG FENG, LETAO CHI    Seller: JIA YUAN GUAN, SHEN MING YU
APN: 8722-004-002    Document #: 26-0202673
Legal: Lot:200 Tract No:27416 Map Ref:MB 710 PG 88-94City/Muni/Twp:WEST COVINA
Land Use: Single Family Residential    Located approximately 0.47 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 7 | 19601 MACKEL TER WALNUT, CA 91789 | 03/25/2026 | $890,000 | $0 | $512 | 1,736 | 3/2 | 1975 | 7,635 SF | N/A |

Owner: REVIVE SOCAL LLC    Seller: BILAL A AND SALNIA B DADABHOY LIV TR,
APN: 8722-024-033    Document #: 26-0206423
Legal: Lot:20 Tract No:31663 Map Ref:MB 845 PG 91-95City/Muni/Twp:WALNUT
Land Use: Single Family Residential    Located approximately 0.93 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 8 | 19619 EL CAMINO ESPLANADE WALNUT, CA 91789 | 02/24/2026 | $840,000 | $400,000 | $541 | 1,550 | 3/2 | 1975 | 7,769 SF | N/A |

Owner: ZEXUN JIA, ANNA SHI    Seller: MINGJIE LI, HONGMEI GONG
APN: 8722-024-049    Document #: 26-0130537
Legal: Lot:36 Tract No:31663 Map Ref:MB 845 PG 91-95City/Muni/Twp:WALNUT
Land Use: Single Family Residential    Located approximately 0.84 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 9 | 516 VISTA RAMBLA WALNUT, CA 91789 | 02/24/2026 | $818,000 | $449,900 | $471 | 1,736 | 3/2 | 1975 | 7,434 SF | N/A |

Owner: YUKAI WANG, PING YIN    Seller: STEPHEN BROOCK LIVING TRUST, PATRICK
APN: 8722-024-060    Document #: 26-0131080
Legal: Lot:62 Tract No:31663 Map Ref:MB 845 PG 91-95City/Muni/Twp:WALNUT
Land Use: Single Family Residential    Located approximately 0.86 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 10 | 578 VISTA RAMBLA WALNUT, CA 91789 | 04/16/2026 | $925,000 | $647,500 | $532 | 1,736 | 3/2 | 1975 | 7,811 SF | N/A |

Owner: YUHUI LE    Seller: WING SUN LEUNG, YINGXIA LI
APN: 8722-025-063    Document #: 26-0268353
Legal: Lot:8 Tract No:31663 Map Ref:MB 845 PG 91-95City/Muni/Twp:WALNUT
Land Use: Single Family Residential    Located approximately 0.97 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 11 | 3512 S FLEMINGTON DR WEST COVINA, CA 91792 | 02/13/2026 | $850,000 | $0 | $607 | 1,400 | 4/2 | 1964 | 7,552 SF | N/A |

Owner: CHONG LEONG LEI    Seller: ROSE WILLIAMS
APN: 8722-027-027    Document #: 26-0107138
Legal: Lot:79 Tract No:27416 Map Ref:MB 710 PG 88-94City/Muni/Twp:WEST COVINA
Land Use: Single Family Residential    Located approximately 0.35 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|----------|------|
| 12 | 3328 S FLEMINGTON DR WEST COVINA, CA 91792 | 02/27/2026 | $958,000 | $622,700 | $577 | 1,658 | 3/2 | 1964 | 7,141 SF | N/A |

Owner: XIAOJU LUO    Seller: PENG FAMILY TRUST, ZHI HAO PENG
APN: 8722-028-026    Document #: 26-0139997
Legal: Lot:65 Tract No:27416 Map Ref:MB 710 PG 88-94City/Muni/Twp:WEST COVINA
Land Use: Single Family Residential    Located approximately 0.29 miles from subject property.

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

## Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 13 | 3022 E QUINNELL DR WEST COVINA, CA 91792 | 12/26/2025 | $804,000 | $603,000 | $568 | 1,414 | 3/2 | 1963 | 6,509 SF | N/A |

Owner: RITA RUOPING DONG  
APN: 8724-005-008  
Legal: Lot:19 Tract No:27666 Map Ref:MB 703 PG 64-70City/Muni/Twp:WEST COVINA  
Land Use: Single Family Residential  
Seller: GARY W MADRIGAL, TRISHA MADRIGAL  
Document #: 25-0937463  
Located approximately 0.94 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 14 | 3632 S MORGANFIELD AVE WEST COVINA, CA 91792 | 04/08/2026 | $930,000 | $330,000 | $573 | 1,621 | 3/2 | 1963 | 7,571 SF | N/A |

Owner: ERLINDA B DE SAGUN  
APN: 8724-009-011  
Legal: Lot:193 Tract No:27666 Map Ref:MB 703 PG 64-70City/Muni/Twp:WEST COVINA  
Land Use: Single Family Residential  
Seller: THE JORDA FAMILY LIVING TRUST,  
Document #: 26-0246029  
Located approximately 0.74 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 15 | 3845 S FORECASTLE AVE WEST COVINA, CA 91792 | 03/05/2026 | $785,000 | $574,000 | $555 | 1,414 | 3/2 | 1963 | 7,431 SF | N/A |

Owner: SHIRLEY LUU  
APN: 8724-011-019  
Legal: Lot:267 Tract No:27666 Map Ref:MB 703 PG 64-70City/Muni/Twp:WEST COVINA  
Land Use: Single Family Residential  
Seller: NANCY AI LAN HUANG  
Document #: 26-0157179  
Located approximately 0.89 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 16 | 244 CALLE LUNA WALNUT, CA 91789 | 02/11/2026 | $900,000 | $810,000 | $562 | 1,600 | 4/2 | 1975 | 8,069 SF | N/A |

Owner: JOSE MANUEL AGUILAR CANO, LETICIA  
APN: 8734-012-003  
Legal: Lot:66 Tract No:31921 Map Ref:MB 836 PG 82-84City/Muni/Twp:WALNUT  
Land Use: Single Family Residential  
Seller: PING HUANG, SUXIA YU  
Document #: 26-0099022  
Located approximately 0.70 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 17 | 19819 CAMINO ARROYO WALNUT, CA 91789 | 05/04/2026 | $1,200,000 | $833,000 | $645 | 1,859 | 4/3 | 1977 | 9,780 SF | N/A |

Owner: KAITAI LIN, XIANGHUI BO  
APN: 8734-021-020  
Legal: Lot:59 Tract No:27355 Map Ref:MB 858 PG 57-60City/Muni/Twp:WALNUT  
Land Use: Single Family Residential  
Seller: THE EUN AE PARK LIVING TRUST, EUN AE  
Document #: 26-0317800  
Located approximately 0.36 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Siz | Pool |
|-----|---------|------|-------|------|------|------|--------|-----------|---------|------|
| 18 | 19873 CALLE GRANADA WALNUT, CA 91789 | 12/22/2025 | $1,180,000 | $944,000 | $585 | 2,015 | 4/3 | 1976 | 9,274 SF | P |

Owner: ENHAN CAO, QI AN  
APN: 8734-025-008  
Legal: Lot:13 Tract No:27391 Map Ref:MB 859 PG 45-47City/Muni/Twp:WALNUT  
Land Use: Single Family Residential  
Seller: JOSEPH H ARIAS JR, FRANCES E ARIAS  
Document #: 25-0927177  
Located approximately 0.36 miles from subject property.

Confidential, Proprietary and/or Trade Secret. TM SM ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.  
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

06/03/2026 12:41:45 PM                                                                 Customer Service Rep: Denise Vasquez

# NEARBY PROPERTY OWNERS

## SUBRAMANIAN BHARATH
167 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-002-024
Telephone:
Square Feet: 1,704
Year Built: 1964
Sale Date: 06/06/2014
Land Use: Single Family Residential

Bedrooms: 5
Bathrooms: 3
Lot size: 7,763
Garage:

## CHAN KAIM S & LOKE KUM M
153 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-002-022
Telephone:
Square Feet: 1,232
Year Built: 1964
Sale Date: 11/20/2009
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 7,517
Garage:

## SURYADI LUCY M
151 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-002-021
Telephone: 626-905-9578
Square Feet: 1,232
Year Built: 1964
Sale Date: 12/12/2008
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 7,262
Garage:

## SANTOS PEDRO R AND TERESINHA TRS
20105 DIEHL ST
WALNUT, CA 91789
APN: 8720-003-013
Telephone:
Square Feet: 1,232
Year Built: 1964
Sale Date: 11/02/1990
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 6,992
Garage:

## YEE FEI Y & HUANG HUIPING
166 N LEMON AVE
WALNUT, CA 91789
APN: 8720-002-036
Telephone:
Square Feet: 1,406
Year Built: 1928
Sale Date: 05/27/2011
Land Use: Single Family Residential

Bedrooms: 3
Bathrooms: 1
Lot size: 14,673
Garage:

## CHOW WILLIE
168 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-003-012
Telephone: 909-598-8392
Square Feet: 1,232
Year Built: 1964
Sale Date: 08/23/1989
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 7,491
Garage:

## CICHOSKI STEPHEN AND ELISA TRS
174 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-003-011
Telephone: 909-979-7909
Square Feet: 1,998
Year Built: 1964
Sale Date: 01/09/1998
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 7,134
Garage:

## LI YUCHANG & GUO ESTHER Y
137 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-002-020
Telephone:
Square Feet: 1,144
Year Built: 1964
Sale Date: 01/13/2017
Land Use: Single Family Residential

Bedrooms: 3
Bathrooms: 2
Lot size: 7,630
Garage:

## REZAI DAMOUN A ETAL TRS
180 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-003-010
Telephone:
Square Feet: 1,232
Year Built: 1964
Sale Date: 04/28/2023
Land Use: Single Family Residential

Bedrooms: 4
Bathrooms: 2
Lot size: 7,346
Garage:

## ANG REAL ESTATE INVESTMENT GROUP INC
144 N DOMMER AVE
WALNUT, CA 91789
APN: 8720-002-014
Telephone:
Square Feet: 1,144
Year Built: 1964
Sale Date: 06/21/1989
Land Use: Single Family Residential

Bedrooms: 3
Bathrooms: 2
Lot size: 7,192
Garage:

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

06/03/2026 12:41:46 PM                                                    Customer Service Rep:  Denise Vasquez



Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.



AERIAL PHOTOS

163 N DOMMER AVE
WALNUT, CA 91789-2312

Confidential, Proprietary and/or Trade Secret. TM SM ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

06/03/2026 12:41:50 PM                                                                    Customer Service Rep:  Denise Vasquez

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL THIS DEED AND, UNLESS
OTHERWISE SHOWN BELOW, MAIL TAX STATEMENTS TO.

Name    Mr. & Mrs. Qin Fun Li
Street Address    163 Dommer Avenue
City State Zip    Walnut, CA 91789

**97 1444724**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

**12:41 PM SEP 18 1997**

FEE $7 F

RECORDERS USE ONLY

**GRANT DEED**

ORDER NO.
ESCROW NO.

TAX PARCEL NO. 8720-002-023

The undersigned declares that the documentary transfer tax is $_____-0-_____ and is
_____ computed on the full value of the interest of the property conveyed, or is
_____ computed on the full value less the value of liens or encumbrances remaining thereon at the time of sale.
The land, tenements or realty is located in
_____ unincorporated area _____ city of _____ and
FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

     C. F. CHEUNG, a married woman as her sole and separate property

hereby GRANT(S) to

     QIN FEN LI AND ZHOU QING TONG, HUSBAND AND WIFE AS JOINT TENANTS

the following described real property in the    City of Walnut
County of    Los Angeles    , State of California:
Lot 23 of Tract 27883, in the City of Walnut, as per map recorded in Book 710, Pages
78 to 80 inclusive of Maps, in the office of the county recorder of said county.

This conveyance confirms title to the grantees who continue to hold the same interest
acquired on June 25, 1997, Document No. 97-046485 wherein $187.00 Documentary Transfer
Tax was paid, R & T 11911.

Dated   September 2, 1997

STATE OF CALIFORNIA,    )
COUNTY OF Los Angeles    )
On September 11, 1997 _____ before me.
ALICE P. TSANG
(insert name/title of the officer), personally appeared

   C. F. CHEUNG

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature_____

_____
C. F. CHEUNG

ALICE P. TSANG
Comm. #1112518
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
Comm Exp Sept 29, 2000

(Notary Seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW. IF NO PARTY SO SHOWN, MAIL AS DIRECTED ABOVE.

| Name | Street Address | City & State | 252 |
|---|---|---|---|

# APPRAISAL OF REAL PROPERTY



**LOCATED AT**

163 N Dommer Ave
Walnut, CA 91789
TRACT NO 27883 LOT 23

**FOR**

Qin Fen Li & Zhou Qing Tong

**OPINION OF VALUE**

960,000

**AS OF**

06/03/2026

**BY**

Rodney Squires
JSR Appraisals

rodney@lci-network.com

# RESIDENTIAL APPRAISAL REPORT

File No.:

## SUBJECT

| Property Address: 163 N Dommer Ave | City: Walnut | State: CA | Zip Code: 91789 |
|---|---|---|---|

County: Los Angeles   Legal Description: TRACT NO 27883 LOT 23
Assessor's Parcel #: 8720-002-023

Tax Year: 2026   R.E. Taxes: $ 3,979   Special Assessments: $ 0   Borrower (if applicable):

Current Owner of Record: Qin Fen Li & Zhou Qing Tong   Occupant: ☒ Owner ☐ Tenant ☐ Vacant   ☐ Manufactured Housing

Project Type: ☐ PUD ☐ Condominium ☐ Cooperative ☐ Other (describe) SFR   HOA: $ 0   ☐ per year ☐ per month

Market Area Name: Walnut   Map Reference: 31084   Census Tract: 4034.02

## ASSIGNMENT

The purpose of this appraisal is to develop an opinion of: ☐ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☐ Current (the Inspection Date is the Effective Date) ☐ Retrospective ☐ Prospective

Approaches developed for this appraisal: ☐ Sales Comparison Approach ☐ Cost Approach ☐ Income Approach (See Reconciliation Comments and Scope of Work)

Property Rights Appraised: ☒ Fee Simple ☐ Leasehold ☐ Leased Fee ☐ Other (describe)

Intended Use: To Assist owners of the property to determine current value of subject property

Intended User(s) (by name or type):

Client: Qin Fen Li & Zhou Qing Tong   Address: 163 N Dommer Ave Walnut, CA 91789

Appraiser: Rodney Squires   Address: 3460 Marron rd #103 Oceanside, CA 92056

## MARKET AREA DESCRIPTION

| Location: | ☐ Urban ☒ Suburban ☐ Rural | Predominant Occupancy | One-Unit Housing | | Present Land Use | | Change in Land Use |
|---|---|---|---|---|---|---|---|
| Built up: | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | PRICE $(000) | AGE (yrs) | One-Unit | 80 % | ☒ Not Likely |
| Growth rate: | ☐ Rapid ☒ Stable ☐ Slow | ☒ Owner 100 | | | 2-4 Unit | 5 % | ☐ Likely * ☐ In Process * |
| Property values: | ☐ Increasing ☒ Stable ☐ Declining | ☐ Tenant | 715 Low | 0 | Multi-Unit | 5 % | * To: |
| Demand/supply: | ☐ Shortage ☒ In Balance ☐ Over Supply | ☐ Vacant (0-5%) | 2,800 High | 82 | Comm'l | 5 % | |
| Marketing time: | ☒ Under 3 Mos. ☐ 3-6 Mos. ☐ Over 6 Mos. | ☐ Vacant (>5%) | 900 Pred | 49 | | 5 % | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends):   Subject neighborhood boundaries are as follows:To the North by Amar Rd, To the West by Nogales, To the South by 60 Fwy, To the East by Grand Ave

The neighborhood is primarily a residential area, composed of average homes with adequate maintenance and average appeal in the market.  The neighborhood appears to have reasonable access to (Other)  schools, places of worship, employment, shopping, public transportation, freeway access and supporting services.

## SITE DESCRIPTION

Dimensions: See Plat Map   Site Area: 7,994 sf

Zoning Classification: WAR17200*   Description: Single-Family residential

Zoning Compliance: ☒ Legal ☐ Legal nonconforming (grandfathered) ☐ Illegal ☐ No zoning

Are CC&Rs applicable? ☐ Yes ☐ No ☐ Unknown   Have the documents been reviewed? ☐ Yes ☐ No   Ground Rent (if applicable) $ /

Highest & Best Use as improved: ☐ Present use, or ☐ Other use (explain)   The highest and best use of this property as improved, or as vacant, is the existing use

Actual Use as of Effective Date: Single Family Residential   Use as appraised in this report: Single Family Residential

Summary of Highest & Best Use:   The highest and best use of this property is the existing use. Site size and shape, topography, and surrounding uses are compatible for SFR use. Because the existing improvements contribute significantly to the value of the site, change is not feasible at this time;

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | Pvd | ☒ | ☐ | Size | 7994 sf |
| Gas | ☒ | ☐ | | Curb/Gutter | Concrete | ☒ | ☐ | Shape | Rectangular |
| Water | ☒ | ☐ | | Sidewalk | Concrete | ☒ | ☐ | Drainage | Typical |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | | ☒ | ☐ | View | N;Res; |
| Storm Sewer | ☒ | ☐ | | Alley | None | | | | |

Other site elements: ☒ Inside Lot ☐ Corner Lot ☐ Cul de Sac ☐ Underground Utilities ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone D   FEMA Map # 06037C1725F   FEMA Map Date 09/26/2008

Site Comments:   The appraiser has no special expertise regarding environmental hazards and this report must not be considered as an environmental assessment of the property. I have not checked the land records for recorded easements, and have reported only apparent easements, encroachments, and other apparent adverse conditions.

## DESCRIPTION OF THE IMPROVEMENTS

| General Description | | Exterior Description | | Foundation | | Basement | ☐ None | Heating | |
|---|---|---|---|---|---|---|---|---|---|
| # of Units | 1 ☐ Acc.Unit | Foundation | Concrete/Avg | Slab | Yes | Area Sq. Ft. | 0sf | Type | FAU |
| # of Stories | 1 | Exterior Walls | Stucco/Avg | Crawl Space | None | % Finished | | Fuel | Gas |
| Type ☒ Det. ☐ Att. | | Roof Surface | Comp/Avg | Basement | | Ceiling | | | |
| Design (Style) | DT1;Ranch | Gutters & Dwnspts. | None | Sump Pump | ☐ | Walls | | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Cons. | | Window Type | Alum | Dampness | ☐ | Floor | | Central | CAC |
| Actual Age (Yrs.) | 62 | Storm/Screens | Yes | Settlement | | Outside Entry | | Other | |
| Effective Age (Yrs.) | 30 | | | Infestation | | | | | |

| Interior Description | | Appliances | | Attic | ☐ None | Amenities | | Car Storage | ☒ None |
|---|---|---|---|---|---|---|---|---|---|
| Floors | Tl/Wd/Avg | Refrigerator ☒ | Stairs ☐ | | Fireplace(s) # 1 | Woodstove(s) # 0 | Garage | # of cars ( 4 Tot.) |
| Walls | Drywall/Avg | Range/Oven ☒ | Drop Stair ☐ | | Patio | | Attach. | 2 |
| Trim/Finish | Wood/Avg | Disposal ☒ | Scuttle ☒ | | Deck | | Detach. | 0 |
| Bath Floor | Tile/Avg | Dishwasher ☒ | Doorway ☐ | | Porch | | Blt.-In | 0 |
| Bath Wainscot | Tl/Avg | Fan/Hood ☒ | Floor ☐ | | Fence | | Carport | 0 |
| Doors | Wd/Avg | Microwave ☒ | Heated ☐ | | Pool | | Driveway | 2 |
| | | Washer/Dryer ☒ | Finished ☐ | | | | Surface | Concrete |

Finished area above grade contains: 6 Rooms   3 Bedrooms   2.0 Bath(s)   1,662 Square Feet of Gross Living Area Above Grade

Additional features:   The subject property has normal features.

Describe the condition of the property (including physical, functional and external obsolescence):   C4;No updates in the prior 15 years;No functional or external inadequacies were noted at the time of inspection, nor were there any apparent need for major repairs or modernization.  Physical depreciation was noted for normal wear and tear.  All utilites, appliances, and plumbing appear to be in working order as of the effective date of the appraisal.  There was some physical damage apparent as of the effective date of the appraisal

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

# RESIDENTIAL APPRAISAL REPORT

File No.:

## TRANSFER HISTORY

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s): RealQuest

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing: |
|---|---|
| Date: | There have been  no previous transfers |
| Price: | or listings on the subject property in the past 36 months. There have been no  previous transfers on the |
| Source(s): Corelogic | comparables in the past 12 months. |
| 2nd Prior Subject Sale/Transfer | |
| Date: | |
| Price: | |
| Source(s): | |

## SALES COMPARISON APPROACH

**SALES COMPARISON APPROACH TO VALUE (if developed)**    ☒ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjust. | COMPARABLE SALE # 2 | +(-) $ Adjust. | COMPARABLE SALE # 3 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 163 N Dommer Ave | 602 Lone Eagle Rd | | 3328 S Flemington Dr | | 20157 McKay Dr | |
| | Walnut, CA 91789 | Walnut, CA 91789 | | West Covina, CA 91792 | | Walnut, CA 91789 | |
| Proximity to Subject | | 0.54 miles NE | | 0.29 miles W | | 0.22 miles NE | |
| Sale Price | $ | $ 1,200,000 | | $ 958,000 | | $ 1,075,000 | |
| Sale Price/GLA | $ /sq.ft. | $ 671.89 /sq.ft. | | $ 577.80 /sq.ft. | | $ 682.11 /sq.ft. | |
| Data Source(s) | | CRMLS#CV26051968;DOM 9 | | CRMLS#OC26005539;DOM 12 | | CRMLS#OC25200059;DOM 33 | |
| Verification Source(s) | No Doc Selected | Doc#277783 | | Doc#139997 | | Doc#742801 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | Conv | | Conv | | Cash | |
| Concessions | | 0 | | 0 | | 0 | |
| Date of Sale/Time | | s04/26;c03/26 | | s02/26;c01/26 | | s10/25;c10/25 | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | A;BacksBsyRd; | N;Res; | -25,000 | N;Res; | -25,000 | N;Res; | -25,000 |
| Site | 7,994 sf | 12067 sf | -20,365 | 7143 sf | | 8044 sf | |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT1;Ranch | | DT1;Ranch | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Age | 54 | 51 | 0 | 62 | 0 | 55 | 0 |
| Condition | C4 | C2 | -100,000 | C4 | | C3 | -50,000 |

| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | | Total | Bdrms | Baths | | Total | Bdrms | Baths | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Room Count | 6 | 3 | 2.0 | 7 | 4 | 2.0 | | 6 | 3 | 2.0 | | 7 | 4 | 2.0 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Gross Living Area | 1,662 sq.ft. | 1,786 sq.ft. | -12,400 | 1,658 sq.ft. | | 1,576 sq.ft. | |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FAU/CAC | FAU/CAC | | FAU/CAC | | FAU/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Patio/Porch | Patio/Porch | | Patio/Porch | | Patio/Porch | |
| Pool/Spa | None | None | | None | | None | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -157,765 | ☐ + ☒ - | $ -25,000 | ☐ + ☒ - | $ -75,000 |
| Adjusted Sale Price of Comparables | | | $ 1,042,235 | | $ 933,000 | | $ 1,000,000 |

Summary of Sales Comparison Approach     See Addendum

Indicated Value by Sales Comparison Approach $     960,000

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

# RESIDENTIAL APPRAISAL REPORT
File No.:

## COST APPROACH

**COST APPROACH TO VALUE (if developed)**    ☒ The Cost Approach was not developed for this appraisal.

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value):

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ |
|---|---|---|---|
| Source of cost data: | DWELLING | Sq.Ft. @ $ | =$ |
| Quality rating from cost service:    Effective date of cost data: | | Sq.Ft. @ $ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | =$ |
| | | Sq.Ft. @ $ | =$ |
| | | Sq.Ft. @ $ | =$ |
| | | | =$ |
| | Garage/Carport | Sq.Ft. @ $ | =$ |
| | Total Estimate of Cost-New | | =$ |
| | Less    Physical    Functional    External | | |
| | Depreciation | | =$( ) |
| | Depreciated Cost of Improvements | | =$ |
| | "As-is" Value of Site Improvements | | =$ |
| | | | =$ |
| | | | =$ |
| Estimated Remaining Economic Life (if required):    Years | INDICATED VALUE BY COST APPROACH | | =$ |

## INCOME APPROACH

**INCOME APPROACH TO VALUE (if developed)**    ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $ 0    X Gross Rent Multiplier 0    = $ 0    **Indicated Value by Income Approach**

Summary of Income Approach (including support for market rent and GRM): The income approach to value was neither applicable nor necessary to produce credible results in this assignment and was not performed.

## PUD

**PROJECT INFORMATION FOR PUDs (if applicable)**    ☐ The Subject is part of a Planned Unit Development.

Legal Name of Project:

Describe common elements and recreational facilities:

## RECONCILIATION

| Indicated Value by: Sales Comparison Approach $ 960,000 | Cost Approach (if developed) $ | Income Approach (if developed) $ 0 |
|---|---|---|

Final Reconciliation    The Market Approach is necessary for credible results given the intended use, property characteristics and type of value sought. It is primarily based on sales of similar type properties in the subjects area, this is known as the Principle Of Substitution.  I did not apply the cost and income approaches because they are neither appropriate nor considered necessary to arrive at credible results.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:    This Appraisal is done in compliance with USPAP and Title XI requirements.

☐ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

**Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is: $ 960,000 , as of: 06/03/2026 , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report. See attached addenda.**

## ATTACHMENTS

A true and complete copy of this report contains 17 pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

☒ Scope of Work          ☒ Limiting Cond./Certifications   ☒ Narrative Addendum      ☒ Photograph Addenda      ☒ Sketch Addendum
☒ Map Addenda            ☒ Additional Sales               ☐ Cost Addendum           ☐ Flood Addendum          ☐ Manuf. House Addendum
☐ Hypothetical Conditions ☐ Extraordinary Assumptions     ☐                         ☐

Client Contact:                                          Client Name:    Qin Fen Li & Zhou Qing Tong
E-Mail:                              Address:    163 N Dommer Ave Walnut, CA 91789

## SIGNATURES

| APPRAISER | SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable) |
|---|---|
| Appraiser Name: Rodney Squires | Supervisory or Co-Appraiser Name: |
| Company: JSR Appraisals | Company: |
| Phone:              Fax: | Phone:              Fax: |
| E-Mail: rodney@lci-network.com | E-Mail: |
| Date of Report (Signature): 06/03/2026 | Date of Report (Signature): |
| License or Certification #: AL040627    State: CA | License or Certification #:    State: |
| Designation: | Designation: |
| Expiration Date of License or Certification: 06/27/2026 | Expiration Date of License or Certification: |
| Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None | Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None |
| Date of Inspection: 06/03/2026 | Date of Inspection: |

GP RESIDENTIAL

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

# ADDITIONAL COMPARABLE SALES

File No.:

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | +(-) $ Adjust. | COMPARABLE SALE # 5 | +(-) $ Adjust. | COMPARABLE SALE # 6 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 163 N Dommer Ave Walnut, CA 91789 | 20156 McKay Dr Walnut, CA 91789 | | 542 S Avenida Alipaz Walnut, CA 91789 | | 131 N Dommer Ave Walnut, CA 91789 | |
| Proximity to Subject | | 0.20 miles NE | | 0.60 miles S | | 0.07 miles S | |
| Sale Price | $ | $ 978,000 | | $ 990,000 | | $ 880,000 | |
| Sale Price/GLA | $ /sq.ft. | $ 620.56 /sq.ft. | | $ 574.25 /sq.ft. | | $ 714.29 /sq.ft. | |
| Data Source(s) | | CRMLS#TR25183193;DOM 22 | | CRMLS#AR25177575;DOM 11 | | CRMLS#OC25136488;DOM 11 | |
| Verification Source(s) | No Doc Selected | Doc#690330 | | Doc#606795 | | Doc#491116 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing Concessions | | Cash 0 | | Cash 0 | | Cash 10000 | |
| Date of Sale/Time | | s10/25;c09/25 | | s09/25;c08/25 | | s07/25;c07/25 | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | A;BacksBsyRd; | N;Res; | -25,000 | N;Res; | -25,000 | A;BacksBsyRd; | |
| Site | 7,994 sf | 6833 sf | +5,805 | 11109 sf | -15,575 | 11498 sf | -17,520 |
| View | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Design (Style) | DT1;Ranch | DT1;Ranch | | DT2;Contemp | | DT1;Ranch | |
| Quality of Construction | Q4 | Q4 | | Q4 | | Q4 | |
| Age | 54 | 55 | 0 | 37 | 0 | 61 | 0 |
| Condition | C4 | C4 | | C4 | | C4 | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Room Count | 6 / 3 / 2.0 | 6 / 3 / 2.0 | | 7 / 3 / 2.1 | -5,000 | 7 / 4 / 2.0 | |
| Gross Living Area | 1,662 sq.ft. | 1,576 sq.ft. | | 1,724 sq.ft. | | 1,232 sq.ft. | +43,000 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FAU/CAC | FAU/CAC | | FAU/CAC | | FAU/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 2ga2dw | 2ga2dw | | 2ga2dw | | 2ga2dw | |
| Porch/Patio/Deck | Patio/Porch | Patio/Porch | | Patio/Porch | | Patio/Porch | |
| Pool/Spa | None | None | | None | | Pool | -10,000 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - $ -19,195 | | ☐ + ☒ - $ -45,575 | | ☒ + ☐ - $ 15,480 | |
| Adjusted Sale Price of Comparables | | $ 958,805 | | $ 944,425 | | $ 895,480 | |

**SALES COMPARISON APPROACH**

Summary of Sales Comparison Approach

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**

Form GPRES2.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

**Market Conditions Addendum to the Appraisal Report**

File No.

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| Property Address | 163 N Dommer Ave | City | Walnut | State | CA | ZIP Code | 91789 |
|---|---|---|---|---|---|---|---|

Borrower

**Instructions:** The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 34 | 17 | 11 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 5.67 | 5.67 | 3.67 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Total # of Comparable Active Listings | 12 | 13 | 25 | ☐ Declining | ☒ Stable | ☒ Increasing |
| Months of Housing Supply (Total Listings/Ab.Rate) | 2.1 | 2.3 | 6.8 | ☐ Declining | ☐ Stable | ☒ Increasing |
| **Median Sale & List Price, DOM, Sale/List %** | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | $1,065,000 | $900,000 | $1,200,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 16 | 24 | 27 | ☐ Declining | ☐ Stable | ☒ Increasing |
| Median Comparable List Price | $1,312,944 | $1,495,000 | $1,298,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 124 | 66 | 63 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 98.96 | 100 | 100 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes ☒ No | | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).    CRMLS indicates there were 62 closed sales during the past 12 months and 52 of those sales contained seller concessions which is 84% of the total transactions in this market area. Prior Months 7-12: 34 Sales; 27 with concessions; 79% of sales for this period. 4-6: 17 Sales; 15 with concessions; 88% of sales for this period. 0-3: 11 Sales; 10 with concessions; 91% of sales for this period. The concessions ranged between $1 and $978,000. The median concession amount is $18,930.

Are foreclosure sales (REO sales) a factor in the market?    ☐ Yes ☒ No    If yes, explain (including the trends in listings and sales of foreclosed properties).
The data used in the grid above does not indicate there were any REO/Short sales or other distressed properties associated with the reported transactions. However, this is not a mandatory reporting field for agents and there may be some distressed sales that were not reported. It is beyond the scope of this assignment to confirm each sale used in the Market Conditions Report.

Cite data sources for above information.    CRMLS was the data source used to complete the Market Conditions Addendum.  6/3/2026

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.

If the subject is a unit in a condominium or cooperative project , complete the following:    Project Name:  Bradford Place

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab.Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?    ☐ Yes ☐ No    If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| | |
|---|---|
| Signature | Signature |
| Appraiser Name  Rodney Squires | Supervisory Appraiser Name |
| Company Name  JSR Appraisals | Company Name |
| Company Address  3460 Trailblazer way, Carlsbad, Ca 92010 | Company Address |
| State License/Certification #  AL040627    State  CA | State License/Certification #    State |
| Email Address  rodney@lci-network.com | Email Address |

Freddie Mac Form 71   March 2009    Page 1 of 1    Fannie Mae Form 1004MC   March 2009

## Supplemental Addendum

File No.

| Borrower | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | | |
| City | Walnut | County | Los Angeles | State | CA | Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | | |

### • GP Residential : Sales Comparison Analysis - Summary of Sales Comparison Approach

Sales chosen and provided in this report were taken from subject's immediate area and are considered to be the best available at time of inspection.

The Appraiser went outside the preferred one mile radius to find enough current comparables to complete the report.

Please refer to the attached 1004MC for market conditions, trends, supply and demand support as well as support for market (time) adjustments and listing adjustments. All quality of construction adjustments are quantitied with $100 Sq.Ft. approximations. Condition adjustments are lump sum or percentage adjustments based on realtor interviews, inspection, and appraiser opinion. In this market, it is typical to adjust for square footage; Bathrooms adjustments are at $10,000.

Subject and all comparables are considered similar overall and best represent the current market.

A paired sales analysis of relevant factors that influence value was undertaken to adjust the sales to the subject property based upon the actions and preferences demonstrated by the participants in the marketplace.

Comparable # 1-6 were considered good indicators of value. With weighted consideration given to Comparables 1-6 (most resent and or most similar closed sales) the sales comparable analysis indicates an objective value range of  $880,000 - 1,200,000 for the subject property. Which is supportive of the appraisers final opinion of market value at $960,000

All appliances and cabinets were installed and appear to be in working order.

The subject property did Not have a CO detector  installed at time of inspection.

All utilities were turned on and appeared to be in working order.

The appraiser went outside the preferred one mile radius to find comparables used in this report.  The reason for this was due to the lack of recent sales available in the subject area.  This does not effect the marketability of the subject in a negative manner

Any remaining adjustments are rather straight forward and are felt to be self-explanatory. For the most part, adjustments are reflective of either perceived market value added or by the cost difference which is based on Marshall and Swift Cost Service numbers. None of the adjustments, or the adjustment process itself, is felt to unduly favor subject.

It is to be noted that the included comparables are the best and most relevant comparables to sales to accurately reflect the true market value of the subject property.

The routine observation of the property and improvements is for purposes of establishing the market value of the property. Attics and crawl space areas are typically not accessed. The property "inspection" is really more of an "observation". It is not to be regarded as a full property inspection of the type intended to reveal defects in mechanical systems, structural integrity, roofing, siding or any other property component. The appraiser claims no special expertise in these areas, nor is the appraiser an expert regarding issues related to foundation settlement, wood destroying (or other) insects, radon gas, lead based paint, asbestos or mold. Unless otherwise noted, this appraisal is based on the extraordinary assumption that the various elements that constitute the subject property are fundamentally sound and in working order. Statements regarding condition, particularly those regarding heating and cooling systems are based on superficial observations only.

In short, the appraiser is not a home inspector and the appraisal report is not a home inspection report.  The appraisal report should not be relied upon to disclose the condition of the property or the presence/absence of any defects.

Subject Photo Page

| Borrower | |
|---|---|
| Property Address | 163 N Dommer Ave |
| City Walnut | County Los Angeles    State CA    Zip Code 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong |



### Subject Front

163 N Dommer Ave
Sales Price
Gross Living Area    1,662
Total Rooms    6
Total Bedrooms    3
Total Bathrooms    2.0
Location    A;BacksBsyRd;
View    N;Res;
Site    7,994 sf
Quality    Q4
Age    54



### Subject Rear



### Subject Street

**Photograph Addendum**

| Borrower | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | | |
| City | Walnut | County | Los Angeles | State | CA | Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | | |


**Kitchen**


**Kitchen (alt view)**


**Family/Dining**


**Living**


**Living (alt view)**


**Bedroom**


**Bedroom**


**Bedroom**



**Bath**


**Bath**


**AC Unit**


**AC Unit**


**Water Heater DBL Strapped**

Photograph Addendum

| Borrower | |
|---|---|
| Property Address | 163 N Dommer Ave |
| City Walnut | County Los Angeles | State CA | Zip Code 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong |



**Garage Interior**



**Right Side**



**Left Side**



**Kitchenette**



**Bonus room**

**Comparable Photo Page**

| Borrower | |
|---|---|
| Property Address | 163 N Dommer Ave |
| City | Walnut |
| County | Los Angeles |
| State | CA |
| Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong |



### Comparable 1

602 Lone Eagle Rd

| | |
|---|---|
| Prox. to Subject | 0.54 miles NE |
| Sale Price | 1,200,000 |
| Gross Living Area | 1,786 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 12067 sf |
| Quality | Q4 |
| Age | 51 |



### Comparable 2

3328 S Flemington Dr

| | |
|---|---|
| Prox. to Subject | 0.29 miles W |
| Sale Price | 958,000 |
| Gross Living Area | 1,658 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 7143 sf |
| Quality | Q4 |
| Age | 62 |



### Comparable 3

20157 McKay Dr

| | |
|---|---|
| Prox. to Subject | 0.22 miles NE |
| Sale Price | 1,075,000 |
| Gross Living Area | 1,576 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 8044 sf |
| Quality | Q4 |
| Age | 55 |

**Comparable Photo Page**

| Borrower | |
|---|---|
| Property Address | 163 N Dommer Ave |
| City | Walnut |

| County | Los Angeles | State | CA | Zip Code | 91789 |
|---|---|---|---|---|---|

| Lender/Client | Qin Fen Li & Zhou Qing Tong |
|---|---|



### Comparable 4

20156 McKay Dr

| | |
|---|---|
| Prox. to Subject | 0.20 miles NE |
| Sale Price | 978,000 |
| Gross Living Area | 1,576 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.0 |
| Location | N;Res; |
| View | N;Res; |
| Site | 6833 sf |
| Quality | Q4 |
| Age | 55 |



### Comparable 5

542 S Avenida Alipaz

| | |
|---|---|
| Prox. to Subject | 0.60 miles S |
| Sale Price | 990,000 |
| Gross Living Area | 1,724 |
| Total Rooms | 7 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.1 |
| Location | N;Res; |
| View | N;Res; |
| Site | 11109 sf |
| Quality | Q4 |
| Age | 37 |



### Comparable 6

131 N Dommer Ave

| | |
|---|---|
| Prox. to Subject | 0.07 miles S |
| Sale Price | 880,000 |
| Gross Living Area | 1,232 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.0 |
| Location | A;BacksBsyRd; |
| View | N;Res; |
| Site | 11498 sf |
| Quality | Q4 |
| Age | 61 |

**Building Sketch**

| Borrower | | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | |
| City | Walnut | County | Los Angeles | State | CA | Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | |



TOTAL Sketch by a la mode

**Area Calculations Summary**

| Living Area | | Calculation Details |
|---|---|---|
| First Floor | 1662 Sq ft | 38 × 29 = 1102 |
| | | 20 × 28 = 560 |
| | | |
| **Total Living Area (Rounded):** | **1662 Sq ft** | |
| **Non-living Area** | | |
| Enclosed Patio | 200 Sq ft | 20 × 10 = 200 |
| 2 Car Attached | 460 Sq ft | 23 × 20 = 460 |

Form SKT.BLDSKI - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

**Aerial Map**

| Borrower | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | | |
| City | Walnut | County | Los Angeles | State | CA | Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | | |



# Aerial Map

| Borrower | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | | |
| City | Walnut | County | Los Angeles | State | CA | Zip Code | 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | | |



Plat Map

| Borrower | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 163 N Dommer Ave | | | | | | |
| City | Walnut | County | Los Angeles | | State | CA | Zip Code 91789 |
| Lender/Client | Qin Fen Li & Zhou Qing Tong | | | | | | |









**Helen Lin**

helenyinilin@gmail.com

## Property Report Prepared On

# 163 N Dommer Ave, Walnut, CA 91789



Beds/Baths:

**3br / 2ba**



Living Area:

**1,780 sqft**



Lot Size:

**0.18 acres**



Year Built:

**1964**



Ownership Length:

**28yr 8mo**



Market Value:

**$1,081,250**

##  Summary

**Property Address:**

**163 N DOMMER AVE**

**City, State, Zipcode:**

**WALNUT, CA 91789**

**Latitude:**

**34.017234**

**Longitude:**

**-117.864206**

**County:**

**LOS ANGELES**

**APN:**

**8720-002-023**

**Legal Description:**

**TRACT NO 27883 LOT 23**

**Legal Subdivision:**

**27883**

**Property Type:**

**SINGLE FAMILY RESIDENCE**

**Owner Status:**

**OWNER OCCUPIED**



Owner Type:

**Individual**

Trust Description:

**- -**

Company Flag:

**NO**

Property Use:

**RESIDENTIAL**

Stories:

**1**

Structure Style:

**CONVENTIONAL**

##  Ownership

## Owner's Name(s)

👤 **Qin Fen**

👤 **Zhou Qing**

## Owner's Mailing Address

📍 **163 N Dommer Ave, Walnut, CA 91789**

## Ownership Timeline

**2016** —— **Zhou Q Tong & Qin F Li**

Transaction Type: **DEED OF TRUST**

Date of Transaction: **10/25/2016**

**2007** —— **Qin F Li**

Transaction Type: **DEED OF TRUST**

Date of Transaction: **01/11/2007**

**2001** —— **Qin F Li & Qin Zhou Q Li**

Transaction Type: **DEED OF TRUST**

Date of Transaction: **11/09/2001**

**1997** —— **Qin F Li & Qin Zhou Q Li**

Transaction Type: **GRANT DEED**

Date of Transaction: **06/25/1997**

Transaction Price: **$170,000**

**1997** —— **Cheung, C F**

Transaction Type: **TRUSTEES DEED**

Date of Transaction: **04/01/1997**

Transaction Price: **$125,000**

**1997** —— **C F Cheung**

Transaction Type: **QUIT CLAIM DEED**

Date of Transaction: **04/01/1997**

**1988** —— **Wailin K Wong**

Transaction Type: **GRANT DEED**

Date of Transaction: **10/13/1988**

Transaction Price: **$140,500**

—— **Riche**

# 📄 Deeds



**Grantee's Name(s):**

**Zhou Q Tong**
**Qin F Li**

**Deed Owner Address:**

**163 N DOMMER AVE, WALNUT, CA 91789**

**Ownership Category:**

**Individual**

**Owner Occupied:**

**Yes**

**Grantor's Name(s):**

**N/A**

**Transaction Amount:**

**N/A**

**Transaction Mortgage Amount:**

**N/A**

**Transaction Type:**

**N/A**

**Document:**

**0000490840**

**Title Company:**

**N/A**

**Transaction Date:**

**N/A**

**Document Type:**

**N/A**

**Property Type:**

**RESIDENTIAL**

**County:**

**N/A**

**Transfer Doc #:**

**N/A**

**Transfer Transaction #:**

**0000490840**

**Sale Document Book #:**

**N/A**

**Last Document #:**

**N/A**

#  Building Permits

> ⓘ We could not locate any building permit records. It's important to keep in mind that the lack of information or results in our reports may not always be entirely accurate, comprehensive, or current. Therefore, we kindly advise against solely relying on our findings and recommend conducting your own thorough research.

#  Pre-Foreclosures

> ⓘ We could not locate any pre-foreclosure records. It's important to keep in mind that the lack of information or results in our reports may not always be entirely accurate, comprehensive, or current. Therefore, we kindly advise against solely relying on our findings and recommend conducting your own thorough research.

#  Values

 Market Value Estimate:
**$1,081,250**

Property Square Footage:
**1,780 Sq Ft**

Market Value Per Sq Ft:
**$607 / Sq Ft**

Rent Estimate:
**$3,935**

 Last Sale Date:

**06/25/1997**

 Last Sale Amount:

**$170,000**

##  Taxes

Tax Bill Amount:

**$3,979**

Tax Year Assessed:

**2025**

Total Assessed Value:

**$276,524**

Land Assessed Value:

**$125,721**

Additions Assessed Value:

**$150,803**

Tax Assessed Change %:

**55%**

Previous Assessed Value:

**$271,103**

Last Assessor Tax Roll Update:

**05/21/2026**

Assessor Last Updated:

**2025**

Zoning Category:

**Individual**

Zoned Code Local:

**WAR17200***

Zoning Type:

**RESIDENTIAL**

Property Use Standardized:

**385**

Property Use Municode:

**0100**

 Year Built:

**1964**

Tax Exemption:

**N/A**

Tax Delinquent:

**N/A**

 # Tax History

| YEAR | PROPERTY TAXES | CHANGE | TAX ASSESSMENT | CHANGE |
|------|----------------|--------|----------------|--------|
| 2023 | $3,645 | 2.13% | $265,789 | 2.00% |
| 2022 | $3,570 | 2.09% | $260,578 | 2.00% |
| 2021 | $3,496 | 3.13% | $255,470 | 1.04% |
| 2020 | $3,390 | 6.77% | $252,852 | 2.00% |
| 2019 | $3,175 | 4.44% | $247,895 | 2.00% |
| 2018 | $3,041 | 0.00% | $243,036 | 2.00% |
| 2017 | $3,041 | 3.40% | $238,272 | 2.00% |
| 2016 | $2,941 | -0.47% | $233,601 | 1.52% |
| 2015 | $2,955 | 0.78% | $230,093 | 2.00% |
| 2014 | $2,932 | 0.45% | $225,586 | 0.45% |
| 2013 | $2,919 | 0.00% | $224,567 | 2.00% |
| 2012 | $2,919 | - | $220,165 | - |

Prepared by HELEN LIN | Phone: | Email: helenyinilin@gmail.com | Date Prepared: 06/03/2026

#  Property Details

**Bedrooms:**

**3**

**Bathrooms:**

**2**

**Living Area:**

**1,780 Sq Ft**

**Lot Size:**

**0.18 Acres**

**Year Built:**

**1964**

**Unit Count:**

**0**

**Stories:**

**1**

**Basement:**

**0**

**Garage:**

**UNKNOWN OR NOT PROVIDED**

**Parking:**

**0**

**Fireplace:**

**UNKNOWN**

**Pool:**

**UNKNOWN**

**Deck:**

**UNKNOWN**

**Patio:**

**0**

**Balcony:**

**N/A**

**Shed:**

**UNKNOWN**

**Accessibility:**

**UNKNOWN**

**Foundation:**

**UNKNOWN OR NOT PROVIDED**



Structure Style:

**CONVENTIONAL**

Construction:

**WOOD**

Roof Material:

**Composition Shingle**

Roof Construction:

**GABLE**

Heating:

**CENTRAL**

Cooling:

**UNKNOWN OR NOT PROVIDED**

## Rooms

| | |
|---|---|
| Bath Count: | 2 |
| Bath Partial Count: | 0 |
| Bedrooms Count: | 3 |
| Rooms Count: | 7 |
| Stories Count: | 1 |
| Units Count: | 0 |
| Bonus Room: | Not on File |
| Breakfast Nook: | Not on File |
| Cellar Room: | Not on File |
| Wine Cellar Room: | Not on File |
| Exercise Room: | Not on File |
| Family Room: | Not on File |
| Game Room: | Not on File |

| | |
|---|---|
| Great Room: | **Not on File** |
| Hobby Room: | **Not on File** |
| Laundry Room: | **Not on File** |
| Media Room: | **Not on File** |
| Mud Room: | **Not on File** |
| Office Room: | **Not on File** |
| Safe Room: | **Not on File** |
| Sitting Room: | **Not on File** |
| Storm Room: | **Not on File** |
| Study Room: | **Not on File** |
| Sunroom: | **Not on File** |
| Utility Room: | **Not on File** |

# Area

| | |
|---|---|
| Building: | **1780** |
| Building Definition Code: | **Living Area** |
| Gross: | **0** |
| 1st Floor: | **0** |
| 2nd Floor: | **Not on File** |
| Upper Floors: | **0** |
| Lot Acres: | **0.18 Acres** |
| Lot SF: | **7991.00** |

| | |
|---|---|
| Lot Depth: | **117.0** |
| Lot Width: | **66.0** |
| Rooms Attic: | **Not on File** |
| Rooms Basement: | **0** |
| Rooms Basement Finished: | **Not on File** |
| Patio: | **0** |
| Deck: | **Not on File** |
| Balcony: | **Not on File** |

#  Parking

| | |
|---|---|
| Garage: | **Not on File** |
| Garage Area: | **0** |
| Carport: | **0** |
| RV Parking Flag: | **Not on File** |
| Space Count: | **0** |
| Driveway Area: | **0** |

#  Construction Details

| | |
|---|---|
| Roof Material: | **Composition Shingle** |
| Roof Construction: | **GABLE** |
| Structure Style: | **CONVENTIONAL** |

| | |
|---|---|
| Exterior Code: | **STUCCO** |
| Foundation: | **Not on File** |
| Construction: | **WOOD** |
| Interior Structure: | **Not on File** |
| Plumbing Fixtures Count: | **0** |
| Safety Fire Sprinklers Flag: | **Not on File** |

## 🏖️ Property Features

| | |
|---|---|
| Fireplace: | **Not on File** |
| Fireplace Count: | **0** |
| Pool: | **Not on File** |
| Pool Area: | **0** |
| Security Alarm Flag: | **Not on File** |
| Accessibility Elevator Flag: | **Not on File** |
| Accessibility Handicap Flag: | **Not on File** |
| Escalator Flag: | **0** |
| Central Vacuum Flag: | **Not on File** |
| Content Intercom Flag: | **Not on File** |
| Content Sound System Flag: | **Not on File** |
| Wet Bar Flag: | **Not on File** |
| Content Storm Shutter Flag: | **Not on File** |
| Content Overhead Door Flag: | **Not on File** |

| Porch Code: | Not on File |
|---|---|
| Porch Area: | 0 |
| Deck Flag: | Not on File |
| Feature Balcony Flag: | Not on File |
| Breezeway Flag: | Not on File |
| Topography Code: | Not on File |
| Fence Area: | 0 |
| Courtyard Flag: | Not on File |
| Arbor Pergola Flag: | Not on File |
| Golf Course Green Flag: | Not on File |
| Tennis Court Flag: | Not on File |
| Sports Court Flag: | Not on File |
| Arena Flag: | Not on File |
| Water Feature Flag: | Not on File |
| Pond Flag: | Not on File |
| Boat Lift Flag: | Not on File |
| Buildings Count: | 1 |
| Bath House Flag: | Not on File |
| Boat Access Flag: | Not on File |
| Boat House Flag: | Not on File |
| Cabin Area: | Not on File |
| Cabin Flag: | Not on File |
| Canopy Area: | Not on File |

| | |
|---|---|
| Canopy Flag: | **Not on File** |
| Gazebo Area: | **Not on File** |
| Gazebo Flag: | **Not on File** |
| Grainery Area: | **Not on File** |
| Grainery Flag: | **Not on File** |
| Green House Area: | **Not on File** |
| Green House Flag: | **Not on File** |
| Guest House Flag: | **Not on File** |
| Kennel Flag: | **Not on File** |
| Milk House Flag: | **Not on File** |
| Outdoor Kitchen Fireplace Flag: | **Not on File** |
| Pool House Flag: | **Not on File** |
| Poultry House Flag: | **Not on File** |
| Quonset Flag: | **Not on File** |
| Shed Code: | **Not on File** |
| Silo Flag: | **Not on File** |
| Stable Flag: | **Not on File** |
| Storage Building Flag: | **Not on File** |
| Pole Structure Flag: | **Not on File** |
| Publication Date: | **05/27/2026** |
| Parcel Shell Record: | **Not on File** |

#  Utilities / Green Energy Details

| | |
|---|---|
| HVAC Cooling Detail: | **Not on File** |
| HVAC Heating Detail: | **CENTRAL** |
| HVAC Heating Fuel: | **Not on File** |
| Utilities Sewage Usage: | **Not on File** |
| Utilities Water Source: | **Not on File** |
| Utilities Mobile Home Hookup Flag: | **Not on File** |

#  Parcel

| | |
|---|---|
| Raw: | **8720-002-023** |
| Formatted: | **Not on File** |
| Year Added: | **2025** |
| Alternate: | **Not on File** |
| Map Book: | **Not on File** |
| Map Page: | **Not on File** |
| Year Change: | **0** |
| Previous: | **Not on File** |
| Account Number: | **Not on File** |

# Legal

| | |
|---|---|
| Description: | **TRACT NO 27883 LOT 23** |

| | |
|---|---|
| Range: | **Not on File** |
| Township: | **Not on File** |
| Section: | **Not on File** |
| Quarter: | **Not on File** |
| Subdivision: | **27883** |
| Phase: | **Not on File** |
| Tract Number: | **27883** |
| Block 1: | **1** |
| Block 2: | **Not on File** |
| Lot Number 1: | **23** |
| Lot Number 2: | **Not on File** |
| Lot Number 3: | **Not on File** |
| Unit: | **Not on File** |

#  Loans

## Previous Loans

###  Loan #1

| | |
|---|---|
| Transaction Mortgage Amount: | **$150,000** |
| Mortgage Date: | **11/07/2016** |

| | |
|---|---|
| Lender Type: | **BANK** |
| Loan Type: | **LINE OF CREDIT** |
| Lender: | **BANK OF AMERICA** |
| Lender Code: | **563715** |

 ## Loan #2

| | |
|---|---|
| Transaction Mortgage Amount: | **$100,000** |
| Mortgage Date: | **01/29/2007** |
| Lender Type: | **BANK** |
| Loan Type: | **LINE OF CREDIT** |
| Lender: | **BANK OF AMERICA** |
| Lender Code: | **563715** |

 ## Loan #3

| | |
|---|---|
| Transaction Mortgage Amount: | **$119,300** |
| Mortgage Date: | **11/09/2001** |
| Lender Type: | **MORTGAGE ELECTRONIC REGISTRATION SYSTEM (MERS)** |
| Loan Type: | **UNKNOWN OR NOT PROVIDED** |
| Lender: | **CAPITOL COMMERCE MORTGAGE CO** |
| Lender Code: | **903** |

 ## Loan #4

| | |
|---|---|
| Transaction Mortgage Amount: | **$134,800** |
| Mortgage Date: | **06/25/1997** |
| Lender Type: | **FUNDING/FINANCE COMPANY** |
| Loan Type: | **CONVENTIONAL** |
| Lender: | **REPUBLIC CONSUMER LENDING GROU** |
| Lender Code: | **14798** |

##  Loan #5

| | |
|---|---|
| Transaction Mortgage Amount: | **$87,500** |
| Mortgage Date: | **04/01/1997** |
| Lender Type: | **FEDERAL SAVINGS BANK (FSB)** |
| Loan Type: | **CONVENTIONAL** |
| Lender: | **AMERICAN SAVINGS BANK** |
| Lender Code: | **259** |

##  Loan #6

| | |
|---|---|
| Transaction Mortgage Amount: | **$104,800** |
| Mortgage Date: | **10/13/1988** |
| Lender Type: | **BANK** |
| Loan Type: | **CONVENTIONAL** |
| Lender: | **COAST FEDERAL BANK** |
| Lender Code: | **1187** |

# 👥 Residents

- 👤 **Qinfen Li**

- 👤 **Qin Fen Li**

- 👤 **Fen Liqin**

- 👤 **Tong Li**

- 👤 **Zhou Qing Tong**

- 👤 **Qing Tong Zhou**

- 👤 **Zhou O. Tong**

- 👤 **Zhouqing Q. Tong**

- 👤 **Chou Q. Tong**

- 👤 **Zhouqing Tong**

- 👤 **Zhouqing Qing Tong**

- 👤 **Yan Gao**

- 👤 **Hongwei Xia**

- 👤 **Hongwei D. Xia**

- **Shudong Wang**

- **Shudong P. Wang**

- **Shu Dong Wang**

- **Shu J. Wang**

- **Shu Yu Wang**

- **Shu Wang**

- **Yi Ding**

- **Jichang Hou**

- **Fermina C. Silva**

- **Fermia Silva**

- **Fermina Silva**

- **Fermina L. Silva**

- **Fermina Lara Dsilva**

- **Fermina Lara Silva**

- **Fermina Dsilva**

**Manuel Dominguez Silva**

**Manuel D. Silva**

**Fengbin Cui**

**Feng Bin Cui**

**Feng Cui**

**Fengbin N. Cui**

**Fang L. Chui**

**Binfeng Cui**

**Jinling Meng**

**Jin L. Meng**

**Jin Ling Meng**

**Jinling L. Meng**

**Jin B. Chou**

**Jin Chou**

**Jack Kung**

- **Yin Saw**

- **Yin Y. Saw**

- **Christine H. Saw**

- **Christine Saw**

- **Llynnette Silva**

- **Lynnette Louise Silva**

- **Lynnette Holcomb**

- **Lynnette L. Silva**

- **Lynnette Brock**

- **Lynette Louise Silva**

- **Patty Wailinkwan Kwan**

- **Patty Kwan**

- **Patty Trust Kwan**

- **Patty W. Lkwan**

- **Patty W. Kwan**

- **Patty W. Wong**

- **Wai Lin Wong**

- **Patty Wailinkwan Kwan-wong**

- **Patty Wailinkwan Wong**

- **Patty W. Kwanwong**

- **Patty K. Kwan**

- **Wai-lin K. Wong**

- **Patty W. Kwan-wong**

- **Irene Rodriguez**

- **Edwardo A. Silva**

- **Eddie Silva**

- **Edwardo Silva**

- **Ed Silva**

- **Jun Sun**

- **Peter Anthony Silva**

- Peter A. Silva

- Peter S. Silva

- Peter Silva

- Robert D. Silva

- Roberto D. Silva

- Peter Li

- Fen Qin

- Yinyin Saw

# Images

   

# Neighborhood

# 📍 Area Information



## 🏢 Walnut, California Ratings   Ⓐ

 **Public Schools** — A+

 **Cost of Living** — C-

 **Health & Fitness** — A+

 **Outdoor Activities** — A

 **Nightlife** — B+

 **Weather** — A+

 **Commute** — B-

 **Access to Bars** — C+

Prepared by HELEN LIN | Phone: | Email: helenyinilin@gmail.com | Date Prepared: 06/03/2026



# Housing  *C-*

| | | | |
|---|---|---|---|
| **Median Home Value:** | | **Median Rent:** | |
| $936,800 | | $2,868 | |
| **Median Real Estate Tax:** | | **Rent vs. Own:** | |
| 0.74% | | 82% | |

## Commute Method

| | |
|---|---|
| Drove Alone | 67.76% |
| Worked at Home | 18.58% |
| Carpooled | 9.39% |
| Public Transportation | 1.97% |

| | |
|---|---|
| Other | **1.33%** |
| Walked | **0.60%** |
| Bicycle | **0.20%** |
| Taxicab | **0.14%** |
| Motorcycle | **0.03%** |

## Commute Time (in Minutes)

| | |
|---|---|
| 30 - 34 | **15.44%** |
| 45 - 59 | **13.76%** |
| 60 - 89 | **13.43%** |
| 20 - 24 | **13.01%** |
| 10 - 14 | **11.05%** |
| 15 - 19 | **10.69%** |
| 40 - 44 | **6.13%** |
| Over 90 | **5.05%** |
| 25 - 29 | **5.01%** |
| 5 - 9 | **4.38%** |
| 35 - 39 | **1.46%** |
| Under 5 | **0.58%** |

## Home Age Breakdown

| | |
|---|---|
| 1980 - 1999 | **52.24%** |
| 1960 - 1979 | **38.15%** |
| 2000 - Present | **6.24%** |

| | |
|---|---|
| 1940 - 1959 | **2.45%** |
| Before 1939 | **0.92%** |

## Home Size Breakdown

| | |
|---|---|
| 4 Bedrooms | **45.47%** |
| 3 Bedrooms | **30.88%** |
| 5 or More Bedrooms | **12.54%** |
| 2 Bedrooms | **9.38%** |
| 1 Bedroom | **1.16%** |
| No Bedrooms | **0.56%** |

## Home Type Breakdowns

| | |
|---|---|
| Single Family | **85.66%** |
| Townhouse | **5.07%** |
| Mobile Home | **3.90%** |
| Small Apartment Building | **2.83%** |
| Large Apartment Building | **2.54%** |

 ## Crime & Safety

Based on violent and property crime rates.

 ## Jobs

Based on employment rates, job and business growth, and cost of living.

Prepared by HELEN LIN | Phone: | Email: helenyinilin@gmail.com | Date Prepared: 06/03/2026

## Median Household Income

# $125,742

National N/A

## Population Age Breakdown

| | |
|---|---|
| 65 Plus | **22.01%** |
| 55 - 64 | **16.89%** |
| 45 - 54 | **12.66%** |
| 25 - 34 | **11.54%** |
| 35 - 44 | **10.85%** |
| 10 - 17 | **9.80%** |
| Under 10 | **9.77%** |
| 18 - 24 | **6.48%** |

 # Education Breakdown

| | |
|---|---|
| Bachelor Degree | **35.13%** |
| High School | **16.05%** |
| Masters Degree | **13%** |
| Some College | **11.21%** |
| Associate Degree | **8.72%** |
| College Less | **4.30%** |
| Professional Degree | **3.01%** |

| | |
|---|---|
| Below High School | **2.18%** |
| Doctorate | **2.03%** |
| Grade 12 | **1.88%** |
| Grade 7-8 | **0.59%** |
| Grade 5-6 | **0.57%** |
| Grade 11 | **0.49%** |
| Grade 9 | **0.41%** |
| Grade 10 | **0.08%** |
| Nursery Grade 4 | **0%** |

# Collegewood Elementary School



📍 20725 E COLLEGEWOOD DR, WALNUT VALLEY, CA 91789

 Academics  Teachers  Diversity

# Cyrus J. Morris Elementary School



📍 19875 E CALLE BAJA, WALNUT, CA 91789

 Academics  Teachers  Diversity

## Discovery World Montessori School

📍 801 BREA CANYON RD, WALNUT, CA 91789

 Diversity

## International School of Montessori

📍 20781 AMAR RD SUITE 1, WALNUT, CA 91789

Ⓒ⁺ Diversity

## Kid Junction Preschool

📍 20704 SAN JOSE HILLS RD, WALNUT, CA 91789

 Diversity

## Leonard G. Westhoff Elementary School

📍 1323 COUNTRY HOLLOW, WALNUT, CA 91789

Ⓐ Academics          Ⓐ⁻ Teachers          Ⓑ Diversity

# Ron Hockwalt Academies (Continuation)

 476 S LEMON AVE, WALNUT, CA 91789

| | | |
|---|---|---|
| A- Teachers | B Clubs & Activities | B Resources & Facilities |
| A- Diversity | C+ Administration | C+ Food |

# South Pointe Middle School

 20671 LARKSTONE DR, WALNUT, CA 91789

| | | |
|---|---|---|
| A Academics | A- Teachers | B+ Diversity |

# Southlands Christian Preschool

 18550 FARJARDO St, ROWLAND HEIGHTS, CA 91789

# Stanley G. Oswalt Academy

 19501 SHADOW OAK DR, WALNUT, CA 91789

| | | |
|---|---|---|
| A- Academics | A Teachers | A Diversity |

# Suzanne Middle School



 525 SUZANNE RD, WALNUT, CA 91789

 Academics     Teachers    A– Diversity

# The Cross Christian School



 20675 LA PUENTE RD, WALNUT, CA 91789

C– Diversity

# Tutor Time of Walnut



 21639 VALLEY BLVD, WALNUT, CA 91789

A Diversity

# Tzu Chi Elementary School



 1920 S BREA CANYON CUTOFF ROAD, WALNUT, CA 91789

 Academics     Teachers    C Diversity

Prepared by HELEN LIN | Phone: | Email: helenyinilin@gmail.com | Date Prepared: 06/03/2026

# Vejar Elementary School

📍 20222 VEJAR RD, WALNUT, CA 91789

Ⓐ Academics        Ⓐ⁻ Teachers        Ⓐ⁻ Diversity

# Walnut Elementary School

📍 841 S GLENWICK, WALNUT, CA 91789

Ⓐ Academics        Ⓐ⁻ Teachers        Ⓑ Diversity

# Walnut High School Ⓐ⁺

📍 400 N PIERRE RD, WALNUT, CA 91789

Ⓐ⁺ Academics        Ⓐ Teachers        Ⓑ Clubs & Activities

Ⓑ Sports        Ⓒ⁺ Resources & Facilities        Ⓐ⁻ Diversity

Ⓐ⁺ College Prep        Ⓑ⁺ Administration        Ⓒ Food

# Walnut United Methodist Preschool

📍 20601 LA PUENTE RD, WALNUT, CA 91789

 Diversity

# Ybarra Academy of Arts and Technology

📍 1300 S BREA CANYON CUTOFF RD, WALNUT, CA 91789

 Academics          Ⓐ Teachers          Ⓐ Diversity

 ## Diversity

Based on ethnic and economic diversity.

| | |
|---|---|
| 👥 Population: | 💼 Unemployment Rate: |
| **40,933** | **2.55%** |

## Diversity Breakdown

| | |
|---|---|
| Asian | **66.74%** |
| Hispanic | **18.43%** |
| White | **9.41%** |
| Multiracial | **2.55%** |
| African-American | **2.04%** |

| | |
|---|---|
| Pacific Islander | **0.44%** |
| Other | **0.25%** |
| Native American | **0.13%** |

Powered by

# Exhibit F



# PROPERTY PROFILE

## Property Information

| | |
|---|---|
| Primary Owner : | LI QIN FEN |
| Secondary Owner : | TONG ZHOU QING |
| Site Address : | 4751 PRESTON ST |
| | JURUPA VALLEY, CA 91752-5096 |
| Mailing Address : | 163 N DOMMER AVE |
| | WALNUT, CA 91789-2312 |
| Assessor Parcel Number : | 160-432-004 |
| CountyName : | Riverside |
| Tax Account ID : | 160432004 |
| Phone : | N/A |
| Census Tract : | 0406.18 |
| Housing Tract Number : | 31644-1 |
| Lot Number : | 154 |
| Page Grid : | - |
| Legal Description : | Lot: 154   ; Tract No: 31644-1   ; Abbreviated Description: LOT:154 TR#:31644-1   .18 ACRES M/L IN LOT 154 MB 448/099 TR 31644-1 |

## Property Characteristics

| | | | | | |
|---|---|---|---|---|---|
| Bedrooms : | 4 | Year Built : | 2017 | Square Feet : | 2831 |
| Bathrooms : | 2.25 | Garage : | A | Lot size : | 7840 SF |
| Partial Bath : | 0 | Fireplace : | N/A | Number of Units : | 0 |
| Total Rooms : | 0 | Pool/Spa : | N | Use Code : | Single Family Residential |
| Zoning : | N/A | | | | |

## Sale/Loan Information

| | | | |
|---|---|---|---|
| Transfer Date : | 10/19/2017 | Document # : | 2017-0435959 |
| Transfer Value : | $508,500 | Cost/Sq Feet : | $ 179 |
| First Loan Amt : | $278,000 | Lender : | TOP WORLD INVESTMENT INC |

## Assessment/Tax Information

| | | | |
|---|---|---|---|
| Assessed Value : | $578,228 | Tax Amount : | $11,684.00 |
| Land Value : | $136,537 | Tax Status : | Current |
| Improvement Value : | $441,691 | Tax Rate Area : | 28-114 |
| Percent Improvement : | 76 % | Homeowner Exemption : | N |

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

07/01/2026 16:34:58 PM                                                                 Customer Service Rep:Monica Pena

4751 PRESTON ST
JURUPA VALLEY, CA 91752-5096



| Address | Date | Price | SqFt | BR/Bth | Year Built | Lot Size |
|---|---|---|---|---|---|---|
| 1. 11083 Coral Dr | 05/22/2026 | $929,000 | 3003 | 4/3 | 2017 | 7405 |
| 2. 4664 Creek Cir | 05/20/2026 | $880,000 | 2795 | 3/2 | 2015 | 8712 |
| 3. 4759 Brison Ct | 05/01/2026 | $900,000 | 3112 | 5/2 | 2016 | 7405 |
| 4. 4775 Wanamaker Dr | 04/29/2026 | $811,000 | 2915 | 5/3 | 2017 | 7840 |
| 5. 11150 Duran Dr | 04/24/2026 | $985,000 | 3622 | 7/5 | 2018 | 7840 |
| 6. 11179 Pala Pl | 04/23/2026 | $1,185,000 | 1910 | 4/1 | 1979 | 19166 |
| 7. 11264 Conner Cir | 04/14/2026 | $1,010,000 | 3112 | 5/2 | 2017 | 7840 |
| 8. 4747 Brison Ct | 03/23/2026 | $970,000 | 3527 | 5/3 | 2016 | 7405 |
| 9. 11466 Antigua Dr | 03/09/2026 | $800,000 | 1625 | 4/1 | 1979 | 19602 |
| 10. 11170 Hamal Ave | 03/04/2026 | $650,000 | 1452 | 3/1 | 1979 | 20037 |

| Address | Date | Price | SqFt | BR/Bth | Year Built | Lot Size |
|---|---|---|---|---|---|---|
| 11. 4991 Graphite Creek Rd | 02/11/2026 | $800,000 | 2463 | 4/2 | 2015 | 8712 |
| 12. 4729 Magnum Way | 12/09/2025 | $1,062,500 | 3969 | 6/4 | 2017 | 7840 |
| 13. 4737 Hot Creek Rd | 12/08/2025 | $950,000 | 2811 | 5/3 | 2016 | 7840 |
| 14. 4900 Eclipse Ave | 11/25/2025 | $870,000 | 1581 | 4/1 | 1978 | 23522 |
| 15. 11234 Owen Ct | 11/20/2025 | $970,000 | 3317 | 6/4 | 2016 | 7405 |
| 16. 4871 Stits Cir | 09/12/2025 | $877,000 | 2784 | 5/2 | 2016 | 6969 |
| 17. 4746 Camino De Madera | 09/05/2025 | $930,000 | 3097 | 5/3 | 2015 | 7840 |
| 18. 4736 Marrieta St | 07/30/2025 | $988,000 | 3527 | 5/3 | 2016 | 7405 |
| 19. 4979 Graphite Creek Rd | 07/23/2025 | $790,000 | 2463 | 4/2 | 2015 | 8276 |
| 20. 4777 Magnum Way | 07/16/2025 | $1,050,000 | 3956 | 7/4 | 2017 | 8276 |

Confidential, Proprietary and/or Trade Secret. TM SM ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

Customer Service Rep:  Monica Pena



# SALES COMPARABLES

## Criteria Selected:

Searched by Radius: 1 Mile
Date Range: 1/7/2025 to 7/1/2026
Land Use: Same as Subject

## Area Sales Analysis

|  | Low | Median | High |
|---|---|---|---|
| Bedrooms: | 3 | 5 | 7 |
| Baths: | 1 | 2 | 5 |
| Lot Size: | 6,969 | 7,840 | 23,522 |
| Living Area (SqFt): | 1,452 | 2,959 | 3,969 |
| Sale Price: | $650,000 | $929,500 | $1,185,000 |
| Year Built: | 1978 | 2016 | 2018 |
| Age: | 8 | 10 | 48 |

## Subject Property

| Sale Date: | 10/19/2017 | Year Built: | 2017 | Price: | $508,500 | Pool: | N |
|---|---|---|---|---|---|---|---|
| Lot Size: | 7,840 SF | Square Feet: | 2,831 | $/SF: | $179 | BR/Bth: | 4/2.25 |

## Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 11083 CORAL DR<br>JURUPA VALLEY, CA 91752 | 05/22/2026 | $929,000 | $789,480 | $309 | 3,003 | 4/3 | 2017 | 7,405 SF | N/A |

Owner: MERCADO, ROBERT; MERCADO, KELLY   Seller: LIU, YING; YIN, QUAN
APN: 160-442-011   Document #: 2026-0157040
Legal: Lot:188 Subdivision:TRACT NO 31644-1 Map Ref:MB 448 PG 99-106Abbreviated Description:TRA 028-114
Land Use: Single Family Residential   Located approximately 0.12 miles from subject property.

| 2 | 4664 CREEK CIR<br>JURUPA VALLEY, CA 91752 | 05/20/2026 | $880,000 | $792,000 | $314 | 2,795 | 3/2 | 2015 | 8,712 SF | N/A |

Owner: SHARMA, ABHISHEK; SHARMA, PALLV   Seller: VAUGHNS, HARRIET
APN: 160-401-014   Document #: 2026-0153879
Legal: Lot:78 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114
Land Use: Single Family Residential   Located approximately 0.36 miles from subject property.

| 3 | 4759 BRISON CT<br>JURUPA VALLEY, CA 91752 | 05/01/2026 | $900,000 | $720,000 | $289 | 3,112 | 5/2 | 2016 | 7,405 SF | N/A |

Owner: SINGH, JATINDER; KAUR, RUPINDER   Seller: MEGA QUANTUM LLC,
APN: 160-392-025   Document #: 2026-0134156
Legal: Lot:195 Subdivision:TRACT MAP 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-144
Land Use: Single Family Residential   Located approximately 0.32 miles from subject property.

| 4 | 4775 WANAMAKER DR<br>JURUPA VALLEY, CA 91752 | 04/29/2026 | $811,000 | $648,800 | $278 | 2,915 | 5/3 | 2017 | 7,840 SF | N/A |

Owner: GALVEZ, GIOVANNI O; GALVEZ, KRISTY Y   Seller: TAYLOR, MATTHEW L
APN: 160-392-001   Document #: 2026-0130009
Legal: Lot:171 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114
Land Use: Single Family Residential   Located approximately 0.22 miles from subject property.

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

Customer Service Rep:  Monica Pena

## Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 11150 DURAN DR<br>JURUPA VALLEY, CA 91752 | 04/24/2026 | $985,000 | $120,000 | $271 | 3,622 | 7/5 | 2018 | 7,840 SF | N/A |

Owner: FANG, DOREEN  
APN: 160-423-010  
Legal: Lot:150 Subdivision:TRACT NO 31644-1 Map Ref:MB 448 PG 99-106Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: CHEN, WENXIAN; CHEN, WANTING  
Document #: 2026-0124768  
Located approximately 0.11 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 11179 PALA PL<br>JURUPA VALLEY, CA 91752 | 04/23/2026 | $1,185,000 | $455,000 | $620 | 1,910 | 4/1 | 1979 | 19,166 SF | P |

Owner: GAEKEL, GABRIEL; GAEKEL, THERESA  
APN: 160-133-017  
Legal: Lot:17 Subdivision:TRACT NO 9933-2 Map Ref:MB 102 PG 28-29Abbreviated Description:TRA 028-029  
Land Use: Single Family Residential  
Seller: LARA, DANIEL  
Document #: 2026-0123198  
Located approximately 0.41 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 | 11264 CONNER CIR<br>JURUPA VALLEY, CA 91752 | 04/14/2026 | $1,010,000 | $0 | $324 | 3,112 | 5/2 | 2017 | 7,840 SF | P |

Owner: CAW PROPERTY MANAGEMENT LLC,  
APN: 160-400-009  
Legal: Lot:5 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: FISHER, JERRY ROBERT; FISHER, ILENE  
Document #: 2026-0112007  
Located approximately 0.27 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 8 | 4747 BRISON CT<br>JURUPA VALLEY, CA 91752 | 03/23/2026 | $970,000 | $670,000 | $275 | 3,527 | 5/3 | 2016 | 7,405 SF | N/A |

Owner: GARCIA, FELIX; CRAIG, ROBIN A  
APN: 160-392-026  
Legal: Lot:196 Subdivision:TRACT MAP 3164 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: MORAN, MICHAEL R; MORAN, NICOLE R  
Document #: 2026-0086735  
Located approximately 0.32 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 11466 ANTIGUA DR<br>JURUPA VALLEY, CA 91752 | 03/09/2026 | $800,000 | $400,000 | $492 | 1,625 | 4/1 | 1979 | 19,602 SF | N/A |

Owner: CRUZ FAMILY TRUST, ; DONIZ, CHARLIE  
APN: 160-120-055  
Legal: Lot:41 Subdivision:TRACT NO 9933 Map Ref:MB 106 PG 16Abbreviated Description:TRA 028-029  
Land Use: Single Family Residential  
Seller: GONZALEZ, ERICA PATZER  
Document #: 2026-0070862  
Located approximately 0.54 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 11170 HAMAL AVE<br>JURUPA VALLEY, CA 91752 | 03/04/2026 | $650,000 | $584,995 | $447 | 1,452 | 3/1 | 1979 | 20,037 SF | N/A |

Owner: ALLBEE, RONALD; ALLBEE, JACALYN  
APN: 160-133-004  
Legal: Lot:24 Subdivision:TRACT NO 9933-1 Map Ref:MB 102 PG 25-27Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: FRED R PHILLIPS REVOCABLE TRUST, ;  
Document #: 2026-0065782  
Located approximately 0.28 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 4991 GRAPHITE CREEK RD<br>JURUPA VALLEY, CA 91752 | 02/11/2026 | $800,000 | $760,000 | $324 | 2,463 | 4/2 | 2015 | 8,712 SF | N/A |

Owner: CHAVEZ, ADAN; CHAVEZ, ILENE YVETTE  
APN: 160-371-004  
Legal: Lot:112 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: TRAN, HUONG THI; NGUYEN, TONY  
Document #: 2026-0044273  
Located approximately 0.43 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 4729 MAGNUM WAY<br>JURUPA VALLEY, CA 91752 | 12/09/2025 | $1,062,500 | $0 | $267 | 3,969 | 6/4 | 2017 | 7,840 SF | N/A |

Owner: ELMER PROPERTY DELTA LLC,  
APN: 160-450-016  
Legal: Lot:94 Subdivision:TRACT NO 31644 1 Map Ref:MB 448 PG 99-106Abbreviated Description:TRA 028-114  
Land Use: Single Family Residential  
Seller: GONZALEZ, JOSEPH STEVEN; GONZALEZ,  
Document #: 2025-0382733  
Located approximately 0.16 miles from subject property.

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

## Comparable Sales Data

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 4737 HOT CREEK RD JURUPA VALLEY, CA 91752 | 12/08/2025 | $950,000 | $0 | $337 | 2,811 | 5/3 | 2016 | 7,840 SF | N/A |

Owner: ELMER PROPERTY BETA LLC,
APN: 160-450-005
Legal: Lot:64 Subdivision:TRACT NO 31644 1 Map Ref:MB 448 PG 99-106Abbreviated Description:TRA 028-114
Land Use: Single Family Residential
Seller: FINLAY III, RICHARD WILLIAM; FINLAY,
Document #: 2025-0380261
Located approximately 0.10 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 4900 ECLIPSE AVE JURUPA VALLEY, CA 91752 | 11/25/2025 | $870,000 | $418,500 | $550 | 1,581 | 4/1 | 1978 | 23,522 SF | P |

Owner: RENATO & DIOR DE MORAES LIVING
APN: 160-131-027
Legal: Lot:52 Subdivision:TRACT NO 7309 Map Ref:MB 92 PG 67-69Abbreviated Description:TRA 028-038
Land Use: Single Family Residential
Seller: 2011 MICHELSON FAMILY TRUST, ;
Document #: 2025-0368916
Located approximately 0.25 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 15 | 11234 OWEN CT JURUPA VALLEY, CA 91752 | 11/20/2025 | $970,000 | $824,000 | $292 | 3,317 | 6/4 | 2016 | 7,405 SF | N/A |

Owner: LOPEZ, APRIL; MONTINOLA, PHOEBEE
APN: 160-422-005
Legal: Lot:106 Subdivision:TRACT NO 316441 Tract No:316441 Map Ref:MB 448 PG 99Abbreviated
Land Use: Single Family Residential
Seller: JOON HO PALK & SOON JOO PALK
Document #: 2025-0364416
Located approximately 0.20 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 16 | 4871 STITS CIR JURUPA VALLEY, CA 91752 | 09/12/2025 | $877,000 | $701,600 | $315 | 2,784 | 5/2 | 2016 | 6,969 SF | N/A |

Owner: LEE, AMY TRUONG; LEE, BETTY TRUONG
APN: 160-380-016
Legal: Lot:25 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114
Land Use: Single Family Residential
Seller: WRIGHT, CHRISTOPHER; WRIGHT,
Document #: 2025-0280357
Located approximately 0.24 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 17 | 4746 CAMINO DE MADERA JURUPA VALLEY, CA 91752 | 09/05/2025 | $930,000 | $430,000 | $300 | 3,097 | 5/3 | 2015 | 7,840 SF | N/A |

Owner: CAZARES, FEDERICO CONTRERAS;
APN: 160-330-008
Legal: Lot:52 Subdivision:MAP OF TRACT NO 33461 Map Ref:MB 411 PG 41-49Abbreviated Description:TRA 028-
Land Use: Single Family Residential
Seller: KIM, MIN KYUNG
Document #: 2025-0273851
Located approximately 0.39 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 18 | 4736 MARRIETA ST JURUPA VALLEY, CA 91752 | 07/30/2025 | $988,000 | $790,400 | $280 | 3,527 | 5/3 | 2016 | 7,405 SF | N/A |

Owner: HUYNH, LOC TAN; BUI, TIEN KIEU
APN: 160-392-044
Legal: Lot:214 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028
Land Use: Single Family Residential
Seller: ZENG, KARL; ZHANG, QING
Document #: 2025-0233226
Located approximately 0.24 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 19 | 4979 GRAPHITE CREEK RD JURUPA VALLEY, CA 91752 | 07/23/2025 | $790,000 | $434,500 | $320 | 2,463 | 4/2 | 2015 | 8,276 SF | N/A |

Owner: VALDEZ, JOSE R
APN: 160-371-003
Legal: Lot:111 Subdivision:TRACT NO 31644 Map Ref:MB 444 PG 58-66Abbreviated Description:TRA 028-114
Land Use: Single Family Residential
Seller: THE COOPER TRUST, ; COOPER, DEBRA E
Document #: 2025-0224676
Located approximately 0.42 miles from subject property.

| No. | Address | Date | Price | Loan | $/SF | SqFt | BR/Bth | Year Built | Lot Size | Pool |
|---|---|---|---|---|---|---|---|---|---|---|
| 20 | 4777 MAGNUM WAY JURUPA VALLEY, CA 91752 | 07/16/2025 | $1,050,000 | $997,499 | $265 | 3,956 | 7/4 | 2017 | 8,276 SF | N/A |

Owner: DONADI, DHANUNJAYA; DONADI, ANJANI
APN: 160-450-020
Legal: Lot:98 Subdivision:TRACT NO 316441 Map Ref:MB 448 PG 99-106Abbreviated Description:TRA 028-1174
Land Use: Single Family Residential
Seller: TOVAR, FREDDY; TOVAR, VANESSA
Document #: 2025-0216995
Located approximately 0.16 miles from subject property.

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

07/01/2026 16:34:59 PM                                                                                       Customer Service Rep:  Monica Pena

# NEARBY PROPERTY OWNERS

### ZAAN ZACHARY
4763 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-003          Bedrooms: 6
Telephone:                Bathrooms: 4
Square Feet: 3,317        Lot size: 7,840
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### KAPOOR LAKSHMI
4739 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-005          Bedrooms: 6
Telephone: 909-590-8970   Bathrooms: 3
Square Feet: 3,692        Lot size: 7,840
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### CALDERON CARLOS
4727 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-006          Bedrooms: 4
Telephone:                Bathrooms: 3
Square Feet: 3,003        Lot size: 7,405
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### WESTAMERICA BANK
4775 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-002          Bedrooms: 4
Telephone:                Bathrooms: 2
Square Feet: 2,572        Lot size: 7,840
Year Built: 2018          Garage: A
Sale Date:
Land Use:     Single Family Residential

### BOMORTINO JOSEPH J III
4754 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-431-017          Bedrooms: 7
Telephone: 760-792-1629   Bathrooms: 5
Square Feet: 4,293        Lot size: 7,405
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### SUBRAMANIAN VINODANAND
4742 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-431-016          Bedrooms: 5
Telephone:                Bathrooms: 3
Square Feet: 2,811        Lot size: 7,405
Year Built: 2017          Garage: A
Sale Date:     03/15/2022
Land Use:     Single Family Residential

### CODILLA ALEXIS MARIE
4766 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-431-018          Bedrooms: 7
Telephone: 951-452-8417   Bathrooms: 5
Square Feet: 3,622        Lot size: 7,405
Year Built: 2017          Garage: A
Sale Date:     07/14/2020
Land Use:     Single Family Residential

### THENG LIVING TRUST (7/5/19)
4715 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-007          Bedrooms: 7
Telephone: 909-342-3072   Bathrooms: 5
Square Feet: 3,622        Lot size: 7,840
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### WLODARCZYK KAMIL
4730 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-431-015          Bedrooms: 6
Telephone:                Bathrooms: 3
Square Feet: 3,692        Lot size: 7,405
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

### JIN GUANGQIAN
4787 PRESTON ST
JURUPA VALLEY, CA 91752
APN: 160-432-001          Bedrooms: 6
Telephone:                Bathrooms: 3
Square Feet: 3,692        Lot size: 8,276
Year Built: 2017          Garage: A
Sale Date:
Land Use:     Single Family Residential

Confidential, Proprietary and/or Trade Secret.  TM SM  ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

Confidential, Proprietary and/or Trade Secret.  TM SM ® Trademark(s) of Intercontinental Exchange, Inc. and its subsidiaries and affiliates.
© 2026 Intercontinental Exchange, Inc. All Rights Reserved.

7/1/2026

Customer Service Rep:   Monica Pena

# Tax Search



Riverside, California
**Searched: 160-432-004**
Non-Order Search

| | |
|---|---|
| Tax Year: | 2025-2026 |
| Tax Cover: | 06/26/2026 |
| Searched By: | MONICA PENA |
| Searched On: | 7/1/2026 7:31 PM |

Company: CHICAGO TITLE | GLENDALE - (FNFSTR) | 01 | CRN: 00021-00021

| | |
|---|---|
| APN: | 160-432-004 |
| Described As: | .18 ACRES M/L IN LOT 154 MB 448/099 TR 31644-1 |
| Address: | 4751 PRESTON ST |
| City: | JURUPA VALLEY |
| Billing Address: | 163 N DOMMER AV WALNUT CA 91789 |
| Assessed Owner(s): | TONG ZHOU QING; LI QIN FEN |
| Search As: | Lot 154 Map 448/99 (Tr 31644-1) |

| | | | | | |
|---|---|---|---|---|---|
| Tax Rate Area: | 028-114 | **Value** | | Conveyance Date: | **OCT 2017** |
| | | Land: | 136,537.00 | Conveying Instrument: | **2017-0435959** |
| Use Code: | 414 | Improvements: | 441,691.00 | Date Transfer Acquired: | |
| **SINGLE FAMILY DWELLING** | | Personal Property: | | Vesting: | |
| Region Code: | | Fixtures: | | Year Built: | |
| Flood Zone: | | Inventory: | | Year Last Modified: | |
| Zoning Code: | | | | | |
| Taxability Code: | | **Exemptions** | | | |
| | | Homeowner: | | **Square Footage** | |
| Tax Rate: | 2.020649 | Inventory: | | Land: | 7841 |
| Auditor Tax Rate: | 1.114671 | Personal Property: | | Improvements: | |
| | | Religious: | | | |
| | | All Other: | | Tax Defaulted: | |
| Bill #: | 2025005098092 | Net Taxable Value: | 578,228.00 | Total Tax: | 11,683.96 |
| Issue Date: | | | | | |

| Installment | Amount | Penalty | Due Date | Status | Payment Date | Balance |
|---|---|---|---|---|---|---|
| 1st | 5,841.98 | 584.20 | 12/10/2025 | PAID | 12/05/2025 | 0.00 |
| 2nd | 5,841.98 | 622.26 | 04/10/2026 | PAID | 04/02/2026 | 0.00 |
| | | | | | **Total Balance:** | 0.00 |

| Account | Special Lien Description | Amount |
|---|---|---|
| 01-0000 | **GENERAL PURPOSE** | **5,782.28** |
| 03-3601 | **JURUPA UNIFIED SCHOOL B & I** | **462.58** |
| 03-9101 | **RIVERSIDE COMMUNITY COLLEGE B & I** | **160.00** |
| 04-5351 | **METRO WATER DISTRICT WEST 1302999** | **40.48** |
| 68-1377 | **FLOOD CONTROL STORMWATER / CLEANWATER/SANTA ANA** | **3.74** |
| 68-1539 | **LLMD 89-1-C ZONE 7** | **1.04** |
| 68-1561 | **CFD 2013-001 BELLEGRAVE A MELLO ROOS** | **548.60** |
| 68-1564 | **CFD 2013-001 BELLEGRAVE B MELLO ROOS** | **27.78** |
| 68-3639 | **JURUPA USD CFD NO 11 IA B MELLO ROOS** | **3,863.88** |
| 68-4571 | **NORTHWEST MOSQUITO & VECTOR CONTROL DISTRICT** | **2.24** |
| 68-4622 | **JURUPA PARK & REC MAINT** | **15.00** |
| 68-4630 | **JURUPA REC & PARK CFD 2014-1 MELLO ROOS** | **767.12** |
| 68-5360 | **METRO WATER DISTRICT STANDBY WEST** | **9.22** |

INTERIM PROCESSING ON

**THE INFORMATION PROVIDED IS A SUMMARIZED SEARCH OF OUR RECORDS. PROPERTY INSIGHT DOES NOT WARRANT NOR GUARANTEE THE ACCURACY NOR COMPLETENESS OF THE INFORMATION SHOWN. A FULL/EXTENDED TAX SEARCH IS RECOMMENDED.**

**\*\*\* END OF REPORT \*\*\***

DOC #2017-0435959
10/19/2017 03:52 PM Fees: $27.00
Page 1 of 5
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: MARY #659

**RECORDING REQUESTED BY**
First American Title Company- Subdivision Sale Out

**AND WHEN RECORDED MAIL DOCUMENT TO:**
Qin Fen Li and Zhou Qing Tong
163 North Dommer Avenue
Walnut, CA 91789

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.: 100-432-004-8
TRA: 028-114

Lot 154, Tract 31644-1
Serrano Ranch

File No.: **5092843 (je)**

DOCUMENTARY TRANSFER TAX $559.35 ;
[ X ]    Computed on the consideration or value of property conveyed; OR
[   ]    Computed on the consideration or value less liens or encumbrances
remaining at time of sale; ☒ City of Jurupa Valley

*Lauren Ramirez*
Signature of Declarant or Agent determining tax- Firm Name

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **PULTE HOME COMPANY, LLC, a Michigan limited liability company,** ("Grantor"),

hereby GRANT(S) to **Qin Fen Li and Zhou Qing Tong, husband and wife as joint tenants** ("Grantee"),

the real property in the City of **Jurupa Valley**, County of **Riverside**, State of **California**, described on Exhibit "A" attached hereto and incorporated herein by this reference.

THE REAL PROPERTY CONVEYED HEREIN BY GRANTOR TO GRANTEE IS CONVEYED AND ACCEPTED SUBJECT TO:    (i)    CURRENT REAL PROPERTY TAXES AND ALL UNPAID GENERAL AND SPECIAL TAXES/BONDS AND ASSESSMENTS;    (ii)    ALL ENCUMBRANCES, EASEMENTS, COVENANTS, CONDITIONS, RESTRICTIONS, RESERVATIONS, RIGHTS, RIGHTS OF WAY RECORD, AND/OR DISCLOSED BY AN INSPECTION.

Dated:  September 29, 2017

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

PULTE HOME COMPANY, LLC,
a Michigan limited liability company

By: _____

Name: _____ **Francine Wallace**

Title: _____ **General Sales Manager**

**Grantor**

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California    )

County of San Bernardino    )

On October 5, 2017 before me, Pamela Lee Berg, Notary Public ,
_____Date_____ , _Here Insert Name and Title of the Officer_

personally appeared Francine Wallace, General Sales Manager
_Name(s) of Signer(s)_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> PAMELA LEE BERG
> Notary Public – California
> San Bernardino County
> Commission # 2188414
> My Comm. Expires Apr 6, 2021

Signature _Pamela Lee Berg_
_Signature of Notary Public_

_Place Notary Seal Above_

──────────── OPTIONAL ────────────

_Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document._

**Description of Attached Document**
Title or Type of Document: Grant Deed    Document Date: 9/29/17
Number of Pages: _____ Signer(s) Other Than Named Above: Li @ SR

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: Francine Wallace | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited  ☐ General | ☐ Partner — ☐ Limited  ☐ General |
| ☐ Individual      ☐ Attorney in Fact | ☐ Individual      ☐ Attorney in Fact |
| ☐ Trustee      ☐ Guardian or Conservator | ☐ Trustee      ☐ Guardian or Conservator |
| ☑ Other: General Sales Manager | ☐ Other: _____ |
| Signer Is Representing: Pulte / Centex Homes | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

## EXHIBIT "A"

That certain real property situated in the City of Jurupa Valley, County of Riverside, State of California, described as follows:

Lot 154 of Tract No. 31644-1, in the City of Jurupa Valley, County of Riverside, State of California, as shown on the Map filed in Book 448 of Maps, Pages 99 through 106, inclusive, in the Office of the County Recorder of said County ("**Map**").

EXCEPTING THEREFROM, any and all (i) oil rights, (ii) mineral rights, (iii) natural gas rights, (iv) rights to all other hydrocarbons by whatsoever name known, (v) geothermal heat rights or geothermal substances that may be produced from the property, (vi) water rights and claims or rights to water and (vii) all products derived from any of the foregoing located in or under the property and lying and being at a vertical depth of 500 or more feet below the present natural surface of the ground, but without right of entry on the surface or within a vertical depth of 500 feet below the present surface of the ground.

RESERVING THEREFROM, all easements described in the Declaration (described below), Master Dispute Resolution Declaration (described below), Individual Dispute Resolution Agreement (described below), the Map and all other easement of record.

The real property conveyed in this grant deed ("**Property**") is conveyed and accepted subject to:

1.    Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tract 31644-1 recorded on <u>February 9 2016</u>, as Document No. <u>2016-0054606</u> in the Office of the County Recorder of Riverside County, California, and any amendments or supplements thereto (collectively, "**Declaration**");

2.    Master Dispute Resolution Declaration for Tract No. 31644-1 recorded in the Office of the County Recorder of Riverside County, California, on <u>February 9, 2016</u>, as Document No. 2016-0054607, and any amendments and supplements thereto (collectively, "**Master Dispute Resolution Declaration**"), and

3.    Individual Dispute Resolution Agreement for Tract No. 31644-1 recorded concurrently herewith, in the Official Records of the County Recorder of Riverside County, and any amendments or supplements thereto (collectively, "**Individual Disputed Resolution Agreement**"), all of which are incorporated herein by reference to this grant deed with the same effect as though fully set forth herein. As more particularly described in the Declaration, the Property is conveyed subject to certain easements reserved by Grantor. Grantee, in accepting this grant deed and the conveyance hereunder, does hereby agree, jointly and severally, that Grantee will promptly, fully and faithfully comply with and conform to the Declaration.

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

## GRANTEE ACCEPTANCE AND AGREEMENT

The undersigned Grantee, by acceptance of this Grant Deed, and each future owner by acceptance of fee title to the Property herein conveyed, agrees it is accepting title to the Property subject to all matters set forth in this Grant Deed, including, without limitation, the Declaration, the Master Dispute Resolution Declaration and the Individual Dispute Declaration Agreement.

_____
Qin Fen Li

_____
Zhou Qing Tong

GRANTEE

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )SS
COUNTY OF _Riverside_ )

On _10-17-2017_, before me, _R-BROWN_, Notary Public, personally appeared _Qin Fen Li and Zhou Qing Tong_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

> R. BROWN
> Notary Public - California
> Riverside County
> Commission # 2182223
> My Comm. Expires Feb 28, 2021

*This area for official notarial seal*

Mail Tax Statements To: **SAME AS ABOVE** or Address Shown Below

DOC #2020-0260432
06/17/2020 04:03 PM Fees: $153.00
Page 1 of 19
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: LISA #580

FIRST AMERICAN TITLE COMPANY LOS ANGELES

Recording Requested By:
TOP WORLD INVESTMENT INC

And After Recording Return To:
TOP WORLD INVESTMENT INC
18645 E GALE AVE 210
CITY OF INDUSTRY, CALIFORNIA 91748
Loan Number: 20040806

627495

———————————— [Space Above This Line For Recording Data] ————————————

# DEED OF TRUST

**MIN:** 101224000200408066                                    **MERS Phone: 888-679-6377**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)  "Security Instrument"** means this document, which is dated        JUNE 12, 2020        , together with all Riders to this document.
**(B)  "Borrower"** is  Qin Fen Li and Zhou Qing Tong, husband and wife as Joint Tenants
BORROWER'S ADDRESS IS 163 N DOMMER AVE, WALNUT, CALIFORNIA 91789.

Borrower is the trustor under this Security Instrument.
**(C)  "Lender"** is   TOP WORLD INVESTMENT INC

Lender is a                          CORPORATION                          organized
and existing under the laws of                    CALIFORNIA
Lender's address is  18645 EAST GALE AVE, 210, CITY OF INDUSTRY, CALIFORNIA 91748

**(D)  "Trustee"** is   June Gorman 5151 CORPORATE DR, TROY, MICHIGAN 48098

**(E)  "MERS"** is  Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security**

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS                     *DocMagic eForms*
Form 3005  01/01                          Page 1 of 15                          *www.docmagic.com*

**Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)  "Note"** means the promissory note signed by Borrower and dated   JUNE 12, 2020                    .
The Note states that Borrower owes Lender    TWO HUNDRED SIXTY-SEVEN THOUSAND AND 00/100
Dollars (U.S. $ 267,000.00            ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
JULY 1, 2050                    .

**(G)  "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H)  "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)  "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | | |
|---|---|---|---|
| ☐ | Adjustable Rate Rider | ☐ | Planned Unit Development Rider |
| ☐ | Balloon Rider | ☐ | Biweekly Payment Rider |
| ☒ | 1-4 Family Rider | ☐ | Second Home Rider |
| ☐ | Condominium Rider | ☐ | Other(s) [specify] |

**(J)  "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)  "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)  "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)  "Escrow Items"** means those items that are described in Section 3.

**(N)  "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)  "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)  "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)  "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)  "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

---

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
    COUNTY                         of                         RIVERSIDE                    :
    [Type of Recording Jurisdiction]                           [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF
A.P.N.: 160-432-004

**See Exhibit A Attached**

which currently has the address of    4751 PRESTON ST

[Street]

JURUPA VALLEY                                    , California 91752-5096    ("Property Address"):
[City]                                              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check,

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          **DocMagic eForms**
Form 3005  01/01                         Page 3 of 15                              **www.docmagic.com**

treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2.  Application of Payments or Proceeds.**  Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3.  Funds for Escrow Items.**  Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for:  (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.  Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items.  Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section

Non-Order Search                                    Page 9 of 24            Requested By: Monica Pena , Printed: 7/1/2026 7:33:55 PM
Doc: 2020-260432 TDR 06-17-2020

15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.   Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005  01/01
Page 5 of 15

*DocMagic eForms*
*www.docmagic.com*

any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Non-Order Search                    Page 11 of 24                    Requested By: Monica Pena , Printed: 7/1/2026 7:33:55 PM
Doc: 2020-260432 TDR 06-17-2020

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage

---

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005  01/01
Page 7 of 15

*DocMagic eForms*
*www.docmagic.com*

Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Non-Order Search
Doc: 2020-260432 TDR 06-17-2020

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005  01/01                                   Page 9 of 15

*DocMagic eForms*
*www.docmagic.com*

under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Non-Order Search                          Page 15 of 24                    Requested By: Monica Pena , Printed: 7/1/2026 7:33:56 PM
Doc: 2020-260432 TDR 06-17-2020

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005  01/01

Page 11 of 15

*DocMagic eForms*
*www.docmagic.com*

Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

Non-Order Search                    Page 17 of 24                    Requested By: Monica Pena , Printed: 7/1/2026 7:33:57 PM
Doc: 2020-260432 TDR 06-17-2020

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

## [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Non-Order Search
Doc: 2020-260432 TDR 06-17-2020

Page 18 of 24

Requested By: Monica Pena , Printed: 7/1/2026 7:33:57 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to Borrower at the address set forth above.

_____(Seal)        _____(Seal)
ZHOU QING TONG            -Borrower        QIN FEN LI              -Borrower

_____                _____
Witness                                  Witness

Borrower requests that a copy of any notice of default or notice of sale be sent to Borrower'snotice address in accordance with the provisions of Section 15 and Section 22.

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS          *DocMagic eForms*
Form 3005  01/01                    Page 14 of 15                              *www.docmagic.com*

———————— [Space Below This Line For Acknowledgment] ————————

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of __CALIFORNIA_____ )

County of _Los Angeles_____ )

On __June 13, 2020__ before me,__Karen Lee, Notary Public__

Date Here Insert Name and Title of the Notarizing Officer

personally appeared _ZHOU QING TONG AND QIN FEN LI_____

Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

```
KAREN LEE
COMM. # 2250631
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES AUG. 14, 2022
```

Notary Seal

_____
Signature of Notary Public

Loan Originator: Tammy Meng, NMLSR ID 323721
Loan Originator Organization: TOP WORLD INVESTMENT INC, NMLSR ID 396284

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005  01/01

DocMagic eForms
www.docmagic.com

Page 15 of 15

Exhibit "A"

## LEGAL DESCRIPTION

Real property in the City of Mira Loma, County of Riverside, State of California, described as follows:

LOT 154 OF TRACT NO. 31644-1, IN THE CITY OF JURUPA VALLEY, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN ON THE MAP FILED IN BOOK 448 OF MAPS, PAGES 99 THROUGH 106, INCLUSIVE, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY ("MAP").

EXCEPTING THEREFROM, ANY AND ALL (I) OIL RIGHTS, (II) MINERAL RIGHTS, (III) NATURAL GAS RIGHTS, (IV) RIGHTS TO ALL OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, (V) GEOTHERMAL HEAT RIGHTS OR GEOTHERMAL SUBSTANCES THAT MAY BE PRODUCED FROM THE PROPERTY, (VI) WATER RIGHTS AND CLAIMS OR RIGHTS TO WATER AND (VII) ALL PRODUCTS DERIVED FROM ANY OF THE FOREGOING LOCATED IN OR UNDER THE PROPERTY AND LYING AND BEING AT A VERTICAL DEPTH OF 500 OR MORE FEET BELOW THE PRESENT NATURAL SURFACE OF THE GROUND, BUT WITHOUT RIGHT OF ENTRY ON THE SURFACE OR WITHIN A VERTICAL DEPTH OF 500 FEET BELOW THE PRESENT SURFACE OF THE GROUND.

RESERVING THEREFROM, ALL EASEMENTS DESCRIBED IN THE DECLARATION (DESCRIBED BELOW), MASTER DISPUTE RESOLUTION DECLARATION (DESCRIBED BELOW), INDIVIDUAL DISPUTE RESOLUTION AGREEMENT (DESCRIBED BELOW), THE MAP AND ALL OTHER EASEMENT OF RECORD.

APN: 160-432-004

Loan Number: 20040806

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this   12th   day of               JUNE, 2020                 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to TOP WORLD INVESTMENT INC, A CALIFORNIA CORPORATION

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

4751 PRESTON ST, JURUPA VALLEY, CALIFORNIA 91752-5096
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY
INSTRUMENT.** In addition to the Property described in Security Instrument, the following
items now or hereafter attached to the Property to the extent they are fixtures are added to the
Property description, and shall also constitute the Property covered by the Security Instrument:
building materials, appliances and goods of every nature whatsoever now or hereafter located
in, on, or used, or intended to be used in connection with the Property, including, but not
limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas,
water, air and light, fire prevention and extinguishing apparatus, security and access control
apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and
attached floor coverings, all of which, including replacements and additions thereto, shall be
deemed to be and remain a part of the Property covered by the Security Instrument. All of the
foregoing together with the Property described in the Security Instrument (or the leasehold
estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and
the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek,
agree to or make a change in the use of the Property or its zoning classification, unless Lender
has agreed in writing to the change. Borrower shall comply with all laws, ordinances,
regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not
allow any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss
in addition to the other hazards for which insurance is required by Section 5.

---

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                              Page 1 of 3                              *DocMagic eForms*

Non-Order Search
Doc: 2020-260432 TDR 06-17-2020

**E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F.  BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G.  ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.  ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22  of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                    Page 2 of 3

DocMagic *eForms*

or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
ZHOU  QING  TONG          -Borrower

_____ (Seal)
QIN  FEN  LI              -Borrower

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                    Page 3 of 3

*DocMagic eForms*

# APPRAISAL OF REAL PROPERTY



## LOCATED AT
4751 Preston St
Jurupa Valley, CA 91752
.18 ACRES M/L IN LOT 154 MB 448/099 TR 31644-1

## FOR
None

## OPINION OF VALUE
920,000

## AS OF
06/29/2026

## BY
Doug Gonzalez
Gonzalez Appraisal Services
1809 N. THIRD AVE
UPLAND, CA 91784
(909) 608-7776
Appraiserdoug@Outlook.com

Douglas Gonzalez (909) 625-4445

# RESIDENTIAL APPRAISAL REPORT

**File No.:** 1053-26

## SUBJECT

| | |
|---|---|
| Property Address: 4751 Preston St | City: Jurupa Valley    State: CA    Zip Code: 91752 |
| County: Riverside | Legal Description: .18 ACRES M/L IN LOT 154 MB 448/099 TR 31644-1 |
| | Assessor's Parcel #: 160-432-004 |

Tax Year: 2025    R.E. Taxes: $ 11,684    Special Assessments: $ 0    Borrower (if applicable): None

Current Owner of Record: Li Qin Fen & Tong Zhou Qing    Occupant: ☒ Owner  ☐ Tenant  ☐ Vacant    ☐ Manufactured Housing

Project Type: ☐ PUD  ☐ Condominium  ☐ Cooperative  ☐ Other (describe)    HOA: $ 0    ☐ per year  ☐ per month

Market Area Name: Jurupa Valley    Map Reference: 40140    Census Tract: 0406.18

## ASSIGNMENT

The purpose of this appraisal is to develop an opinion of: ☒ Market Value (as defined), or  ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☐ Current (the Inspection Date is the Effective Date)  ☒ Retrospective  ☐ Prospective

Approaches developed for this appraisal: ☒ Sales Comparison Approach  ☐ Cost Approach  ☐ Income Approach    (See Reconciliation Comments and Scope of Work)

Property Rights Appraised: ☒ Fee Simple  ☐ Leasehold  ☐ Leased Fee  ☐ Other (describe)

Intended Use: Personal use to determine market value

Intended User(s) (by name or type): Li Qin Fen & Tong Zhou Qing

Client: Li Qin Fen & Tong Zhou Qing    Address: 4751 Preston St Jurupa Valley, CA 91752

Appraiser: Doug Gonzalez    Address: 1809 N. Third Ave, Upland, CA 91784

## MARKET AREA DESCRIPTION

| | | | | |
|---|---|---|---|---|
| Location: | ☐ Urban  ☒ Suburban  ☐ Rural | **Predominant Occupancy** | **One-Unit Housing** | **Present Land Use** |
| Built up: | ☒ Over 75%  ☐ 25-75%  ☐ Under 25% | | PRICE / AGE | One-Unit 95 % |
| Growth rate: | ☐ Rapid  ☒ Stable  ☐ Slow | ☒ Owner | $(000) / (yrs) | 2-4 Unit 0 % |
| Property values: | ☐ Increasing  ☒ Stable  ☐ Declining | ☐ Tenant | 780 Low 6 | Multi-Unit 0 % |
| Demand/supply: | ☐ Shortage  ☒ In Balance  ☐ Over Supply | ☒ Vacant (0-5%) | 1,050 High 11 | Comm'l 5 % |
| Marketing time: | ☒ Under 3 Mos.  ☐ 3-6 Mos.  ☐ Over 6 Mos. | ☐ Vacant (>5%) | 970 Pred 9 | % |

**Change in Land Use:** ☒ Not Likely  ☐ Likely *  ☐ In Process *  * To:

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends): PROPERTY VALUES APPEAR TO BE STABILIZING AFTER A PERIOD OF INCREASE. THIS DUE TO SLIGHT INCREASE YET STILL REASONABLE INTEREST RATES AND SOME CHANGES IN THE AVAILABILITY OF COMPETITIVE FINANCING PLANS AS WELL AS PREVIOUSLY MENTIONED INCREASE IN PRICING. TYPICAL MARKETING TIME APPEARS TO BE UNDER 3 MONTHS, WITH NEIGHBORHOOD SUPPLY AND DEMAND IN BALANCE.

## SITE DESCRIPTION

Dimensions: 68.25' x 107' x 71.59' x 105.90'    Site Area: 7,841

Zoning Classification: R1    Description: Single Family Residential

Zoning Compliance: ☒ Legal  ☐ Legal nonconforming (grandfathered)  ☐ Illegal  ☐ No zoning

Are CC&Rs applicable? ☐ Yes  ☐ No  ☒ Unknown    Have the documents been reviewed? ☐ Yes  ☒ No    Ground Rent (if applicable) $    /

Highest & Best Use as improved: ☒ Present use, or  ☐ Other use (explain)

Actual Use as of Effective Date: Single Family Residence    Use as appraised in this report: Single Family Residence

Summary of Highest & Best Use: The highest and best use is likely its the current use be its maximum. Because of the existing use and zoning, no alternate use is likely.

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | Flat |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | Public | Street | Asphalt | ☒ | ☐ | Size | Average |
| Gas | ☒ | ☐ | Public | Curb/Gutter | Concrete | ☒ | ☐ | Shape | Rectangular |
| Water | ☒ | ☐ | Public | Sidewalk | Concrete | ☒ | ☐ | Drainage | Adequate |
| Sanitary Sewer | ☒ | ☐ | Public | Street Lights | Post | ☒ | ☐ | View | Residential |
| Storm Sewer | ☒ | ☐ | Public | Alley | None | ☐ | ☐ | | |

Other site elements: ☒ Inside Lot  ☐ Corner Lot  ☐ Cul de Sac  ☐ Underground Utilities  ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☐ Yes  ☒ No    FEMA Flood Zone X    FEMA Map # 06065C0019G    FEMA Map Date 8/28/2008

Site Comments: The subject backs to a public park.

## DESCRIPTION OF THE IMPROVEMENTS

| General Description | Exterior Description | Foundation | Basement ☒ None | Heating |
|---|---|---|---|---|
| # of Units 1  ☐ Acc.Unit | Foundation Concrete | Slab Yes | Area Sq. Ft. 0 | Type Fau |
| # of Stories 2 | Exterior Walls Stucco | Crawl Space No | % Finished 0 | Fuel Gas |
| Type ☒ Det.  ☐ Att. | Roof Surface Tile | Basement None | Ceiling | |
| Design (Style) Neo-Eclectic | Gutters & Dwnspts. None | Sump Pump ☐ | Walls | **Cooling** |
| ☒ Existing  ☐ Proposed  ☐ Und.Cons. | Window Type Doublepane | Dampness ☐ | Floor | Central Central |
| Actual Age (Yrs.) 9 | Storm/Screens None/Half | Settlement None Noted | Outside Entry | Other |
| Effective Age (Yrs.) 5 | | Infestation None Noted | | |

| Interior Description | Appliances | Attic ☐ None | Amenities | Car Storage ☐ None |
|---|---|---|---|---|
| Floors Unknown | Refrigerator ☐ | Stairs ☐ | Fireplace(s) # 1    Woodstove(s) # 0 | Garage # of cars 3 Tot.) |
| Walls Drywall | Range/Oven ☒ | Drop Stair ☐ | Patio Conc/Cov | Attach. |
| Trim/Finish Wood | Disposal ☒ | Scuttle ☐ | Deck None | Detach. |
| Bath Floor Unknown | Dishwasher ☒ | Doorway ☒ | Porch Front | Blt.-In 3 |
| Bath Wainscot Unknown | Fan/Hood ☐ | Floor ☐ | Fence Block | Carport |
| Doors Hollow Core | Microwave ☐ | Heated ☐ | Pool None | Driveway |
| | Washer/Dryer ☐ | Finished ☐ | | Surface Concrete |

Finished area **above** grade contains: 7 Rooms    4 Bedrooms    2.1 Bath(s)    2,831 Square Feet of Gross Living Area Above Grade

Additional features: Custom walkway brick accents

Describe the condition of the property (including physical, functional and external obsolescence): The subject has construction of good quality and has been maintained in good condition with no repairs noted as necessary. No apparent functional obsolescence was noted. Some economic obsolescence was noted due to the subject proximity to a public park and the nuisances associated to such a location. The subjects square footage was based on public record data and all remaining aspects based on contact provided descriptions and assumed accurate.

GP RESIDENTIAL

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    3/2007

# RESIDENTIAL APPRAISAL REPORT

File No.: 1053-26

**TRANSFER HISTORY**

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s): REALIST

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing: DATA TAKEN FROM PUBLIC |
|---|---|
| Date: | RECORDS. |
| Price: | |
| Source(s): REALIST | |
| 2nd Prior Subject Sale/Transfer | |
| Date: | |
| Price: | |
| Source(s): | |

**SALES COMPARISON APPROACH TO VALUE (if developed)**     ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 4751 Preston St | 11781 Forsythia St | | 11150 Duran Dr | | 11414 Corte Los Laureles | |
| | Jurupa Valley, CA 91752 | Jurupa Valley, CA 91752 | | Jurupa Valley, CA 91752 | | Jurupa Valley, CA 91752 | |
| Proximity to Subject | | 0.86 miles SW | | 0.11 miles SW | | 0.46 miles W | |
| Sale Price | $ | $ 1,050,000 | | $ 985,000 | | $ 925,000 | |
| Sale Price/GLA | $ /sq.ft. | $ 277.26 /sq.ft. | | $ 271.95 /sq.ft. | | $ 339.33 /sq.ft. | |
| Data Source(s) | | Rlst/Mls#CV25257455;DOM 80 | | Rlst/Mls#TR26045537;DOM 21 | | Rlst/Mls#IV26097139;DOM 7 | |
| Verification Source(s) | | Doc# 90917 | | Doc# 124768 | | Doc# 178651 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | | Arms length sale | | Arms length sale | | Arms length sale | |
| Concessions | | Conv;0 | | Conv;0 | | Conv;13000 | -13,000 |
| Date of Sale/Time | | 03/26/2026 coe | | 04/24/2026 coe | | 05/12/2026 coe | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | Park Influence | Residential | -5,000 | Park Influence | | Residential | -5,000 |
| Site | 7,841 | 7841 sf | | 7841 sf | | 8276 sf | |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Neo-Eclectic | Neo-Eclectic | | Neo-Eclectic | | Ranch | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Age | 9 | 10 | | 8 | | 11 | |
| Condition | Very Good | Very Good | | Very Good | | Very Good | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Room Count | 7 / 4 / 2.1 | 8 / 5 / 2.1 | | 9 / 6 / 5.1 | -6,000 | 7 / 4 / 2.1 | |
| Gross Living Area | 2,831 sq.ft. | 3,787 sq.ft. | -105,160 | 3,622 sq.ft. | -87,010 | 2,726 sq.ft. | +11,550 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | Fau/Cac | Fau/Cac | | Fau/Cac | | Fau/Cac | |
| Energy Efficient Items | None | Non Owned Solar | 0 | None | | Non Owned Solar | 0 |
| Garage/Carport | 3 Car Garage | 3 Car Garage | | 2 Car Garage | +30,000 | 3 Car Garage | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | Porch/Patio | |
| Pool | None | None | | None | | None | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -110,160 | ☐ + ☒ - | $ -63,010 | ☐ + ☒ - | $ -6,450 |
| Adjusted Sale Price of Comparables | | | $ 939,840 | | $ 921,990 | | $ 918,550 |

Summary of Sales Comparison Approach     See attached addenda.

**Indicated Value by Sales Comparison Approach $** 920,000

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**

# RESIDENTIAL APPRAISAL REPORT

File No.: 1053-26

**COST APPROACH TO VALUE (if developed)**  ☒ The Cost Approach was not developed for this appraisal.

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value): _____

ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW

| | | | |
|---|---|---|---|
| OPINION OF SITE VALUE | | _____ | =$ |
| DWELLING | Sq.Ft. @ $ | ____ | =$ |
| Source of cost data: | Sq.Ft. @ $ | ____ | =$ |
| Quality rating from cost service: Effective date of cost data: | Sq.Ft. @ $ | ____ | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | Sq.Ft. @ $ | ____ | =$ |
| | Sq.Ft. @ $ | ____ | =$ |
| | | | =$ |
| Garage/Carport | Sq.Ft. @ $ | ____ | =$ |
| Total Estimate of Cost-New | | ____ | =$ |

Less      Physical | Functional | External

| | |
|---|---|
| Depreciation | =$( ) |
| Depreciated Cost of Improvements _____ | =$ |
| "As-is" Value of Site Improvements _____ | =$ |
| | =$ |
| | =$ |

Estimated Remaining Economic Life (if required): ____ Years | **INDICATED VALUE BY COST APPROACH** _____ = $

**INCOME APPROACH TO VALUE (if developed)**  ☒ The Income Approach was not developed for this appraisal.

Estimated Monthly Market Rent $ ____ X Gross Rent Multiplier ____ = $ ____ **Indicated Value by Income Approach** ____

Summary of Income Approach (including support for market rent and GRM): _____

**PROJECT INFORMATION FOR PUDs (if applicable)**  ☐ The Subject is part of a Planned Unit Development.

Legal Name of Project: _____

Describe common elements and recreational facilities: _____

Indicated Value by: Sales Comparison Approach $   920,000   Cost Approach (if developed) $ ____   Income Approach (if developed) $ ____

Final Reconciliation   The sales comparison approach was used due to its reliability and availability of market comparables. This method best represents current market trends. The cost approach supports the value opinion and the income approach was not used due to most of the properties in the area being owner occupied.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair: _____

☐ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

**Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is:  $   920,000   , as of:   06/29/2026   , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report.  See attached addenda.**

A true and complete copy of this report contains ___13___ pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:

☒ Scope of Work    ☒ Limiting Cond./Certifications    ☐ Narrative Addendum    ☐ Photograph Addenda    ☐ Sketch Addendum
☒ Map Addenda    ☒ Additional Sales    ☐ Cost Addendum    ☐ Flood Addendum    ☐ Manuf. House Addendum
☒ Hypothetical Conditions    ☐ Extraordinary Assumptions    ☐    ☐    ☐

Client Contact: _____    Client Name:   Li Qin Fen & Tong Zhou Qing
E-Mail: _____    Address:   4751 Preston St Jurupa Valley, CA 91752

**APPRAISER**

Appraiser Name:   Doug Gonzalez
Company:   Gonzalez Appraisal Services
Phone:   (909) 608-7776    Fax: ____
E-Mail:   Appraiserdoug@Outlook.com
Date of Report (Signature):   06/30/2026
License or Certification #:   AR033276    State:  CA
Designation:   Certified Residential Appraiser
Expiration Date of License or Certification:   03/04/2028
Inspection of Subject:   ☐ Interior & Exterior    ☒ Exterior Only    ☐ None
Date of Inspection:   06/29/2026

**SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable)**

Supervisory or Co-Appraiser Name: ____
Company: ____
Phone: ____    Fax: ____
E-Mail: ____
Date of Report (Signature): ____
License or Certification #: ____    State: ____
Designation: ____
Expiration Date of License or Certification: ____
Inspection of Subject:   ☐ Interior & Exterior    ☐ Exterior Only    ☐ None
Date of Inspection: ____

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**

Form GPRES2 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

# ADDITIONAL COMPARABLE SALES

File No.: 1053-26

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 4751 Preston St Jurupa Valley, CA 91752 | 11661 Forsythia St Jurupa Valley, CA 91752 | | 11662 Salvia St Jurupa Valley, CA 91752 | | | |
| Proximity to Subject | | 0.73 miles SW | | 0.73 miles W | | | |
| Sale Price | $ | $ 855,000 | | $ 965,000 | | $ | |
| Sale Price/GLA | $ /sq.ft. | $ 345.45 /sq.ft. | | $ 285.67 /sq.ft. | | $ /sq.ft. | |
| Data Source(s) | | Rlst/Mls#CV26012800;DOM 61 | | Rlst/Mls#TR26011183;DOM 13 | | | |
| Verification Source(s) | | Doc# 140407 | | Doc# 70745 | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing Concessions | | Arms length sale Cash;0 | | Arms length sale Conv;2000 | -2,000 | | |
| Date of Sale/Time | | 05/07/2026 coe | | 05/07/2026 coe | | | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | | |
| Location | Park Influence | Residential | -5,000 | Residential | -5,000 | | |
| Site | 7,841 | 8712 sf | | 8712 sf | | | |
| View | Residential | Residential | | Residential | | | |
| Design (Style) | Neo-Eclectic | Ranch | | Ranch | | | |
| Quality of Construction | Good | Good | | Good | | | |
| Age | 9 | 11 | | 9 | | | |
| Condition | Very Good | Very Good | | Very Good | | | |
| Above Grade | Total / Bdrms / Baths | Total / Bdrms / Baths | | Total / Bdrms / Baths | | Total / Bdrms / Baths | |
| Room Count | 7 / 4 / 2.1 | 7 / 4 / 2.1 | | 8 / 5 / 3.1 | -2,000 | | |
| Gross Living Area | 2,831 sq.ft. | 2,475 sq.ft. | +39,160 | 3,378 sq.ft. | -60,170 | sq.ft. | |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | Fau/Cac | Fau/Cac | | Fau/Cac | | | |
| Energy Efficient Items | None | None | | None | | | |
| Garage/Carport | 3 Car Garage | 2 Car Garage | +30,000 | 2 Car Garage | +30,000 | | |
| Porch/Patio/Deck | Porch/Patio | Porch/Patio | | Porch/Patio | | | |
| Pool | None | None | | None | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 64,160 | ☐ + ☒ - | $ -39,170 | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | | $ 919,160 | | $ 925,830 | | $ |

**SALES COMPARISON APPROACH**

Summary of Sales Comparison Approach

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**

Form GPRES2.(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

3/2007

**Supplemental Addendum**                                          File No. 1053-26

| Borrower | None | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | |
| City | Jurupa Valley | County | Riverside | State | CA | Zip Code | 91752 |
| Lender/Client | None | | | | | |

# Appraiser Independence Requirements (AIR) Certification

*This Certifies that the ordering and delivering of this appraisal report was completed in compliance with the Appraiser Independence Requirements (AIR) as referenced in Fannie Mae Announcement SEL- 2010-14, the Appraisal Independence guidance provided by HUD, including all future announcements and the USPAP standards. The undersign appraiser(s) responsible for preparing the above referenced appraisal report hereby certify that the report was completed and the opinion of value developed in accordance with USPAP standards; and at no time did any employee, director, officer, or agent of the lender or any third party acting as joint venture partner, independent contractor, appraisal company appraisal management company or partnering on behalf of the lender, influence or attempt to influence the development, reporting, result or review of the report. The undersigned certifies the appraisal report is in compliance with the Appraisal Independence provisions.*

SCOPE OF WORK:
The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form including the definition of market value, statement of assumptions and limiting conditions and certifications. The appraiser at a minimum has performed a complete visual inspection of the interior and exterior areas of the subject property, inspected the neighborhood and researched, verified and analyzed data from a reliable public and/or private sources and reported his or her analysis, opinions and conclusions in the report

DEFINITION OF MARKET VALUE:
The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the passing of title from seller to buyer and under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest: (3) a reasonable time is allowed for exposure in the open market: payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto: and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for these costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property or transaction.

STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.
2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.
3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.
4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.
5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.
6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:
1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.
2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability,

| | |
|---|---|
| Signature | Signature |
| Name  Doug Gonzalez | Name |
| Date Signed   06/30/2026 | Date Signed |
| State Certification #   AR033276                     State  CA | State Certification #                     State |
| Or State License #                     State | Or State License #                     State |

## Supplemental Addendum

File No. 1053-26

| | |
|---|---|
| Borrower | None |
| Property Address | 4751 Preston St |
| City | Jurupa Valley    County Riverside    State CA    Zip Code 91752 |
| Lender/Client | None |

soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property. MLS photos were used for all comparables.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

24. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

| | | |
|---|---|---|
| Signature | | Signature |
| Name  Doug Gonzalez | | Name |
| Date Signed  06/30/2026 | | Date Signed |
| State Certification #  AR033276    State CA | | State Certification #    State |
| Or State License #    State | | Or State License #    State |

## Supplemental Addendum

File No. 1053-26

| Borrower | None | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | |
| City | Jurupa Valley | County | Riverside | State CA | Zip Code | 91752 |
| Lender/Client | None | | | | | |

I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this appraisal within the three-year period immediately preceding acceptance of this assignment.

Exposure time:
Based on the recent market comparables and if competitively priced, an estimated exposure time for the subject would have been 1-90 days.

*Extraordinary assumptions: It was assumed that the subjects overall condition, attributes and amenities were the same or at a minimum very similar on the effective date of the report as opposed to the inspection date.*

**• GP Residential: Sales Comparison Analysis - Summary of Sales Comparison Approach**

All comps are taken from the subjects market area and considered similar in age, size and locational influence.

Neutral locations were adjusted at $5,000.

Bathrooms were adjusted at $2,000.

Living area adjustments were computed at $110 per sq. ft.

Garage stalls were adjusted at $30,000 each.

The adjustments for location, bathroom count, living area and garage utility are based on what the typical buyer would expect to pay in this market. They were derived by pairing within the comps used in this report, then analyzed as a group to find what were considered the most reasonable and consistently supported adjustments. The analysis found no support for design and age variance adjustments.

Though all comps were taken into consideration in determining the final value conclusion, the subjects value opinion was leaned towards comps 2, 3 & 4 due to their most similar living areas.

Signature _____
Name  Doug Gonzalez
Date Signed    06/30/2026
State Certification #   AR033276                          State CA
Or State License # _____    State _____

Signature _____
Name _____
Date Signed _____
State Certification # _____    State _____
Or State License # _____    State _____

## Location Map

| Borrower | None | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | | |
| City | Jurupa Valley | County | Riverside | | State | CA | Zip Code | 91752 |
| Lender/Client | None | | | | | | |



# Plat Map

| Borrower | None | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | |
| City | Jurupa Valley | County | Riverside | State | CA | Zip Code 91752 |
| Lender/Client | None | | | | | |



## Subject Photo Page

| Borrower | None | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | |
| City | Jurupa Valley | County | Riverside | State | CA | Zip Code  91752 |
| Lender/Client | None | | | | | |



### Subject Front

4751 Preston St
Sales Price
Gross Living Area      2,831
Total Rooms               7
Total Bedrooms          4
Total Bathrooms        2.1
Location                      Park Influence
View                           Residential
Site                           7,841
Quality                      Good
Age                            9

### Subject Rear

### Subject Street



4751 Preston St
Sales Price
Gross Living Area      2,831
Total Rooms               7
Total Bedrooms          4
Total Bathrooms        2.1

Form PICPIX.SR - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

## Comparable Photo Page

| | |
|---|---|
| Borrower | None |
| Property Address | 4751 Preston St |
| City | Jurupa Valley |
| County | Riverside |
| State | CA |
| Zip Code | 91752 |
| Lender/Client | None |



### Comparable 1

11781 Forsythia St

| | |
|---|---|
| Prox. to Subject | 0.86 miles SW |
| Sales Price | 1,050,000 |
| Gross Living Area | 3,787 |
| Total Rooms | 8 |
| Total Bedrooms | 5 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Site | 7841 sf |
| Quality | Good |
| Age | 10 |

MLS PHOTO



### Comparable 2

11150 Duran Dr

| | |
|---|---|
| Prox. to Subject | 0.11 miles SW |
| Sales Price | 985,000 |
| Gross Living Area | 3,622 |
| Total Rooms | 9 |
| Total Bedrooms | 6 |
| Total Bathrooms | 5.1 |
| Location | Park Influence |
| View | Residential |
| Site | 7841 sf |
| Quality | Good |
| Age | 8 |



### Comparable 3

11414 Corte Los Laureles

| | |
|---|---|
| Prox. to Subject | 0.46 miles W |
| Sales Price | 925,000 |
| Gross Living Area | 2,726 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Site | 8276 sf |
| Quality | Good |
| Age | 11 |

MLS PHOTO

## Comparable Photo Page

| Borrower | None | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 4751 Preston St | | | | | |
| City | Jurupa Valley | County | Riverside | State  CA | Zip Code | 91752 |
| Lender/Client | None | | | | | |



### Comparable 4

11661 Forsythia St

| | |
|---|---|
| Prox. to Subject | 0.73 miles SW |
| Sales Price | 855,000 |
| Gross Living Area | 2,475 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.1 |
| Location | Residential |
| View | Residential |
| Site | 8712 sf |
| Quality | Good |
| Age | 11 |

MLS PHOTO



### Comparable 5

11662 Salvia St

| | |
|---|---|
| Prox. to Subject | 0.73 miles W |
| Sales Price | 965,000 |
| Gross Living Area | 3,378 |
| Total Rooms | 8 |
| Total Bedrooms | 5 |
| Total Bathrooms | 3.1 |
| Location | Residential |
| View | Residential |
| Site | 8712 sf |
| Quality | Good |
| Age | 9 |

MLS PHOTO

### Comparable 6

Prox. to Subject
Sales Price
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location
View
Site
Quality
Age

Douglas Gonzalez (909) 629-4443

# INVOICE

**FROM:**

DOUG GONZALEZ
GONZALEZ APPRAISAL SERVICES
1809 N THIRD AVE
UPLAND, CA 91784

Telephone Number: 909-524-8021     Fax Number: 909-608-7795

**TO:**

E-Mail:
Telephone Number:                    Fax Number:
Alternate Number:

| INVOICE NUMBER | |
|---|---|
| 1053-26 | |
| **DATES** | |
| Invoice Date: | |
| Due Date: | |
| **REFERENCE** | |
| Internal Order #: | 1053-26 |
| Lender Case #: | |
| Client File #: | |
| FHA/VA Case #: | |
| Main File # on form: | 1053-26 |
| Other File # on form: | |
| Federal Tax ID: | |
| Employer ID: | |

## DESCRIPTION

| | | |
|---|---|---|
| Lender: | None | Client: Li Qin Fen & Tong Zhou Qing |
| Purchaser/Borrower: | None | |
| Property Address: | 4751 Preston St | |
| City: | Jurupa Valley | |
| County: | Riverside | State: CA   Zip: 91752 |
| Legal Description: | .18 ACRES M/L IN LOT 154 MB 448/099 TR 31644-1 | |

| FEES | AMOUNT |
|---|---|
| Appraisal Fee w/ Rush | 500.00 |
| Paid | -500.00 |
| | |
| **SUBTOTAL** | |

| PAYMENTS | AMOUNT |
|---|---|
| Check #:      Date:      Description: | |
| Check #:      Date:      Description: | |
| Check #:      Date:      Description: | |
| **SUBTOTAL** | |
| **TOTAL DUE** | **$** 0.00 |

**DOC # 2017-0435959**
10/19/2017 03:52 PM Fees: $27.00
Page 1 of 5
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

**This document was electronically submitted
to the County of Riverside for recording**
Receipted by: MARY #659

**RECORDING REQUESTED BY**
First American Title Company- Subdivision Sale Out

**AND WHEN RECORDED MAIL DOCUMENT TO:**
Qin Fen Li and Zhou Qing Tong
163 North Dommer Avenue
Walnut, CA 91789

_____ Space Above This Line for Recorder's Use Only _____

A.P.N.: 160-432-004-8       Lot 154, Tract 31644-1          File No.: **5092843 (je)**
TRA: 028-114                Serrano Ranch

DOCUMENTARY TRANSFER TAX $559.35;

[ X ]   Computed on the consideration or value of property conveyed; OR

[   ]   Computed on the consideration or value less liens or encumbrances
        remaining at time of sale; [X] City of Jurupa Valley

_Lauren Ramirez_
Signature of Declarant or Agent determining tax- Firm Name

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **PULTE HOME COMPANY, LLC, a Michigan limited liability company,** ("Grantor"),

hereby GRANT(S) to **Qin Fen Li and Zhou Qing Tong, husband and wife as joint tenants** ("Grantee"),

the real property in the City of **Jurupa Valley**, County of **Riverside**, State of **California**, described on Exhibit "A" attached hereto and incorporated herein by this reference.

THE REAL PROPERTY CONVEYED HEREIN BY GRANTOR TO GRANTEE IS CONVEYED AND ACCEPTED SUBJECT TO:   (i)   CURRENT REAL PROPERTY TAXES AND ALL UNPAID GENERAL AND SPECIAL TAXES/BONDS AND ASSESSMENTS;   (ii)   ALL ENCUMBRANCES, EASEMENTS, COVENANTS, CONDITIONS, RESTRICTIONS, RESERVATIONS, RIGHTS, RIGHTS OF WAY RECORD, AND/OR DISCLOSED BY AN INSPECTION.

Dated:  September 29, 2017

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

_____

PULTE HOME COMPANY, LLC,
a Michigan limited liability company

By: _____

Name: _____ **Francine Wallace** _____

Title: _____ **General Sales Manager** _____

**Grantor**

Mail Tax Statements To: **SAME AS ABOVE** or Address Shown Below

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of San Bernardino )

On October 5, 2017 before me, Pamela Lee Berg, Notary Public ,
Date ,    Here Insert Name and Title of the Officer

personally appeared Francine Wallace, General Sales Manager
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

PAMELA LEE BERG
Notary Public – California
San Bernardino County
Commission # 2188414
My Comm. Expires Apr 6, 2021

Signature _Pamela Lee Berg_
Signature of Notary Public

Place Notary Seal Above

──────── OPTIONAL ────────
Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**
Title or Type of Document: Grant Deed    Document Date: 9/29/17
Number of Pages: _____ Signer(s) Other Than Named Above: 2i @ SR

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: Francine Wallace | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☑ Other: General Sales Manager | ☐ Other: _____ |
| Signer Is Representing: Pulte / Centex Homes | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

## EXHIBIT "A"

That certain real property situated in the City of Jurupa Valley, County of Riverside, State of California, described as follows:

Lot 154 of Tract No. 31644-1, in the City of Jurupa Valley, County of Riverside, State of California, as shown on the Map filed in Book 448 of Maps, Pages 99 through 106, inclusive, in the Office of the County Recorder of said County ("**Map**").

EXCEPTING THEREFROM, any and all (i) oil rights, (ii) mineral rights, (iii) natural gas rights, (iv) rights to all other hydrocarbons by whatsoever name known, (v) geothermal heat rights or geothermal substances that may be produced from the property, (vi) water rights and claims or rights to water and (vii) all products derived from any of the foregoing located in or under the property and lying and being at a vertical depth of 500 or more feet below the present natural surface of the ground, but without right of entry on the surface or within a vertical depth of 500 feet below the present surface of the ground.

RESERVING THEREFROM, all easements described in the Declaration (described below), Master Dispute Resolution Declaration (described below), Individual Dispute Resolution Agreement (described below), the Map and all other easement of record.

The real property conveyed in this grant deed ("**Property**") is conveyed and accepted subject to:

1.    Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tract 31644-1 recorded on February 9 2016, as Document No. 2016-0054606 in the Office of the County Recorder of Riverside County, California, and any amendments or supplements thereto (collectively, "**Declaration**");

2.    Master Dispute Resolution Declaration for Tract No. 31644-1 recorded in the Office of the County Recorder of Riverside County, California, on February 9, 2016, as Document No. 2016-0054607, and any amendments and supplements thereto (collectively, "**Master Dispute Resolution Declaration**"), and

3.    Individual Dispute Resolution Agreement for Tract No. 31644-1 recorded concurrently herewith, in the Official Records of the County Recorder of Riverside County, and any amendments or supplements thereto (collectively, "**Individual Disputed Resolution Agreement**"), all of which are incorporated herein by reference to this grant deed with the same effect as though fully set forth herein. As more particularly described in the Declaration, the Property is conveyed subject to certain easements reserved by Grantor. Grantee, in accepting this grant deed and the conveyance hereunder, does hereby agree, jointly and severally, that Grantee will promptly, fully and faithfully comply with and conform to the Declaration.

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

## GRANTEE ACCEPTANCE AND AGREEMENT

The undersigned Grantee, by acceptance of this Grant Deed, and each future owner by acceptance of fee title to the Property herein conveyed, agrees it is accepting title to the Property subject to all matters set forth in this Grant Deed, including, without limitation, the Declaration, the Master Dispute Resolution Declaration and the Individual Dispute Declaration Agreement.

_____   _____
Qin Fen Li                   Zhou Qing Tong

GRANTEE

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _California_ )SS
COUNTY OF _Riverside_ )

On _10-17-2017_, before me, _R-BROWN_, Notary Public, personally appeared _Qin Fen Li and Zhou Qing Tong_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

```
R. BROWN
Notary Public - California
Riverside County
Commission # 2182223
My Comm. Expires Feb 28, 2021
```

*This area for official notarial seal*

Mail Tax Statements To:  **SAME AS ABOVE** or Address Shown Below

_____